**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
|  | ) | Case No. 23-11071 (PB) |
|  | ) |  |
| 560 SEVENTH AVENUE OWNER SECONDARY LLC, | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| Debtor. | ) |  |

## <u>MOTION FOR RELIEF FROM STAY</u>

**AREPIII MVTS, LLC** and **CREP TIMES SQUARE HOTEL LLC** (together,

"<u>Secured Party</u>")[1], by its attorneys Paul Hastings LLP, respectfully moves the Court for an

Order, pursuant to 11 U.S.C. §362(d) of the Bankruptcy Code (the "<u>Bankruptcy Code</u>"), granting

relief from the stay provided by §362(a) of the Bankruptcy Code, and in support thereof, alleges

as follows:

1.      By this motion, Secured Party seeks relief from the stay provided by §362(a) of

the Bankruptcy Code to permit it to proceed with a UCC disposition of collateral securing a loan

owed to it by 560 Seventh Avenue Owner Secondary LLC (the "<u>Debtor</u>"), which UCC collateral

disposition was automatically stayed as a result of the filing of the Chapter 11 petition herein on

July 9, 2023, just one day before the scheduled public auction.  As will be shown in more detail

herein, the Debtor is indebted to Secured Party in an amount in excess of $85 million, which

indebtedness is secured by 100% of the membership interests in 560 Seventh Avenue Owner

---

[1] Whenever Secured Party is referenced herein, it shall mean either AREPIII MVTS, LLC, individually, before the sale of 50% of the Mezz Loan referenced herein, or both AREPIII MVTS, LLC and CREP Times Square Hotel LLC, together, after the sale of 50% of the Mezz Loan.

Primary LLC ("Primary"), a Delaware limited liability company with its principal place of

business in New York County, the owner in fee simple of the Margaritaville Times Square

Resort (the "Property").[2]

## THE PARTIES AND THE PROPERTY

2.    The Property is collectively encumbered by a total direct and indirect

indebtedness of approximately $365 million (exclusive of exit fees, selling/transfer costs,

accrued liabilities and other obligations).  This aggregate indebtedness is comprised of a senior

mortgage loan on the Property (with a current accrued balance of approximately $167 million,

before any reserves held by the "Senior Lender"), a senior mezzanine loan owed to Secured

Party (the "Mezz Loan," with a current accrued balance of approximately $85 million), and a

junior mezzanine loan (with an initial principal balance of $85 million and a current accrued

balance of approximately $113 million, according to the default notice and interest shortfall

notice issued by the "Junior Mezzanine Lender" on March 31, 2023).

3.    The Debtor, a Delaware limited liability company with its principal place of

business in New York County, is the legal and beneficial owner of 100% of the membership

interests in Primary.  On information and belief, the only asset of the Debtor is the membership

interests in Primary and the only creditor of the Debtor is Secured Party.  As the sole member of

Primary, the Debtor fully controls the operation of the Property.[3]

---

[2] The exhibits referred to in this motion are extremely voluminous, and the terms of some are highly confidential.
The Debtor is in full possession of all of the exhibits referred to in this motion.  Copies will be made available for
inspection by the Court and other parties in interest at the scheduled hearing on this motion.

[3] Whenever this motion refers to the Property and its operations, it is referring to Primary, as the direct owner of the
Property, and/or the Debtor by virtue of its indirect control of Primary as its sole member.

## THE RELEVANT TRANSACTIONS

4.    On September 13, 2021, pursuant to a Mezzanine Loan Agreement (the "Mezz Loan"), the Secured Party made a mezzanine loan to the Debtor in the original principal amount of $57,000,000.

5.    To secure the repayment of the Mezz Loan, on September 13, 2021, the Debtor entered into a Pledge and Security Agreement, in which the Debtor granted to the Secured Party a first priority security interest in the assets and membership interest of the Debtor (the "Pledged Membership Interest").

6.    On July 22, 2022, the Secured Party sold 50% of its interest in the Mezz Loan to CREP Times Square Hotel LLC ("CREP"), an entity controlled by Corten Real Estate Partners ("Corten").  The Debtor executed replacement notes each in the amount of $28,500,000 to the Secured Party and CREP.

## DEFAULTS UNDER THE MEZZ LOAN

7.    Over the last six months, the Debtor has repeatedly defaulted under the Mezz Loan.  The Debtor does not dispute and has never disputed that these defaults have indeed occurred, and none of these defaults have been remedied to date.

