| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>-------------------------------------------------------------x<br>In re:<br><br>560 Seventh Avenue Owner Secondary LLC,<br><br>　　　　　　　　　　　　　　Debtor.<br>-------------------------------------------------------------x | Hearing Date and Time:<br>August 3, 2023 at 11:00 a.m.<br><br>Chapter 11<br><br>Case No.  23-11071-PB |

**DEBTOR'S OPPOSITION TO MOTION OF SECURED MEZZANINE
LENDER FOR RELIEF FROM THE AUTOMATIC STAY**

　　　　The debtor herein, 560 Seventh Avenue Owner Secondary LLC (the "Debtor"), as and for its Opposition to the motion of AREPIII MVTS LLC and CREP Times Square Hotel LLC (jointly, the "Mezz Lender") seeking relief from the automatic stay pursuant to 11 U.S.C. §362 (the "Lift Stay Motion"), respectfully states and alleges as follows:

**Overview**

　　　　1.　　The Debtor is the mezzanine entity holding the 100% membership interest in 560 Seventh Avenue Owner Primary LLC, which owns and operates the Margaritaville Resort Times Square Hotel located at 560 Seventh Avenue, New York, NY (the "Hotel").  The Hotel project first began in 2014 and took about seven years to complete, including about two years of active construction.  Because the Hotel's opening in 2021 coincided with the ongoing pandemic and, later on, unprecedented increases in interest rates, full stabilization has been delayed into 2024.  Nevertheless, the Hotel remains a solid asset and, once fully stabilized, will be able to obtain a significant exit financing to address creditor claims.

　　　　2.　　The Hotel contains 234 guest rooms, plus 34,271 square feet of retail space.  Most of the retail space, save for approximately 5,000 square feet on the corner of 40th Street, is leased to International Meal Company, Inc. ("IMC").  IMC is a preferred vendor of the franchisor, Margaritaville Enterprises ("Margaritaville"), and operates a restaurant at the Hotel, paying the

1

Debtor approximately $300,000 per month in rent while providing food and beverage services to Hotel guests and patrons. The Hotel also has the ability to add auxiliary services such as a spa or additional retail leasing if a settlement can be implemented with the Garment Center Congregation ("GCC").

3. The Hotel has an appraised value in the range of between $273 million and $302 million, as per an appraisal report dated July 28, 2023 (the "Appraisal")[1], with a potential stabilized value of between $307 million to $339 million as of April 1, 2025. A copy of the Appraisal is annexed hereto as Exhibit "A". The Appraisal undercuts the false narrative that the Hotel is totally underwater. The question of "solvency" may be different insofar as equity holders are concerned, but there should be no rush to judgment concerning the Debtor's reorganization prospects until the Hotel has had an opportunity to achieve full stabilization.

4. Operationally, the Hotel employs approximately 75 people (with an average weekly payroll of approximately $100,000). Based on current data, the Hotel's occupancy is clearly on the rise. The Hotel generated monthly operating revenues of $2.79 million in May and $2.71 million in June 2023. Improved revenues are projected through the end of the year as reflected by the attached detailed operating budget and cash statements for May and June, annexed hereto as Exhibits "B" and "C", respectively.

5. This Chapter 11 case is symbiotically tied to the upcoming Chapter 11 bankruptcy filing by the Hotel itself. The Hotel's anticipated Chapter 11 filing is in process and should be

---

[1] The Appraisal has been updated since the Debtor reached agreement with the Hotel and Gaming Trades Council (the "Hotel Union") on a Memorandum of Understanding ("MOU") after the Hotel Union was designated as the Hotel's collective bargaining representative for House Persons and Room Attendants following a card count certification on February 9, 2023. The final version of the MOU will ensure labor peace at the Hotel and quiet the Mezz Lender's concerns in that regard.

finalized prior to the return rate of the Lift Stay Motion, or shortly thereafter.[2] A resolution has already been passed by the Hotel's Independent Managers authorizing the Hotel's Chapter 11 bankruptcy filing, a copy of which is annexed hereto as <u>Exhibit</u> "D". Additionally, the Chapter 11 filing by the Hotel (replete with anticipated use of cash collateral) is being actively discussed with counsel for OWS BCA Funding LLC (the "<u>Senior Mortgage Lender</u>"), which holds a first mortgage against the Hotel. The Senior Mortgage Lender is also in possession of approximately $3.2 million in unrestricted cash from prior lock-box collections. Besides this unrestricted cash, the Debtor has just learned that the Senior Mortgage Lender recently applied other reserves it was holding totaling $10,457,461.72 to reduce the senior mortgage balance to $156,652,018.10. This was done on July 13, 2023 (four days after the Debtor's Chapter 11 filing). Whether the application of funds was proper remains to be seen, but there has been a significant reduction in the first mortgage debt over the past two weeks.