8.    On March 9, 2023, an Event of Default occurred under the Mezz Loan when the Debtor failed to make its regularly scheduled monthly debt service payment.  The Debtor has failed to make four consecutive monthly debt service payments to date.

9.    On March 10, 2023, Secured Party delivered written notice to the Debtor of the Event of Default with respect to the Debtor's failure to make its March debt service payment, and separately noted that Secured Party was still awaiting receipt of a 2023 budget in a form reasonably satisfactory to Secured Party.

10.     On May 1, 2023, two additional Events of Default occurred under the Mezz Loan when the Debtor failed to deliver the required financial reporting for both the month of March 2023 and the fiscal year 2022 within the required periods set forth in the Mezz Loan.   Secured Party delivered notice of these additional Events of Default to the Debtor on May 18, 2023.

11.     On May 30, 2023, Secured Party delivered written notice to Olsen, Pearl & Olsen, the firm that prepared and audited certain financial statements relating to the Property and the Debtor, which requested that Secured Party's financial advisor have access to the Debtor's books, records and accounts in Olsen's possession.  This request was made following discussions between Secured Party and the Debtor regarding finances at the Property, as well as the deficient financial reporting submissions of the Debtor.  Olsen, Pearl & Olsen declined to provide such access, claiming they were not authorized by the Debtor to do so.

12.     On June 29, 2023, IMCMV Times Square LLC, the lessee under the food and beverage operator lease at the Property ("F&B Operator"), delivered written notice to the Debtor of certain defaults under the applicable lease with the F&B Operator.  These defaults included unpaid room service charges, resort fee payments, repair costs, and retail space development costs totaling more than $1 million.

13.     On June 30, 2023, Secured Party delivered written notice to the Debtor that the default under the F&B Operator's lease (as well as an amendment by the Debtor of the lease without first obtaining Secured Party's prior written consent, as required under the Mezz Loan) constitutes an additional Event of Default under the Mezz Loan.

## DEFAULTS UNDER OTHER AGREEMENTS

14.     The Debtor has not merely repeatedly defaulted on the Mezz Loan.  Secured Party has also received multiple default notices from the Senior Secured Party and the junior mezzanine secured party (the "Junior Mezz Secured Party").

15.     Regarding Senior Secured Party, Primary defaulted on March 10, 2023 (for non-payment), April 11, 2023 (for failure to fund required interest reserves), on May 11, 2023 (for failure to make scheduled debt service payment, tax deposit, and insurance deposit, and failure to pay all funds on deposit in a property account in the agreed-upon order and priority), and on June 12, 2023 (for failure to make scheduled debt service payment and failure to pay funds deposited into the property account in accordance with the parties' agreement, including failure to pay certain operating expenses incurred at the property from collected revenues).

16.     Likewise, regarding the Junior Mezz Secured Party, 560 Seventh Owner Mezz LLC, the Debtor's affiliate and the owner of 100% of the membership interests in the Debtor, defaulted on March 31, 2023 (for an interest shortfall) and on April 28, 2023 (for an interest shortfall).

17.     Additionally, the Garment Center Congregation (the "Congregation") filed an action against affiliates of the Debtor due to their failure to provide replacement space for a synagogue in the Property.  *See Garment Center Congregation v. Seventh Avenue Development, LLC, et al.*, Index No. 654427/2022 (Sup. Ct., N.Y. Cnty.).  The Congregation gave up the space it originally occupied on the Property prior to its development in exchange for an agreement from the Debtor's affiliates that they would build a new replacement space.  This replacement space has never been built.

**SECURED PARTY MOVES FORWARD WITH UCC DISPOSITION**

18.     On April 10, 2023, Secured Party delivered written notice to the Debtor that Secured Party would exercise its rights under the Mezz Loan and related documents of its intention to sell the membership interest in Primary to the highest qualified bidder in a UCC disposition to be conducted on July 10, 2023 at 10:00 am EST.

## THE DEBTOR'S ATTEMPT TO STOP THE UCC DISPOSITION

19.     On June 28, 2023, the Debtor commenced an action in the Supreme Court of the State of New York, County of New York, seeking a preliminary injunction and a temporary restraining order to delay the UCC disposition claiming that the proposed UCC disposition was not being conducted in a commercially reasonable manner.  The next day, at a hearing before the state court during which the Debtor pressed for a temporary restraining order, the state court judge denied the request and set the matter down for a further hearing on July 7, 2023.  At that further hearing, the state court judge again denied the request for a temporary restraining order and denied the request for a preliminary injunction.  As a last minute attempt to further thwart the Secured Party and delay the UCC disposition, the Debtor filed the petition herein.