6. Going forward, it is projected that the Hotel can generate sufficient revenues to pay post-petition debts, including some level of debt service owed to the Senior Mortgage Lender. The real estate taxes and insurance relating to the Hotel are fully paid through the end of the year.

7. With operations improving, it is both premature and wrong to doom the entire project to failure merely because the Debtor is not yet in a position to refinance the mezzanine debt. The Court will soon be presiding over a very active and viable hotel operation in Times Square which is now enjoying high occupancy rates of 95% or more for the months of April, May and June 2023. This represents a significant improvement from the start of the year and the trend is plainly moving upward.

---

[2] The reason why the bankruptcy cases were not filed together is attributable to the fact that the Debtor and Hotel have different sets of Independent Managers who requested that the decisions to file bankruptcy on behalf of each company be considered separately.

3

8. The Debtor's management has been aggressively seeking DIP financing so as to be in a position to refinance the Hotel's existing senior mortgage debt and provide additional liquidity to further stabilize and enhance Hotel operations. The Debtor is heartened to report that a workable term sheet has also been recently received from Cirrus REP Funding LLC for potential DIP financing of up to $170 million. A copy of the term sheet with proposed uses and sources of cash is annexed hereto as Exhibit "E". Obviously the term sheet is not a commitment, but the Hotel expects to complete due diligence soon so as to be in a position to close on DIP financing in the early fall, assuming approval of the DIP financing can be obtained from the Bankruptcy Court.

9. The development was conceived in the belief that the leasing of the commercial retail space on the corner of 40th Street would attract a national tenant. Because of intervening adverse market conditions, the anticipated leasing of this retail space has not yet occurred. However, the location has the potential to generate additional operating income of between $2 to $4 million per year, which will add further value to the Hotel ($20-$40 million based upon a current market multiplier of ten). A central aspect of the Debtor's overall business plan is to seek out a tenant for the remaining retail space in the upcoming months.

10. Yet, despite all of these positives, the Mezz Lender filed the Lift Stay Motion with the ink hardly dry on the petition, unfairly alleging purported mismanagement of the asset in the most conclusory fashion. It suffices to say that the allegations of mismanagement are and will be contested and cannot be fairly decided without a full trial on the merits.

11. Surprisingly, the Mezz Lender has moved without any true evidentiary support. Instead, the Lift Stay Motion appears to be driven by pique because the Debtor was unable to refinance the mezzanine loan quickly enough and sought Chapter 11 relief on the eve of a UCC

4

Article 9 foreclosure sale. These events are quite commonplace in bankruptcy and do not by themselves constitute proper grounds to lift the stay. As one court explained:

> The Creditor . . . has not proven by a preponderance of the evidence that the Debtor filed its chapter 11 case as a litigation tactic for the purpose of stalling the Creditor's state court rights, or to open the door for expanded legal sparring of state court issues in bankruptcy court. Its bad faith arguments are quite conclusory and, in the judgment of the Court, manifest its understandable "frustration" with the Debtor's bankruptcy filing rather than a showing of the Debtor's "abuse of judicial purpose." Simply checking off these factors on the list does not prove bad faith.

*In re R & G Properties, Inc.*, 2009 WL 1076703, at *2 (Bankr. D. Vt. Apr. 16, 2009)(internal citations omitted).

12.  Stripped of its *ad hominem* arguments, the Mezz Lender offers no evidence whatsoever that its collateral (*i.e.*, the equity interest in the Hotel) is actually declining in value, which is the benchmark for assessing adequate protection in bankruptcy. As this Court recently pointed out in a similar context, to establish a lack of adequate protection, ". . . a lender invoking 363(e) relief needs to make a prima facie case not only as to the validity of its liens, but also that its collateral is declining in value." *In re Golden Seahorse LLC*, 2023 WL 2472970 (Bankr. S.D.N.Y. 2023).