## THE DEBTOR'S REPEATED FAILURE TO REFINANCE THE MEZZ LOAN

20.     In its complaint filed in the Supreme Court of the State of New York, County of New York, seeking to temporarily restrain and preliminarily enjoin the UCC disposition, the Debtor and its affiliates also alleged it had been negotiating with approximately a dozen potential lenders and investors and strongly believed the Property could soon be effectively positioned for a successful refinancing.  In the petition filed herein, the Debtor asserts that its "ultimate business goal" is to "refinance the Hotel's existing mortgage and mezzanine debt based on negotiated pay-off with creditors."  But, the assertions that the Debtor and its affiliates are close to refinancing the property are simply not credible.

21.     For over a year, the Debtor has claimed to have adequate refinancing opportunities and, for over a year, the Debtor has failed to make good on those claims or to provide even basic support for its assertions that it has capital partners lined up.  Even when the Debtor made proposals to refinance the Mezz Loan, those offers were always far below the total indebtedness outstanding on the Mezz Loan, which now totals approximately $85 million.

22.     On May 19, 2022, Secured Party received a letter from one Patrick Fisher, Head of Capital Markets at Soho Properties (the entity controlled by Mr. Sharif El-Gamal, a principal of the Debtor), communicating a desire to pay off the Mezz Loan for $65 million. Mr. Fisher claimed that they had "secured the capability from a $900 billion+ dollar financial institution with whom we have a multi-decade relationship," but he claimed that "[d]ue to the sensitive nature of the transaction, we are not authorized to share the term sheet or disclose information with respect to their funding guidelines." Upon receiving this letter, Secured Party indicated to Mr. El-Gamal that this offer was insufficient, but agreed to negotiate further in good faith, and the parties entered into a pre-negotiation agreement.

23.     On June 10, 2022, Secured Party received a second term sheet from Mr. Fisher, which increased the offer to pay off the Mezz Loan at $73 million. Secured Party responded with a $74 million counter-offer and informed the Debtor that it was in advanced discussions to sell 50% of its interest under the Mezz Loan to CREP and would move forward with that transaction if it was unable to come to terms with the Debtor, including the posting of a deposit and providing evidence of the Debtor's ability to move forward with a transaction. The Debtor did not accept Secured Party's counter-offer, so Secured Party proceeded with the transaction to sell 50% of its interest under the Mezz Loan to CREP on July 22, 2022.

24.     On March 26, 2023, Mr. El-Gamal sent Secured Party an e-mail memorandum indicating he was in Saudi Arabia preparing a proposal to pay off the Mezz Loan, which he would circulate no later than March 30, 2023. On March 30, 2023, Mr. El-Gamal sent Secured Party an e-mail memorandum offering to acquire the Mezz Loan for $57 million in the name of a newly formed entity. Mr. El-Gamal's e-mail memorandum enumerated several factors affecting the value of the Property, many of which (including a lack of stability in operations, the vacancy

of the retail space, the fact that hotel operations are likely to become subject to a collective

bargaining agreement, and the fact that the Property is unlikely to recover the synagogue space)

were within the Debtor's control.  Secured Party rejected this offer as insufficient, and noted that

the offer was $16 million—or 22%—below Secured Party's proposal from nine (9) months

earlier.  At this point, the Debtor was aware that the Property would be subjected to a collective

bargaining agreement, but withheld that information from Secured Party as well as its other the

secured parties.

25.    On April 6, 2023, Mr. El-Gamal sent Secured Party an e-mail memorandum

offering to acquire the Mezz Loan for $66 million.  Mr. El-Gamal never provided any

information on Mr. El-Gamal's partner on this offer or its commitment level to the proposed

transaction.

26.    On May 22, 2023, Mr. El-Gamal's brother cold-called Brandon Flury at Corten to

see if Corten would be interested in refinancing the senior loan and the Mezz Loan (*i.e.*, seeking

to refinance Corten's own investment), not knowing that Corten was already a participant in the

Mezz Loan.  Unsurprisingly, these discussions were not fruitful, but the fact that the Debtor was

cold-calling prospective investors to find capital partners suggests that the Debtor did not have

capital sources lined up.