13.  As the party seeking stay relief, the Mezzanine Lender has the burden to make a *prima facie* showing with actual evidence that cause exists for relief from the stay. *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1825 (2d Cir. 1990). Unless and until the Mezz Lender meets its evidentiary burden (which the Debtor believes it cannot do), the Lift Stay Motion must be denied. In the interim, the Debtor, in conjunction with the Hotel, should be provided a fair and reasonable opportunity to implement its business plan in bankruptcy. The familiar standard for deciding stay relief under *United Savings Association v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375-76, 180 S.Ct. 626 (1987) ("*Timbers*") is whether a confirmable Chapter 11 plan can be

5

achieved within a reasonable period of time. A decision of this magnitude cannot be made within the first few weeks of the Chapter 11 filing.

## Factual Background

14. The Mezz Lender's allegations conflate the Hotel's growing pains during difficult market conditions with poor mismanagement. This Opposition is intended to provide the Court with a more balanced assessment of the Hotel's true potential.

### A. Genesis of the Loans

15. The development of the Hotel in began 2014. The current set of lenders came on the scene in the fall of 2021 (just after the Hotel's opening), to refinance earlier acquisition and construction financing provided by Related Real Estate Partners. The Senior Mortgage Lender funded a first mortgage totaling $167,000,000 on September 13, 2021, which included $32 million in reserves to address remaining construction issues and fund carry costs through the stabilization process. Part of the reserves were an "Additional Collateral Reserve" in the amount of $2,158,147.62, which were not allocated to a specific purpose.

16. As of February 23, 2023 the Hotel anticipated a shortfall in the debt service reserves in the coming months and requested that the Senior Mortgage Lender transfer the Additional Collateral Reserve to the Debt Service Reserves. This request was denied without a formal response. Instead, on March 23, 2023, the Senior Lender sent a demand to replenish the Debt Service Reserves in the amount of $2,447,761.00.

17. The Hotel was declared in default on or about April 7, 2023, whereupon various lock-box arrangements went into effect. Unfortunately, the declaration of a default by the Senior Mortgage Lender had a cascading effect on the Hotel's other obligations. The Hotel's non-

6

management financial investors stopped funding the mezzanine loans, which also went into default.

18. While the Mezz Lender asserts a total debt of $87 million, it has not provided any itemization of the specific components of the claim. On its face, the claim appears inflated by runaway default interest charges that will be challenged in bankruptcy. The loan started in the principal amount of $57 million and it is difficult to conceive that $30 million of interest and fees legitimately accrued, particularly since a default did not occur until March of this year.

19. Besides the senior mezzanine loan, the development is also subject to a junior mezzanine loan in the principal amount of $85 million held by Global One Real Estate Investment Trust and its affiliates ("Global One"). The junior mezzanine loan is secured by a pledge of the 100% membership interest in the Debtor owned by 560 Seventh Owner Mezz LLC. While the junior mezzanine loan is also in default, no action has been taken by Global One to foreclose its pledge.

### B. The Debtor is Not Guilty of Mismanagement

20. The Lift Stay Motion is predicated on character attacks against the Hotel's management, citing various business disputes and arrears as proof of mismanagement. However, these attacks do not square with improving trends at the Hotel. In the pages that follow, the Debtor will address the major areas of concern raised by the Mezz Lender.

#### 1. Status of the Franchise Agreement with Margaritaville

21. The Debtor concurs that maintaining good relations with the franchisor, Margaritaville, is a top priority. However, contrary to the Mezz Lender's insinuations, the Hotel's franchise is not in peril. Due to lock-box constraints, arrears in franchise fees and royalties have grown to well over $1 million and Margaritaville has not been paid in some time. Ultimately,

these arrears must be paid and cured, but it is noteworthy that despite the arrears Margaritaville has <u>not</u> issued a notice of termination or taken any action to end the relationship.