27.    On June 26, 2023, Mr. El-Gamal sent Secured Party an e-mail memorandum

claiming that the Debtor had a new capital source, but he admitted that the "situation was fluid"

and would be less than an immediate repayment of the Mezz Loan at $70 million.  In this same

e-mail memorandum, Mr. El-Gamal threatened to put the Debtor in bankruptcy if Secured Party

did not grant an extension to the July 10, 2023 UCC disposition.  On June 26, 2023, Defendant

rejected the Debtor's request to delay the UCC disposition.

## THE DEBTOR CANNOT BE TRUSTED TO RUN THE PROPERTY ANY LONGER

28.    The Debtor has severely mismanaged the Property, has failed to pay financial obligations of the Property which were reported as being paid, has diverted millions of dollars from the Property accounts, has defaulted on its franchise, management, and lease agreements, and is accruing financial penalties on a daily basis, all of which put the Property in financial peril.  Due to this mismanagement, it was imperative that the UCC disposition proceed immediately to ensure that there is no further dissipation in the value of the Property.

29.    According to the company that manages the hotel, there are over $4 million in unpaid bills at the Property, including over $400,000 worth of bounced checks, even though the Debtor had reported that those bills had been paid (and, in the case of the bounced checks, that funds had been set aside for payment before being diverted into other accounts controlled by the Debtor).  It is also the understanding of Secured Party that revenues received during the month of March 2023 were not properly allocated toward operating expenses or remitted to the Senior Secured Party to cover debt service, and in fact were apparently diverted from the hotel bank accounts into separate accounts controlled by the Debtor, in violation of the terms of the loan agreements.  As a result, the Senior Secured Party implemented cash management procedures, and multiple vendors and utility companies were close to either discontinuing service or filing claims against the Property.

30.    The Debtor has repeatedly failed to comply with information requests by the Hotel & Gaming Trades Council, AFL-CIO ("HTC") to provide employee information related to the unionization of the Property.  As a result of the non-compliance, on May 8, 2023, a penalty for non-compliance of $41,866 per day was imposed on the Property.  Secured Party understands that this penalty is currently accruing, and Secured Party has not received any evidence to suggest that the required information has been provided to the HTC.  Assuming this is accurate,

the total accrued penalty as of July 10, 2023, the date originally set for the UCC disposition, would have been approximately $2.6 million. The additional delay in the UCC disposition would thus have resulted in additional penalties totaling approximately $2.5 million to $3.8 million. The Debtor has also prevented the Property from being managed effectively by refusing to pay the Dream Hotel Group ("DHG"), the hotel manager, for the past two years, as well as by refusing DHG's request to assign its management agreement.

31.     This mismanagement, along with the defaults under the various loan agreements and the F&B Operator's lease, are jeopardizing the Property's very valuable Margaritaville food and beverage lease, which brings in $3.6 million in revenue per year, as well as the license agreement and ability to operate as a Margaritaville hotel. The Debtor also appears to have deliberately delayed leasing of the first floor retail space, which is expected to generate up to $200,000 per month in rental income. The Debtor also appears to have stalled the process of leasing the space on a temporary basis, which would generate $50,000 to $100,000 per month.

## THE PROPERTY IS TOTALLY UNDER WATER

32.     The futility of the Debtor's attempts to refinance are made clear in light of the fact that the Property is totally under water. Total outstanding indebtedness on the Property owed to the Senior Secured Party, the Secured Party and the Junior Mezzanine Secured Party totals $365 million (exclusive of exit fees, selling/transfer costs, accrued liabilities and other obligations). The Debtor has alleged that the Property has a value of between $266 million and (at most) $350 million, based on a May 2023 appraisal. However, the Debtor's valuation is overstated by virtue of the fact that the Property is apparently now subject to a collective bargaining agreement, a fact that was improperly withheld from Secured Party, and, presumably, withheld from the appraiser. As a result of the unionization of the hotel, the Property value is

likely significantly less than even the $252 million balance of the Senior Loan and the Mezz

Loan.

33.      In fact, on multiple occasions, Mr. El-Gamal told Secured Party during telephone

conversations that the Property is worth far less than the outstanding debt and that it was clear

Secured Party would never recoup everything it is owed.  Indeed, Mr. El-Gamal said as much in

a June 26 email.  ("The result here is that proceeds will not allow for an immediate repayment of

the senior mezzanine loan at the ~$70m level you were seeking[.]").