22. Like any franchisor, Margaritaville is interested in getting paid, and has been in communication with the lenders regarding outstanding balances. A letter to this effect dated May 15, 2023 is annexed hereto as <u>Exhibit</u> "F" itemizing the amounts due at that time and requesting payment without threat of termination. Thus, the Mezz Lender's fears that the Hotel is danger of losing the franchise is misplaced. To the contrary, published reports indicate that Margaritaville is happy with the location and plans to remain in Times Square for a long time. (*See*, https://www.the-sun.com/money/8572455/margaritaville-resort-ownership-hotel-new-york-city-bankruptcy/).

### 2. Status of Management Agreement

23. The Mezz Lender correctly notes that the Debtor has been in litigation with its hotel management company, Dream Hotel Group ("<u>DHG</u>"). Dating back to 2021, the Hotel issued a notice of termination to DHG and believes that DHG fraudulently induced execution of its agreement based upon a host of false promises. The dispute went to formal arbitration. Unfortunately, the arbitration went against the Hotel, which suffered an adverse ruling that led to a monetary award. The claims of DHG will be addressed in bankruptcy, if not through a state court appeal.

24. Going forward, the relationship with DHG is irrevocably fractured. Accordingly, the Hotel intends to retain a new management company in conjunction with its own Chapter 11 filing. DHG has done little to improve operations over the last several months, and with new management, it is hoped that the Hotel can improve direct bookings (which are more profitable) and increase the Hotel's average nightly room rates.

### 3. The IMC Lease

25. The Hotel's lease with IMC likewise is in arrears but is not subject to a formal notice of default. Amounts claimed by IMC remain subject to reconciliation based upon corresponding debits and credits. The Debtor views IMC's demands as being overstated, including some $120,000 in "estimated" charges, while IMC has not recognized some $329,786.77 in charges owed to the Hotel. Moreover, still additional charges are disputed, leaving a much-reduced balance which ultimately will be fully reconciled and resolved as part of a lease assumption process.

### 4. Status of GCC

26. When the project was conceived, the property was subject to a 100-year land lease with GCC. As part of the development, the Hotel entered into an agreement to relocate the synagogue from the site for an interim period of time, and thereafter move GCC back into redeveloped basement space at the Hotel. The agreement stalled after GCC did not provide final approval for its build-out, leading to ongoing litigation.

27. In the interim, at least $5,168,204.82 was previously deposited in reserve out of the 2021 refinancing proceeds. Until July 13, 2023, these funds were being held by the Senior Mortgage Lender before being re-allocated to pay down the mortgage debt. At any rate, the Debtor recognizes that the situation with GCC will need to be resolved. While the issues are complex, there is no basis to vacate the automatic stay due to the ongoing disputes with GCC.

### 5. Prior Reporting

28. The Hotel has historically provided detailed and accurate reporting to its lenders on an accrual basis. The fact that various reported items were not paid is consistent with accrual reporting and does not mean that the reports were false or misleading.

9

## Legal Analysis

A.  **Section 362(d)(1) – Lack of Adequate Protection Has Not Been Established**

29. Whether or not the Mezz Lender is fully secured or partially secured remains to be seen. One thing is certain, however, the Mezz Lender is not a creditor of the Hotel and has no lien against the Hotel's assets. Its lien, to the extent valid, attaches solely to the membership interest in the Hotel (*i.e.,* equity). Thus, the question presented at this early stage becomes what are the Mezz Lender's entitlements to adequate protection pending a full evaluation of the Hotel's solvency? On the one hand, if the Mezz Lender is totally unsecured, then it is not entitled to any adequate protection at all. *See, In re Koger*, No. 12-31409, 2013 WL 4666738, at *3 (Bankr. S.D. Ill. Aug. 30, 2013) (adequate protection "is to protect an entity's interest in property against a decrease in value and to afford it the benefit of its bargain . . . The concept is not applicable to unsecured creditors who, by definition, do not have interests in property"); *In re Access Air, Inc.,* No. 99–04498–CH, 2000 WL 35798996, at *3 (Bankr. S.D. Iowa 2000) ("[A]dequate protection is not available to the unsecured creditor.").

30. On the other hand, if the Mezz Lender is partially secured, then it is entitled to some level of adequate protection, which can take various forms outside of the payment of post-petition interest. *See, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. supra*, 484 U.S. at 382, 108 S. Ct. at 636 ("the undersecured petitioner is not entitled to interest on its collateral during the stay to assure adequate protection under 11 U.S.C. § 362(d)(1)"). It is also possible that the Mezz Lender is fully secured, in which event an equity cushion in the Hotel constitutes sufficient adequate protection by itself.