## SECURED PARTY IS ACTING IN GOOD FAITH

34.      The Debtor has alleged that Secured Party intends to seize control of the Property

and benefit from the Debtor's hard work.  Secured Party has never breached any aspect of the

Mezz Loan and the Debtor has never alleged otherwise.  Secured Party has done everything

reasonably possible to ensure that the UCC disposition was a success, including hiring Newmark

and JP&R to conduct the marketing and run the auction itself.  Indeed, the engagement

agreement between Secured Party and Newmark states that the UCC disposition is to be

commercially reasonable and that Newmark's commission is contingent upon running a

commercially reasonable process.

35.      In addition, more importantly, the Debtor had been afforded every opportunity to

participate in the UCC disposition under the same conditions as any other bidder.  The Debtor

was also entitled to pay off the Mezz Loan in full at any time before the UCC disposition and

retain the Property.

## THE DEBTOR IS ACTING IN BAD FAITH

36.      The Debtor's conduct with respect to Secured Party and the Property has

consistently been in bad faith, and the filing of the petition herein is further evidence of such.

37.    **License Agreement**.  Franchise is everything to a hotel property.  The entire Property has been branded as a Margaritaville hotel.  On May 15, 2023, the franchisor sent a letter providing an accounting of the outstanding invoices owed to Margaritaville by the Debtor, stating that the unpaid balance was $1,205,935.31, with $1,187,206.38 being past due. This letter notes that these invoices span from October 2022 through May 2023.

38.    Since at least October, the Debtor has been engaging in fraud, reporting to Secured Party that it has been paying these franchise fees when in fact the Debtor has not.  The 2022 monthly P&L statement reports that for October-December 2022, over $100,000 per month generated at the property was being allocated to pay to the franchisor.  However, the spreadsheet attached to the franchisor's letter shows that this amount was never paid.  It is believed that all of these amounts remain due to franchisor.   Under the Mezz Loan, the Debtor was required to use these amounts to pay the franchisor its fees, or these amounts should have been remitted to the Senior Secured Party.  Secured Party has no idea where this money went, and had to engage a forensic accountant (Marcum) at considerable expense to try to locate these funds.

39.    There is a real risk that the Debtor's conduct will cause the Property to lose the Margaritaville franchise, and that risk increases every day that the Debtor remains in control of the Property and the membership interest in Primary and can continue to run the hotel.  Under the license agreement, the franchisor can terminate at any point based on failure to pay.  The Secured Party cannot allow this agreement to be terminated.  The Debtor has also filed the petition herein in order to delay Secured Party's ability to dispose of the collateral, and thus the Debtor is putting the hotel at risk.   As a result of the filing of the petition herein, in the next 90 days, franchisor has immediate right to terminate under agreement, all the while the value of the hotel declines.

40.  **IMC.**  Secured Party closed on the Mezz Loan on September 13, 2021.  Under the

Mezz Loan, the Debtor cannot enter into amendments to major leases without Secured Party's

approval.  This provision is designed to protect Secured Party against the Debtor's decisions that

could significantly impact amounts due from third parties at the Property.  During a conversation

had on June 27, 2023 with David Crabtree, the President of the F&B Operator, Secured Party

learned that, unbeknownst to Secured Party, the Debtor entered into a third amendment to the

F&B Operator lease on September 14, 2021—the very day after Secured Party consummated the

loan—that reduces the amounts due under this key lease.  At no point did the Debtor seek, let

alone obtain, Secured Party's consent for this amendment.  If the UCC disposition is further

delayed, the Debtor could possibly enter into other amendments/modifications to key third party

agreements, reducing those parties' financial obligations, without seeking or obtaining Secured

Party's consent.  Those amendments/modifications could significantly reduce the value of the

collateral, and would be binding on any third-party bidder.

41.  **Management Agreement**.  Most every hotel property is managed by a third-party

management company responsible for the hotel's overall strategy to generate business and run

the day-to-day operations of the hotel.  Pursuant to the management agreement, DHG has been

the manager of this Property since September 2021.  Although DHG has been managing the

Property, and is entitled to management fees for doing so, the Debtor has failed to pay it a single

penny of the management fees owed to date.  DHG commenced an arbitration to force the

Debtor to pay or let them out of the management agreement.  On May 15, 2023, arbitrators

issued a final ruling determining that the Debtor owes DHG $1,402,729.83 in management fees

and reimbursable expenses.  The arbitrators also awarded DHG attorneys' fees and costs

exceeding $1.6 million.  Secured Party understands that none of this has been paid.