31. In the Debtor's view, until the value of the Mezz Lender's claim is fully ascertained, adequate protection is achieved through maintaining and improving the Hotel's operations to

10

prevent any diminution in value. As highlighted by this Court in *In re Golden Seahorse LLC, supra*, 2023 WL 2472970:

> . . . a lender invoking 363 (e) relief needs to make a prima facie case not only as to the validity of its liens, but also that its collateral is declining in value. If the lender bears that prima facie case and satisfies it, the burden then shifts to the debtor to disprove that showing or alternatively to show that the lender is adequately protected despite a decline in the value of its collateral.
>
> Here, I don't need to address other means of adequate protection such as an equity cushion, replacement liens, or other payments. The question is just whether the value of the collateral is declining. The parties have not addressed whether the Lenders have satisfied their prima facie case on that issue, to the extent the Lenders have the burden of so proving.

*Id.*, at *7 (internal citations omitted).

32. The shifting burden of proof was examined at length by the Hon. Stuart M. Bernstein in *In re Elmira Litho, Inc.*, 174 B.R. 892 (Bankr. S.D.N.Y. 1994), cited in *Golden Seahorse, supra*. As Judge Bernstein explained, once the moving creditor has established the validity of its secured claim, it has the burden of proving that its position is imperiled by a potential decline in value of its collateral as a result of the automatic stay, at which point the burden shifts to the Debtor to prove either that the collateral is not declining in value, or that the Mezz Lender is otherwise adequately protected by an equity cushion, payments or otherwise. *Id.,* at 902-903. *See, also, In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1825 (2d Cir. 1990) (movant "has the burden to make a prima facie should that 'cause' exists for relief from the stay").

33. Here, the Mezz Lender has failed to meet its burden. It provides <u>no</u> actual proof of either the correct amount of its claim, the validity of its pledge and security agreement and, most importantly, ignores entirely the need to establish that the value of the Debtor's membership interest is actually declining in value.

11

34. In fact, the Mezz Lender spins a false narrative when it argues that the Hotel is completely underwater because the total liens exceed $365 million. While this aggregate number is inflated, any amounts owed to Global One do not properly factor into the equation since Global One's pledge is junior to the pledge held by the Mezz Lender. As Judge Bernstein instructed in *Elmira Litho*:

> the equity cushion under § 362(d)(1) ignores junior liens and focuses on the *creditor's* interest in the collateral. *In re Hinchliffe,* 164 B.R. at 51; *In re Colonial Center, Inc.,* 156 B.R. 452, 460 (Bankr. E.D.Pa. 1993); *In re Morysville Body Works, Inc.,* 86 B.R. at 56 n. 8; *In re Jug End in the Berkshires, Inc.,* 46 B.R. at 899; *see generally* 1 Queenan § 8:18, at p. 8:75. Thus, although a debtor may lack equity in its property, a senior lienor may nonetheless enjoy a substantial equity cushion in that property.

*In re Elmira Litho, Inc., supra*, 174 B.R. at 904.

35. While the Mezz Lender spends considerable time arguing that there is no adequate protection, there is no proof of an actual diminution in value even though the Mezz Lender bears the initial burden of proof. At this point, the issue of adequate protection cannot be decided without discovery and an evidentiary hearing after August 3, 2023. *See*, Local Bankruptcy Rule 9014-2 ("The first scheduled hearing in a contested matter will not be an evidentiary hearing at which witnesses may testify, unless (a) the Court gives prior notice to the parties that such hearing will be an evidentiary hearing . . . .").

B.  **Section 362(d)(1) – Cause Has Not Been Shown of Purported Mismanagement**

36. The Mezz Lender's arguments that cause exists for stay relief by reason of mismanagement are equally unavailing. These contentions essentially boil down to that the Hotel defaulted on various payments to its creditors, has open disputes with the hotel management company, DHG, and is involved in a pending litigation with GCC over replacement space. None of these matters rises to the level of "cause" to vacate the stay, nor does the Mezz Lender cite any

cases in support of this contention. Moreover, contrary to the Lift Stay Motion, the Hotel is on the brink of reaching labor peace with the Hotel Union based on recent negotiations which are expected to culminate in the MOU.