42.    As with the franchise fees, the Debtor represented to Secured Party that it had

been paying these management fees all along.  The Debtor gave Secured Party financial

reporting that it was paying these amounts due, but it was in fact not paying these amounts and

instead was pocketing the money.  If the Debtor is not paying those fees, then those amounts are

required to be paid to the Senior Secured Party under the loan agreements.  The Debtor has

claimed to have paid $802,306 in management fees for 2022 but, as reflected in the arbitration

award, this was a blatant misrepresentation.  Again, under the Mezz Loan, the Debtor was

required to use these amounts to pay the management fees, or would have been required to remit

them to the Senior Secured Party to cover interest payments.

43.    If the scheduled UCC disposition is further delayed, the current situation with

DHG as manager will have a serious impact on the overall value of the collateral.  No hotel

management company has any incentive to dedicate the resources to properly manage a hotel if it

is not being paid.  Since February 2023, DHG, in particular, has moved away from its hotel

management business and transitioned all of its other hotel management contracts to other

reputable managers.  In April 2023, DHG requested consent from the Debtor that the

management agreement be assigned to Highgate Hotels, which is a reputable hotel manager with

the resources to manage the Property.  All of the Secured Parties, including Secured Party, gave

consent to this assignment, but the Debtor refused to grant its consent.

44.    Because DHG does not operate a hotel management company any longer, and the

Debtor is not paying it to manage the Property, DHG has neither the ability nor the motivation to

properly run the hotel.  This has a serious impact on the value of Secured Party's collateral.  The

hotel is currently going through its annual RFP process to attract corporate accounts and business

contracts for bookings in 2024 and 2025.  That entire RFP process must be done within the next

90 days, which is when corporate accounts schedule their bookings for the upcoming two

years.  Should Secured Party be the successful bidder at the UCC disposition, it plans to change

the manager immediately so that the new manager will devote the appropriate resources to

ensure that these corporate accounts and contracts are secured before it is too late.  The Debtor is

blocking that from happening, trying to hold DHG to a contract it has no incentive to

perform.  Without ability to change the manager immediately, any successful bidder will

recognize the lost business opportunities that will not be recaptured.  The longer the UCC

disposition is delayed, the more business will be lost.  Clients simply will not book corporate

events at a poorly managed hotel, one in the middle of a UCC Disposition process, or one that is

the subject of a pending bankruptcy proceeding.

      45.    **F&B Operator Demand.**  The Property has several spaces designed for food and

beverage operations, including a hotel restaurant, bar, and rooftop skyline space.  These spaces

are leased, pursuant to a long term lease, so that the entire hotel is consistent with the

Margaritaville brand.  The F&B Operator is what gives this hotel its Margaritaville identity.  The

F&B Lease generates approximately $3.6 million per year in payments to the Debtor through the

full term of that lease, and it is backed by a corporate guaranty.  Under the F&B Lease, the

Debtor is required to pay various amounts to the tenant for provision of the F&B services to

guests of the hotel.  On June 29, 2023, the F&B Operator gave notice that the Debtor owed over

$1 million in past due amounts under the F&B lease and demanded that the Debtor pay the full

amount due by July 15, 2023.  On information and belief, as of this date, none of this has been

paid.  If F&B Lease is terminated, two things would happen.  First, the hotel would turn from a

full service hotel to a limited service hotel without any F&B Operations, significantly impacting

occupancy levels and occupancy rates.  Second, the ultimate owner of the hotel would need to

find a replacement F&B tenant or tenants for all of these spaces, switching away from the Margaritaville theme, which would devalue the collateral.

46.     **Threatened Electricity Shutdown.**  The Debtor also failed to stay current with their utility payments.  In fact, on April 28, 2023, ConEdison sent a "Final Termination Notice of Non-Residential Rights" to the Property due to an unpaid bill.  An electrical shutdown would obviously have catastrophic results for the functioning of the hotel.  Moreover, if the Debtor stops paying other vendors, which at this point seems entirely possible, then vendors will refuse to deal with us on credit.

47.     **Protective Advances.**  In order to ensure that the senior loan did not go into default, the Secured Party was forced to make approximately $3.7 million in protective advances.