37. That the Hotel defaulted on certain obligations prior to bankruptcy is as newsworthy as "dog bites man". Considering that the Hotel opened and has operated under the spectre of the pandemic, it should not be surprising that the Debtor's operations did not meet initial expectations. However, business is improving and the forecasts are positive, as reflected by the charts annexed as <u>Exhibits</u> "B" and "C".

38. The disputes with DHG go beyond simple nonpayment, as the Hotel was and remains dissatisfied with the services performed. Nevertheless, losing the arbitration is not proper grounds for vacating the automatic stay.

39. Similarly, the Mezz Lender also mischaracterizes the dispute between the Hotel and GCC over replacement space for the synagogue. That GCC commenced litigation (perhaps as a negotiating strategy) is also not evidence of mismanagement. The matter will be addressed once GCC makes up its mind as to how it wants to proceed. At this point, it is doubtful that GCC will return to the location. Accordingly, the Hotel believes that a resolution with GCC will be based on a monetary payment to be negotiated during bankruptcy.

C. **Section 362(d)(2) – No Showing Has Been Made That the Debtor and Hotel are Incapable of Reorganizing**

40. The Mezz Lender also seeks to vacate the stay under Section 362(d)(2), which permits the stay to be modified with respect to specific property only if "(A) the debtor does not have any equity in such property; and (B) such property is not necessary to an effective reorganization."

41. At this point, it cannot be said that the Debtor's membership interest in the Hotel has no equity value. However, even if a lack of equity was actually established, the inquiry does not end there, as the Mezz Lender would still have establish the second element or prong under Section 362(d)(2), that the membership interest in the Hotel is "not necessary to an effective reorganization."

42. Clearly, continued ownership of the Hotel is necessary for any reorganization of the Debtor. Whether an effective reorganization can be achieved is more subjective, but at this very early stage, the Debtor should be given the benefit of all reasonable inferences consistent with *Timbers*, where the Supreme Court held that the Debtor is entitled to latitude under 11 U.S.C. §362(d)(2) in determining whether a confirmable Chapter 11 plan can be filed within a reasonable time. 484 U.S. at 375-76. Moreover, the Supreme Court also duly noted that when a motion for stay relief is made in the early stages of a bankruptcy case the courts "demand less detailed showings" of reorganization prospects. *Id.,* at 376.

43. This case is still very much in its infancy, with DIP financing on the horizon, leading to the prospect of enhanced asset values and revenues, and ultimately the ability to attract additional exit financing. Going forward, the Debtor and the Hotel will have various methods available to deal with the Mezz Lender, including the ability to provide the indubitable equivalent of its claim by, for example, giving the Mezz Lender the same collateral it has now, a pledge of the Debtor's ownership interest in the reorganized Hotel. Indeed, in *In re Transwest Resort*, 881 F.3d 724 (9th Cir. 2018), the Ninth Circuit affirmed confirmation of a plan which provide no distribution to the holder of the mezzanine loan and extinguished the mezzanine debtor's ownership interest in the operating debtors.

14

44.     The term sheet issued from a potential DIP lender is a hopeful sign that refinancing can be obtained in relatively short order to allow the Hotel to achieve full stabilization. As the case is less than one month old, the Debtor is well within the "reasonable time" allotted by the Supreme Court in *Timbers* for proceeding with a plan. Thus, cause under Section 362(d)(2) has not been established.

WHEREFORE, for all of the reasons set forth above, the Debtor respectfully submits that the Lift Stay Motion should be denied in its entirety.

Dated: New York, New York
　　　 July 30, 2023

　　　　　　　　　　　　　　　　　　　　　　Goldberg Weprin Finkel Goldstein LLP
　　　　　　　　　　　　　　　　　　　　　　Proposed Attorneys for the Debtor
　　　　　　　　　　　　　　　　　　　　　　125 Park Avenue, 12th Floor
　　　　　　　　　　　　　　　　　　　　　　New York, NY 10017


　　　　　　　　　　　　　　　　　　　　　　By:    /s/ Kevin J. Nash, Esq.