## CAUSE AND LACK OF ADEQUATE PROTECTION

48.     Section 362(a) of the Bankruptcy Code provides, *inter alia*:

> ". . . a petition filed under section 301 . . . of this title . . . operates as a stay applicable to all entities of -- . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; (4) any act to create, perfect, or enforce any lien against property of the estate; . . .."

However, §362(d) of the Bankruptcy Code provides:

> "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay -- (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; . . .."

49.     For all of the reasons stated herein, Secured Party has clearly shown cause for this Court to grant relief from the stay, including a lack of adequate protection of its interest in the membership interest in Primary, the only collateral it holds for its loan and the only asset of the Debtor.  The Debtor has defaulted on practically all of its financial obligations and has put the

very operation of the Property in serious jeopardy.  The Debtor's own statements, in an attempt

to negotiate a reduced pay-off of the Secured Party's debt, was that the Property is subject to a

lack of stability in operations, vacancy of the retail space, the fact that hotel operations are likely

to become subject to a collective bargaining agreement, and the fact that the Property is unlikely

to recover the synagogue space, are in and of themselves evidence of the continued deterioration

of the Property and the collateral held by Secured Party.  Any further delay in permitting Secured

Party to proceed with the UCC disposition will have a disastrous effect on Secured Party and the

operation of the Property.

## THE DEBTOR DOES NOT HAVE AN EQUITY IN THE MEMBERSHIP INTEREST IN PRIMARY AND SUCH MEMBERSHIP INTEREST IS NOT NECESSARY TO AN EFFECTIVE REORGANIZATION

50.    Section 362(d) of the Bankruptcy Code further provides:

> "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay -- . . . (2) with respect to a stay of any act against property under subsection (a) of this section if – (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization; . . ..

51.    The Debtor, by its own admission, does not have an equity interest in the

membership interest in Primary and such membership interest is not necessary to an effective

reorganization.  This bankruptcy case is essentially a one-on-one dispute between the Debtor's

sole creditor holding a security interest in the Debtor's sole asset.  By the Debtor's own

statement in the petition commencing this case, the sole objective for this filing is to secure

refinancing of the Property, something with which it has been unable to do to date despite

significant efforts, and to negotiate a reduced pay-out with its secured lenders, something it has

been unable to do to date despite significant efforts and something its secured lenders have

rejected to date.

WHEREFORE, Secured Party respectfully requests that the Court grant this motion and

terminate the stay provided by §362(a) of the Bankruptcy Code so as to permit Secured Party to

proceed with the UCC disposition of the membership interest in Primary and grant such other

and further relief as may to the Court appear appropriate.

Dated: New York, New York
        July 12, 2023

PAUL HASTINGS LLP

By:    /s/ Harvey A. Strickon
            Harvey A. Strickon

Attorneys for Secured Party

200 Park Avenue
New York, NY 10166
Tel:    (212) 318-6380
Fax:    (212) 230-7689
e-mail: harveystrickon@paulhastings.com

# **PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 23-11071 (PB) |
| 560 SEVENTH AVENUE OWNER SECONDARY LLC, | |
| Debtor. | |

### ORDER PURSUANT TO 11 U.S.C. § 362(d) GRANTING RELIEF FROM THE AUTOMATIC STAY IMPOSED BY 11 U.S.C. § 362(a)

Upon the motion dated July 12, 2023 (the "Motion"), of AREPIII MVTS, LLC and CREP TIMES SQUARE HOTEL LLC (with any subsequent successor or assign, the "Secured Party"), for an order, pursuant to section 362(d) of title 11 of the United States Code (the "Bankruptcy Code"), granting relief from the automatic stay imposed in this case by section 362(a) of the Bankruptcy Code as to the Secured Party's interest in the membership interest in 560 Seventh Avenue Owner Primary LLC (the "Property") to allow the Secured Party's enforcement of its rights in, and remedies in and to, the Property; and due and proper notice of the Motion having been made on all necessary parties; and the Court having held a hearing on the Motion on August 3, 2023; and the above-captioned debtor (the "Debtor") having opposed the relief requested in the Motion (the "Objection"); and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing, it is hereby

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the automatic stay imposed in this case by section 362(a) of the Bankruptcy Code is terminated under section 362(d) of the Bankruptcy Code as to the Secured

Creditor's interest in the Property to allow the Secured Creditor's enforcement of its rights in,

and remedies in and to, the Property

Dated: New York, New York
        August ___, 2023

_____

UNITED STATES BANKRUPTCY JUDGE