**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| | ) Case No. 23-11071 (PB) |
| | ) |
| 560 SEVENTH AVENUE OWNER SECONDARY LLC, | ) |
| | ) |
| | ) |
| | ) |
| Debtor. | ) |

### SECURED PARTY'S REPLY TO DEBTOR'S
### OPPOSITION TO MOTION FOR RELIEF FROM STAY

**AREPIII MVTS, LLC** and **CREP TIMES SQUARE HOTEL LLC** (together,

"Secured Party")[1], by its attorneys Paul Hastings LLP, respectfully submits this reply to the

"Debtor's Opposition to Motion of Secured Mezzanine Lender for Relief from the Automatic

Stay" dated and filed July 30, 2023 (the "Opposition") [ECF Doc 19], and in support thereof,

alleges as follows:

      1.      By Secured Party's motion (the "Motion"), Secured Party seeks relief from the stay

provided by §362(a) of the Bankruptcy Code to permit it to proceed with a UCC disposition of

collateral (the "UCC Disposition") securing a loan (the "Loan") owed to it by 560 Seventh Avenue

Owner Secondary LLC (the "Debtor"). The UCC Disposition was scheduled to take place on July

10, 2023, and was automatically stayed as a result of the filing of the Chapter 11 petition herein

---

[1] Whenever Secured Party is referenced herein, it shall mean either AREPIII MVTS, LLC, individually, before the sale of 50% of the loan referenced herein, or both AREPIII MVTS, LLC and CREP Times Square Hotel LLC, together, after the sale of 50% of the loan.

on July 9, 2023, just one day before the scheduled auction and following the Debtor's unsuccessful

effort to obtain an injunction from the New York State Supreme Court to stop the sale.

2.      As demonstrated in the Motion, the Debtor is indebted to Secured Party in an

amount in excess of $85 million, which indebtedness is secured by 100% of the membership

interests in 560 Seventh Avenue Owner Primary LLC ("Primary"), the owner in fee simple of the

Margaritaville Times Square Resort (the "Property" or the "Hotel").  As was also demonstrated

in the Motion, there is no dispute that the Debtor is in default under the Loan or that Secured Party

has every right under the loan documents to proceed now with the UCC Disposition.

3.      Simply put, there is nothing in the Debtor's Opposition that would justify

maintaining the automatic stay to prevent the UCC Disposition from proceeding.  The Debtor's

Opposition is directed solely to the business affairs of Primary and the Property itself and the

multitude of issues affecting the Property, its operation and its value.   But, the Opposition

completely ignores the facts and circumstances specifically applicable to this Debtor and to this

case before the Court.  Any discussions of the Property bear only on the value of Secured Party's

collateral and whether or not Secured Party is entitled to the relief sought by the Motion.  This

bankruptcy case is nothing more than a one asset, one creditor case.  There is nothing to reorganize

and no possibility of confirming any plan of reorganization.

4.      The Property is collectively encumbered by a total direct and indirect indebtedness

of approximately $355 million (exclusive of exit fees, selling/transfer costs, accrued liabilities and

other obligations).  This aggregate indebtedness is comprised of a senior mortgage loan on the

Property (with a current accrued balance of approximately $157 million,[2] before applying any

---

[2] A previous balance of approximately $167 million was just recently reduced by Senior Lender by approximately
$10 million, due to the application of reserves held by Senior Lender and not as a result of any payment by Primary.

remaining reserves held by the "Senior Lender"), plus the senior mezzanine Loan owed to Secured
Party (with a current accrued balance of approximately $85 million), plus a junior mezzanine loan
(with an initial principal balance of $85 million and a current accrued balance of approximately
$113 million, according to the default notice and interest shortfall notice issued by the "Junior
Mezzanine Lender" on March 31, 2023).

5.      As of today, there is no reasonable possibility of repaying or refinancing the entire
debt stack applicable to the Property, let alone any significant portion thereof.  In simple terms,
the Property is grossly overleveraged, and the ultimate equity holders are wiped out in total.  The
suggestion that Primary is set to file its own Chapter 11 petition is nothing more than an attempt
to further delay the inevitable in this case.  Possessing a non-committal term sheet for $170 million
of refinancing is not evidence of an ability to satisfy any significant portions of the debt stack.  As
has now been confirmed by the Debtor's own schedules filed July 30, 2023, the only asset of the
Debtor is its membership interest in Primary, and the only known creditor of the Debtor is Secured
Party.

6.      As a first point of attack in its Opposition to the Motion, the Debtor submits that
the Hotel itself has an appraised value in the range of between $273 million and $302 million and
a potential stabilized value of between $307 million and $339 million some two years from now.
In support of these values, the Debtor presents to the Court what is captioned as a "Pricing Opinion
of Value." This "Pricing Opinion of Value" cannot be taken as an accurate reflection of the
Property's real value for several reasons.  First, the "Pricing Opinion of Value" is not a full,
qualified appraisal, and cannot be viewed as such.  Second, even if it could, the only relevant
valuation contained in that document is what the Property is worth today, which the Debtor
contends is $273 million to $302 million.  What the Hotel may be worth two years from now,

assuming its operations can indeed be stabilized in two years, is irrelevant to what the Hotel is worth today and irrelevant to the question of whether the ultimate equity holders have any actual equity here, which they do not by their own admissions. Third, the Debtor's "Pricing Opinion of Value" intentionally ignores the significant fact that the Gaming Trades Council has already been designated as the Hotel's collective bargaining representative for House Persons and Room Attendants (something acknowledged by the Debtor in footnote 1 of its Opposition, but something the Debtor totally failed to disclose to its evaluator), and therefore the Hotel will inevitably be unionized.[3] As is confirmed in the letter annexed hereto as Exhibit A, and as is widely known in the industry and was discussed extensively between Secured Party and the Debtor before the closing of the Loan in 2021, the unionization of the hotel would reduce the value of the Property from between 15% and 20%, would substantially reduce the ability of Primary to refinance its debt and/or to sell the Hotel, and would further reduce the possibility of repaying the Loan in full. A 15% reduction in the value of the Property would equate to a corrected market value of between $232 million and $275 million against almost $400 million of indebtedness and unfunded obligations, and a 20% reduction in the value of the Property would equate to an even lower corrected market value. Fourth, the Debtor deliberately withheld other relevant factors from the evaluator, all of which materially affect the Property's value. For example, the evaluator was instructed to assume that the GCC synagogue space (which is described below and is the subject of pending litigation), would be leased out as retail, and to assume that the 12,698 square feet would rent for $125/sq. ft. However, the GCC lease provides for an annual rental of only $1/annum, through 2076. Ignoring this lease (and assuming that the Debtor will prevail in the

---

[3] Unionization of the Hotel was confirmed as early as March 23, 2022 when the Union had majority support of housekeeping employees, which was reaffirmed with a second card count on February 2, 2023 and adjudicated with a March 17, 2023 award in favor of the Union (when a daily penalty of $41,886 was imposed if the Hotel failed to provide documentation within 10 days).

pending litigation by the synagogue seeking to enforce it) inflates the annual income by $1,587,250. The evaluator was further instructed to assume that an additional 1,683 square foot mezzanine would be constructed above the existing retail space, increasing the rentable square footage from 4,765 sq. ft. to 6,731 sq. ft. At an assumed lease rate of $450/sq. ft., that equates to an overstatement of income by $884,700 per annum. Significantly, none of these assumptions include any costs associated with renovation of the space, tenant improvements, buildout of the mezzanine, or resolution of the GCC lease. As a clear sign of the Debtor's tendency toward misconduct, the historical financials provided to the evaluator differ materially from the financials provided to Secured Party, inflating 2022 Net Income from $5.1M to $7.0M (Exhibit B). This inflated Net Income served as the basis for the evaluator's *pro forma*, significantly overstating future earnings of the Property. An example of information that was withheld from the evaluator is the fact that the food and beverage lessee receives 40% of the Resort Fee charged to guests, amounting to $1.2M in 2022 and budgeted to be $1.4M in 2023 according to the Debtor's 2023 Budget. But the evaluator included these amounts as if they would be paid to the Debtor and not to the lessee. Historical franchise fees are also significantly understated which, again, fails to take into account actual expenses of the Property. Lastly, the Debtor fails to address how the many operational issues affecting Primary and the Property directly affect the value of the membership interest in Primary, the collateral for the Loan.

7.      As was noted in the Motion, Margaritaville Enterprises, the franchisor of the Hotel, claimed to be owed $1,205,935.11 as of May 11, 2023 (as per its letter attached to the Opposition

as Exhibit F).   Under the license agreement, the franchisor can terminate at any point based on failure to pay.  Secured Party cannot allow this agreement to be terminated.[4]

8.        As was also noted  in the Motion, Primary owes substantial arrears to its food and beverage operator.  On June 29, 2023, the food and beverage operator gave notice that Primary owed over $1 million in past due amounts under the food and beverage lease and demanded that Primary pay the full amount due by July 15, 2023.  This indebtedness was funded by Secured Party, in the form of a protective advance, to prevent the food and beverage lessee from declaring a default under and terminating its lease.  If the food and beverage lease is ever terminated, the Hotel would turn from a full service hotel to a limited service hotel, without any food and beverage operations, significantly affecting occupancy levels and occupancy rates.  The ultimate owner of the Hotel would then need to find a replacement food and beverage tenant or tenants, switching away from the Margaritaville theme, which would further devalue the value of Secured Party's collateral.  Secured Party cannot allow this agreement to be terminated.[5]

9.        Additionally, since the filing of the Motion, it has come to the attention of Secured Party that the Debtor's ongoing disputes with the hotel manager, DHG TSQ, LLC ("Dream"), resulted in an adverse judgment being entered against Primary on July 13, 2023 in favor of Dream for the amount of $3,111,115.25.  A copy of such judgment is annexed hereto as Exhibit C.  While the Debtor now asserts in its Opposition that "the relationship with [Dream] is irrevocably fractured" and that "[a]ccordingly, the Hotel intends  to retain a new management company," previously in April 2023 Dream requested consent from the Debtor that the

---

[4] It should be noted that monies owed to Margaritaville Enterprises were withdrawn from the Property, despite the fact that the Debtor provided financial documents to Secured Lender representing that those monies would be used to make payment to the franchisor.

[5] As was the case with monies owed to Margaritaville Enterprises, it should also be noted that monies owed to the food and beverage lessee were likewise withdrawn from the Property and not used to make payment the

management agreement be assigned to Highgate Hotels, which is a reputable hotel manager with the resources to manage the Property.  All of the Property's direct and indirect secured parties, including Secured Party, gave consent to this assignment, but the Debtor refused to grant its consent.

10.     On July 14, 2023, a mechanic's lien was filed against the Property by Flintlock Construction Services LLC ("Flintlock"), Primary's general contractor, claiming an unpaid balance due of $2,763,091.77.  On July 11, 2023, a mechanic's lien was filed against the Property by Broadtrade Group Inc., an apparent subcontractor of Flintlock, claiming an unpaid balance due of $302,158.56.  Copies of these mechanic's liens are annexed hereto as Exhibit D.

11.     Lastly, there is a major ongoing dispute with the Garment Center Congregation ("GCC" or the "synagogue") over Primary's failure to provide and construct a replacement facility at the Property.  The details of this dispute, which highlight the unethical business practices of Primary and one of its major principals, describe claims against Primary for injunctive relief and damages in excess of $5,000,000.00 (which amount does not even include the potential costs relating to the construction of the Replacement Premises at the Property ) and are set forth in the Amended Complaint of GCC, a copy of which is annexed hereto as Exhibit E.

12.     With all of this going on, the Debtor's assertion that Primary is being properly managed is far from credible. Numerous parties could at any time declare defaults, terminate critical agreements, and/or pursue remedies under judgments that would be devastating to the Property's value.  Primary is managed by Soho Properties ("Soho"), an affiliate of the Debtor.  A public sale of the membership interest in Primary and a resulting change in ownership and management of Primary is clearly the best route to a resolution of these problems, rather than

through the purely vindictive Chapter 11 filing by the Debtor and the threatened Chapter 11 filing by Primary.

13.     Any assertions that the Debtor and its affiliates are close to refinancing the Property are simply not credible.  First and foremost, it should be obvious that there is little appetite in the market to provide the level of financing necessary to satisfy the existing debt when taking into account the actual value of the Property.  Tellingly, the Debtor's failed efforts to refinance are fully set forth in the Motion.  Simply reiterated, for over a year the Debtor has claimed to have adequate refinancing opportunities and, for over a year, the Debtor has failed to make good on those claims or to provide even basic support for its assertions that it has capital partners lined up.  Even when the Debtor made proposals to refinance the Loan, those offers were always far below the total indebtedness outstanding on the Loan.

14.     Secured Party has never breached any aspect of the Loan and the Debtor has never alleged otherwise, so no legal or logical basis exists to preclude Secured Party from pursuing its remedies based on the Debtor's default.

15.     To summarize, what was set forth in a recent draft proposed restructuring plan submitted to Secured Party by the Debtor totally undercuts the arguments presented by the Debtor in its Opposition.  According to the Debtor's own draft reorganization plan, the Hotel had the following indebtedness:

| | |
|---|---|
| Senior Loan (OWS – net of reserves): | $165,656,253 |
| Senior Mezz Loan | $ 85,000,000 |
| Junior Mezz Loan | $113,135,873 |
| 560 Lender | $ 11,667,010 |
| | |
| Cumulative Loans: | $375,459,136 |

In addition to what the Debtor disclosed in its draft reorganization plan, there are apparently tens of millions of dollars of additional claimed liabilities:

| | |
|---|---|
| Obligations to GCC | $5M - $10M |
| Past due payables for which funds<br>    were diverted by Primary[6] | $4M - $5M |
| Additional past due payables | $1M - $2M |
| Dream judgment | $3.1M |
| Potential union judgment[7] | $2M - $4M |
| Mechanic's liens | $3M |

Burdened with that amount of debt, it is ludicrous for the Debtor to claim that there is any equity whatsoever in the membership interest in Primary, the sole collateral for the Loan. It is also ludicrous to claim that the Property is being properly managed by Soho, its affiliate. In addition to running up huge unpaid bills, the Debtor gives no credible explanation as to why leasing of the commercial retail space, which the Debtor claims could potentially generate an additional $2-4 million per year, has not yet commenced. And, Secured Party was compelled to make aggregate protective advances of $2,425,305.74 to the Senior Lender in response to demands by Senior Lender to cover debt service and replenish reserves in order to prevent the Senior Mortgage from going into default.

16.    Secured Party could go on and on with describing the plethora of problems plaguing the Property and responding to the false accusations made by the Debtor in support of its Opposition to the Motion. So as to make a complete record, Secured Party has prepared detailed responses to the Debtor's accusations, which responses are incorporated and made a part of this Reply as <u>Exhibit F</u> hereto. But, suffice to say, the simple issue before the Court is whether there

---

[6] This amount represents items that were budgeted by Primary and funded by Senior Lender, but the funds were never used to pay these items.
[7] This item represents potential liability to the Union for assessed daily penalties resulting from Primary's failure to provide the Union with required documentation relating to the unionization of the Hotel.

is indeed any equity in Secured Party's collateral and whether there is any scenario where any effective reorganization is possible. The simple answer is "NO."

WHEREFORE, Secured Party respectfully requests that the Court grant the Motion and terminate the stay provided by §362(a) of the Bankruptcy Code, so as to permit Secured Party to proceed with the UCC Disposition of the membership interest in Primary and to exercise any and all of its other rights and remedies attributable to the Loan, and grant such other and further relief as may to the Court appear just and proper.

Dated: New York, New York
      August 1, 2023

PAUL HASTINGS LLP

By:    /s/ Harvey A. Strickon      
            Harvey A. Strickon

Attorneys for Secured Party

200 Park Avenue
New York, NY 10166
Tel:    (212) 318-6380
Fax:    (212) 230-7689
e-mail: harveystrickon@paulhastings.com

# EXHIBIT A



200 West 41st Street, Suite 602
New York, NY 10036
(212) 300-6684
www.lwhospitalityadvisors.com

August 1, 2023

Greg Denton
Managing Director
Arden Group
1600 Market St, Suite 2600
Philadelphia PA 19103

Re:     Pricing Opinion of Value of the Margaritaville Resort Times Square
        560 7th Ave
        New York, New York County, NY 10018

        LWHA® Job No.: 23-NY-674AC

To Mr. Denton:

We were retained to conduct a pricing opinion of Margaritaville Resort Times Square with an effective date of January 1, 2023. The report was delivered on March 2, 2023. Under the assumptions and considerations contained in the pricing opinion completed, the concluded value range of the as is market value as of the effective date was $268,700,000 to $316,200,000. The range of the as stable market value as of January 1, 2025, was $304,100,000 to $357,000,000. At the time of the pricing opinion, we were informed that the property was non-union, and projected accordingly as a non-union asset. As such, our opinions of value were based upon the assumption of continued operation as a non-union hotel.

We have been asked to advise the Client on impact on value of unionizing the property. While we have not conducted an independent assessment of this potential impact, based upon our experience with hotels in New York City, discussions with asset managers local to the Manhattan market, and a review of union expense comparables, we believe unionization would cause a decrease in cash flows and would **likely result in a downward impact on value in the range of 15% to 20%** below the value range concluded to in our pricing opinion.

The charts contained herein summarize the limited analysis conducted to produce this letter. *Please note this letter should not be considered or relied upon independent of the complete pricing opinion report dated March 2, 2023. No updated financial information or data has been considered.*



## Union Hotel – Expense Comparables

The below comparables are unionized full-service hotels located in Manhattan. Please note the comparables are masked for confidentiality purposes.

***Note, the line items highlighted in yellow indicate departments expected to be most impacted by unionization at the subject property.***

| Category | Comp Weighted Average | | | Comp Hotel 1 | | | Comp Hotel 2 | | | Comp Hotel 3 | | | Comp Hotel 4 | | | Comp Hotel 5 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ratio to Sales | PAR | POR | Ratio to Sales | PAR | POR | Ratio to Sales | PAR | POR | Ratio to Sales | PAR | POR | Ratio to Sales | PAR | POR | Ratio to Sales | PAR | POR |
| **Revenue** | | | | | | | | | | | | | | | | | | |
| Rooms Revenue | 83.3% | 105,595 | 315.89 | 89.2% | 98,014 | 380.42 | 87.6% | 101,675 | 362.34 | 85.8% | 90,998 | 295.41 | 91.3% | 64,997 | 278.33 | 78.8% | 118,132 | 297.36 |
| Food & Beverage Revenue | 11.2% | 15,735 | 43.14 | 8.9% | 9,725 | 37.75 | 9.0% | 10,409 | 37.10 | 2.4% | 2,521 | 8.19 | 0.0% | 0 | 0.00 | 16.3% | 24,413 | 61.45 |
| Other Operated Departments Revenue | 0.6% | 613 | 2.26 | 1.9% | 2,111 | 8.19 | 0.9% | 992 | 3.54 | 1.0% | 1,022 | 3.32 | 0.1% | 98 | 0.42 | 0.0% | 0 | 0.00 |
| Miscellaneous Income | 0.5% | 688 | 1.73 | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 0.9% | 1,315 | 3.31 |
| Amenity/Resort Fee Revenue | 3.5% | 4,471 | 12.74 | 0.0% | 0 | 0.00 | 2.6% | 2,991 | 10.66 | 4.3% | 4,556 | 14.79 | 8.5% | 6,071 | 26.00 | 4.0% | 5,978 | 15.05 |
| Retail Lease Income | 0.5% | 547 | 1.78 | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 3.4% | 3,654 | 11.86 | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 |
| Food & Beverage Lease Income | 0.5% | 492 | 1.60 | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 3.1% | 3,282 | 10.65 | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 |
| **Total Revenue** | 100.0% | 128,141 | 379.13 | 100.0% | 109,851 | 426.36 | 100.0% | 116,067 | 413.64 | 100.0% | 106,033 | 344.22 | 100.0% | 71,166 | 304.75 | 100.0% | 149,838 | 377.17 |
| **Departmental Expenses** | | | | | | | | | | | | | | | | | | |
| Rooms Expense | 41.2% | 43,060 | 129.55 | 37.8% | 37,090 | 143.95 | 41.6% | 42,312 | 150.79 | 43.4% | 39,465 | 128.12 | 54.9% | 35,704 | 152.89 | 39.9% | 47,143 | 118.67 |
| Food & Beverage Expense | 124.6% | 20,388 | 58.20 | 213.0% | 20,712 | 80.39 | 184.7% | 19,224 | 68.51 | 71.6% | 1,805 | 5.86 | 0.0% | 191 | 0.82 | 116.2% | 28,373 | 71.42 |
| Other Operated Departments Expense | 17.2% | 127 | 0.43 | 6.7% | 142 | 0.55 | 0.0% | 0 | 0.00 | 62.5% | 638 | 2.07 | 100.2% | 98 | 0.42 | 0.0% | 0 | 0.00 |
| **Total Departmental Expenses** | 49.4% | 63,575 | 188.19 | 52.7% | 57,944 | 224.90 | 53.0% | 61,536 | 219.30 | 39.5% | 41,909 | 136.05 | 50.6% | 35,993 | 154.13 | 50.4% | 75,516 | 190.09 |
| **Departmental Income (Loss)** | 50.6% | 64,566 | 190.94 | 47.3% | 51,906 | 201.46 | 47.0% | 54,531 | 194.34 | 60.5% | 64,124 | 208.17 | 49.4% | 35,173 | 150.62 | 49.6% | 74,322 | 187.08 |
| **Undistributed Operating Expenses** | | | | | | | | | | | | | | | | | | |
| Administrative & General | 9.7% | 12,039 | 36.83 | 11.9% | 13,066 | 50.71 | 12.4% | 14,356 | 51.16 | 13.2% | 13,952 | 45.29 | 7.1% | 5,049 | 21.62 | 7.8% | 11,658 | 29.35 |
| Information & Telecommunications Systems | 2.6% | 3,297 | 10.06 | 4.0% | 4,419 | 17.15 | 3.0% | 3,449 | 12.29 | 1.6% | 1,682 | 5.46 | 2.5% | 1,811 | 7.76 | 2.4% | 3,550 | 8.94 |
| Sales & Marketing | 5.7% | 7,128 | 22.01 | 8.1% | 8,900 | 34.54 | 7.7% | 8,888 | 31.67 | 7.6% | 8,033 | 26.08 | 3.2% | 2,304 | 9.87 | 4.4% | 6,602 | 16.62 |
| Franchise Fees | 3.8% | 5,587 | 14.66 | 0.0% | 0 | 0.00 | 5.6% | 6,553 | 23.35 | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 6.4% | 9,604 | 24.18 |
| Utility Costs | 3.0% | 3,789 | 11.55 | 3.6% | 3,919 | 15.21 | 3.5% | 4,073 | 14.52 | 3.0% | 3,197 | 10.38 | 4.4% | 3,102 | 13.29 | 2.6% | 3,955 | 9.96 |
| Property Operation & Maintenance | 5.3% | 6,449 | 20.03 | 5.5% | 6,089 | 23.63 | 7.2% | 8,385 | 29.88 | 6.2% | 6,527 | 21.19 | 10.5% | 7,485 | 32.05 | 4.1% | 6,095 | 15.34 |
| **Total Undistributed Operating Expenses** | 30.2% | 38,289 | 115.14 | 33.1% | 36,393 | 141.25 | 39.4% | 45,703 | 162.88 | 31.5% | 33,392 | 108.40 | 27.8% | 19,752 | 84.58 | 27.7% | 41,465 | 104.38 |
| **Gross Operating Profit (GOP)** | 20.4% | 26,277 | 75.80 | 14.1% | 15,513 | 60.21 | 7.6% | 8,828 | 31.46 | 29.0% | 30,733 | 99.77 | 21.7% | 15,421 | 66.04 | 21.9% | 32,857 | 82.71 |



## Comparison – Union Expense Comparables vs. Subject Actuals

We compared the average of the above presented union expense comparables to the actual subject financials (most recent presented in our report: trailing 12-month period through October 2022). Based on our experience, and considering discussions with LWHA Asset Management Group, unionization typically has the most impact on rooms expense and property operations and maintenance expense. These increases are primarily driven by increases in wages as well as benefits/pension costs, and restrictions realized via work rules.

The comparison is below:

| LWHA Analyais | Union Comparables Average | | | Margaritaville Times Square: Actual TTM 10/2022 performance | | | Comparison | |
|---|---|---|---|---|---|---|---|---|
| | Ratio to Total Revenue | PAR | POR | Ratio to Total Revenue | PAR | POR | Union Avg. *over* Subject Actual | Focus Metric |
| Rooms Expense | 41.2% | $43,060 | $129.55 | 39.6% | $29,557 | $111.56 | 16.1% | POR |
| Property Operation & Maintenance | 5.3% | $6,449 | $20.03 | 4.4% | $3,809 | $14.38 | 39.3% | POR |
| Gross Operating Profit (GOP) | 20% | $26,277 | $75.80 | 35% | $29,780 | $112.40 | -41.1% | % |

As shown in the table above, the union comparables average a gross operating profit approximately 41% lower than the subject property. The comparison indicates that this decreased profitability is driven by higher Rooms expenses and Property Operation & Maintenance.

## Third Party Analysis

In addition to the internal findings above, we reviewed financial projections provided by the Client, which were prepared by a third-party management company familiar with operations of union hotels in New York. Their analysis concluded that unionization would decrease the subject hotel's Net Operating Income by approximately $3M per annum on a stabilized basis. This decrease was driven entirely by an expected $35 POR (or 35%) increase in Rooms expenses, and a $5 POR (or 28%) increase in Property Operation & Maintenance.

The analysis is summarized below:

| Analysis Provided by Client *(via Third Party Management Company)* | Margaritaville Times Square: 2027 Projections - Unionized | | | Margaritaville Times Square: 2027 Projections - NOT Unionized | | | Comparison | |
|---|---|---|---|---|---|---|---|---|
| | Ratio to Total Revenue | PAR | POR | Ratio to Total Revenue | PAR | POR | Union Scenario *over* Non-Union Scenario | Focus Metric |
| Rooms Expense | 26.7% | $43,315 | $135.21 | 19.8% | $33,687 | $100.51 | 34.5% | POR |
| Property Operation & Maintenance | 4.8% | $8,413 | $24.30 | 3.8% | $6,374 | $19.02 | 27.8% | POR |
| Gross Operating Profit (GOP) | 46% | $78,444 | $234.06 | 54% | $91,842 | $274.03 | -14.6% | % |



## Adjusted Cash Flow Projections

Based on the above findings, we prepared adjusted cash flow projections. Utilizing the analysis prepared for the pricing opinion dated March 2, 2023, we employed an increase to the Rooms and Property Operations & Maintenance departments. The charts below show the stabilized period (Year 3; 2025) in both the original scenario (non-union), and the adjusted scenario (unionized).

In consideration of our internal analysis of expense comparables and of the analysis provided by the client (presented on the preceding page), we have estimated an increase of 30% to Room expenses and an increase of 35% to Property Operations and Maintenance.

The cash flows are presented below:

**Margaritaville Resort Times Square**
**Cash Flow Detail**

| | Cash Flows Submitted in March 2, 2023 Pricing Opinion NOT UNION | | | | | Adjusted Cash Flows UNION | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Stabilized DCF Year 3 | | | | | Stabilized DCF Year 3 | | | |
| Projected Fiscal Year Ending December 31: | 2025 | | | | | 2025 | | | |
| Number of Days in Year: | 365 | | | | | 365 | | | |
| Number of Rooms: | 234 | | | | | 234 | | | |
| Annual Available Rooms: | 85,410 | | | | | 85,410 | | | |
| Occupied Rooms: | 75,161 | | | | | 75,161 | | | |
| Annual Occupancy: | 88.00% | | | | | 88.00% | | | |
| Average Rate: | 374.08 | | | | | 374.08 | | | |
| RevPAR: | 329.19 | | | | | 329.19 | | | |
| **Revenue** | Amount | Gross % | PAR | POR | | Amount | Gross % | PAR | POR |
| Rooms Revenue | 28,116,077 | 68.7% | 120,154 | 374.08 | | 28,116,077 | 68.6% | 120,154 | 374.08 |
| Other Operated Departments Revenue | 347,341 | 0.8% | 1,484 | 4.62 | | 347,341 | 0.8% | 1,484 | 4.62 |
| Amenity/Resort Fee Revenue | 2,746,560 | 6.7% | 11,737 | 36.54 | | 2,746,560 | 6.7% | 11,737 | 36.54 |
| Retail Lease Income | 4,889,165 | 12.0% | 20,894 | 65.05 | | 4,889,165 | 11.9% | 20,894 | 65.05 |
| Food & Beverage Lease Income | 4,813,697 | 11.8% | 20,571 | 64.05 | | 4,878,456 | 11.9% | 20,848 | 64.91 |
| **Total Revenue** | 40,912,839 | 100.0% | 174,841 | 544.34 | | 40,977,598 | 100.0% | 175,118 | 545.20 |
| **Departmental Expenses** | | | | | Increase to POR Metric | | | | |
| Rooms Expense | 7,473,487 | 26.6% | 31,938 | 99.43 | 30% | 9,715,533 | 34.6% | 41,519 | 129.26 |
| Other Operated Departments Expense | 165,337 | 47.6% | 707 | 2.20 | | 165,337 | 47.6% | 707 | 2.20 |
| **Total Departmental Expenses** | 7,638,824 | 18.7% | 32,645 | 101.63 | | 9,880,870 | 24.1% | 42,226 | 131.46 |
| **Departmental Income (Loss)** | 33,274,015 | 81.3% | 142,197 | 442.70 | | 31,096,728 | 75.9% | 132,892 | 413.74 |
| **Undistributed Operating Expenses** | | | | | | | | | |
| Administrative & General | 2,205,904 | 5.4% | 9,427 | 29.35 | | 2,207,207 | 5.4% | 9,433 | 29.37 |
| Information & Telecommunications Systems | 287,065 | 0.7% | 1,227 | 3.82 | | 287,173 | 0.7% | 1,227 | 3.82 |
| Sales & Marketing | 1,562,309 | 3.8% | 6,677 | 20.79 | | 1,563,382 | 3.8% | 6,681 | 20.80 |
| Franchise Fees | 1,893,439 | 4.6% | 8,092 | 25.19 | | 1,893,439 | 4.6% | 8,092 | 25.19 |
| Utility Costs | 880,627 | 2.2% | 3,763 | 11.72 | | 880,858 | 2.1% | 3,764 | 11.72 |
| Property Operation & Maintenance | 1,007,499 | 2.5% | 4,306 | 13.40 | 35% | 1,361,179 | 3.3% | 5,817 | 18.11 |
| **Total Undistributed Operating Expenses** | 7,836,843 | 19.2% | 33,491 | 104.27 | | 8,193,238 | 20.0% | 35,014 | 109.01 |
| **Gross Operating Profit (GOP)** | 25,437,172 | 62.2% | 108,706 | 338.44 | | 22,903,489 | 55.9% | 97,878 | 304.73 |
| **Fixed Charges** | | | | | | | | | |
| Management Fee | 936,299 | 2.3% | 4,001 | 12.46 | | 936,299 | 2.3% | 4,001 | 12.46 |
| Property Taxes | 2,581,678 | 6.3% | 11,033 | 34.35 | | 2,581,678 | 6.3% | 11,033 | 34.35 |
| Insurance | 368,717 | 0.9% | 1,576 | 4.91 | | 368,717 | 0.9% | 1,576 | 4.91 |
| Reserve for Replacement | 1,248,399 | 3.1% | 5,335 | 16.61 | | 1,248,399 | 3.0% | 5,335 | 16.61 |
| **Total Fixed Charges** | 5,135,094 | 12.6% | 21,945 | 68.32 | | 5,135,094 | 12.5% | 21,945 | 68.32 |
| **Hotel Cash Flow** | 20,302,078 | 49.6% | 86,761 | 270.12 | | 17,768,396 | 43.4% | 75,933 | 236.41 |
| | | | | | GOP Impact | -$2,533,682 | -10.0% | -$10,828 | -$34 |
| | | | | | NOI Impact | -$2,533,682 | -12.5% | -$10,828 | -$34 |

As shown in the table above, the impact of the union would decrease gross operating profit and net operating income by approximately $2.5 million (a 10% decrease from non-union GOP, and a 12.5% decrease from non-union NOI).



## Sales Comparables

We also reviewed a select number of recent union and non-union hotel sales in Times Square. As indicated by the chart below, union hotels typically trade at a lower price per key. However, it is important to note that there are many other factors that can impact a sale price, such as deferred maintenance and/or renovation plans, timing in the market, and interest sold (ie: fee simple vs. leasehold).

| | Select Manhattan Hotel Sales | | | | | |
|---|---|---|---|---|---|---|
| # | Property Name | Date | Keys | Sale Price | Price Per Room | Union/ Non Union |
| 3 | SIXTY SoHo | Feb-23 | 97 | $106,900,000 | $1,102,062 | Non-Union |
| 4 | New York Marriott East Side | Jan-23 | 655 | $154,000,000 | $235,115 | Union |
| 5 | Mr. C Seaport | Jan-23 | 66 | $60,000,000 | $909,091 | Non-Union |
| 7 | Kimpton Muse Hotel | Sep-22 | 200 | $49,500,000 | $247,500 | Union |
| 8 | Hilton Times Square* | Sep-22 | 478 | $85,000,000 | $177,824 | Union |
| 16 | The Hotel at Times Square | Feb-22 | 213 | $59,500,000 | $279,343 | Union |
| 17 | Roger Smith Hotel* | Feb-22 | 134 | $41,396,953 | $308,932 | Union |
| 19 | Hyatt Centric Wall Street New York* | Dec-21 | 253 | $84,680,000 | $334,704 | Union |
| 22 | Doubletree Metropolitan | Dec-21 | 764 | $169,000,000 | $221,204 | Union |
| 30 | The Lexington Hotel, an Autograph Collection | Jun-21 | 725 | $185,300,000 | $255,586 | Union |
| 36 | Watson Hotel | Apr-21 | 596 | $175,000,000 | $293,624 | Non-Union |
| 39 | The Surrey | Dec-20 | 190 | $150,150,000 | $790,263 | Union |
| 44 | Royalton Hotel | Sep-20 | 168 | $40,840,000 | $243,095 | Union |
| 45 | Embassy Suites New York Midtown Manhattan | Aug-20 | 310 | $115,129,600 | $371,386 | Non-Union |
| | | | | *Union Average* | *$310,346* | |
| | | | | *Non-Union Average* | *$669,041* | |

Footnotes*
*Sale #*
8    This property represents a leasehold interest & transaction reportedly resolved a troubled loan situation
17    Purchased to be converted into 81 time-share units
19    Please note the property was sold as the Andaz Wall Street, and was converted to Hyatt Centric by the buyer

*Source: LW Hospitality Advisors ®*

## Conclusions

Based on the limited and preliminary review presented herein, we believe it is reasonable to expect that unionization of the subject property would lead to an approximate 15-20% decline in value, relative to the range presented in our pricing opinion report dated March 2, 2023.

***This letter should not be considered or relied upon independent of the referenced pricing opinion report dated March 2, 2023.***

Respectfully submitted,

**LW Hospitality Advisors®**

# EXHIBIT B

**2022 P&L provided to Lenders**

| | YEAR | % |
|---|---|---|
| **OPERATING REVENUE** | | |
| Rooms | 18,895,115 | 86.9% |
| Miscellanous Income | 2,848,403 | 13.1% |
| **TOTAL OPERATING REVENUE** | 21,743,519 | 100.0% |
| | | |
| **DEPARTMENT EXPENSES** | | |
| Rooms | 7,275,201 | 33.5% |
| **TOTAL DEPT EXPENSES** | 7,275,201 | 33.5% |
| | | |
| **TOTAL DEPARMENTAL PROFIT** | 14,468,318 | 66.5% |
| | | |
| **UNDISTRIBUTED EXPENSES** | | |
| Administrative and General | 2,440,244 | 11.2% |
| Information & Telecomm. | 218,762 | 1.0% |
| Sales and Marketing | 2,155,888 | 9.9% |
| Property Maintenance | 999,598 | 4.6% |
| Utilities | 959,904 | 4.4% |
| **TOTAL UNDISTRIBUTED EXPENSE** | 6,774,396 | 31.2% |
| | | |
| **GROSS OPER PROFIT** | 7,693,922 | 35.4% |
| | | |
| **MANAGEMENT FEES** | 802,306 | 3.7% |
| | | |
| **INCOME BEFORE NON-OPERATING INCOME & EXPENSES** | 6,891,617 | 31.7% |
| | | |
| **NON-OPERATING EXPENSES** | | |
| Property And Other Taxes | 1,368,397 | 6.3% |
| Insurance | 444,162 | 2.0% |
| **TOTAL NON-OPERATING EXPENSE** | 1,812,559 | 8.3% |
| | | |
| **EBITD&A** | 5,079,058 | 23.4% |

**2022 P&L provided to Appraiser**

Margaritaville Resort Times Square
Full Operating History

| | Actual - Year End 2022 | | | |
|---|---|---|---|---|
| Year Ending December 31: | 2022 | | | |
| Number of Days in Year: | 365 | | | |
| Number of Rooms: | 234 | | | |
| Annual Available Rooms: | 85,410 | | | |
| Occupied Rooms: | 64,668 | | | |
| Annual Occupancy: | 75.71% | | | |
| Average Rate: | $292.19 | | | |
| RevPAR: | $221.23 | | | |
| | | | | |
| Revenue | $ (000's) | Gross % | PAR | POR |
| Rooms Revenue | 18,895 | 86.9% | 80,748 | 292.19 |
| Other Operated Departments Revenue | 2,848 | 13.1% | 12,173 | 44.05 |
| Amenity/Resort Fee Revenue | - | 0.0% | - | 0.00 |
| Retail Lease Income | - | 0.0% | - | 0.00 |
| Food & Beverage Lease Income | - | 0.0% | - | 0.00 |
| **Total Revenue** | 21,744 | 100.0% | 92,921 | 336.23 |
| | | | | |
| Departmental Expenses | | | | |
| Rooms Expense | 6,156 | 32.6% | 26,306 | 95.19 |
| Other Operated Departments Expense | - | 0.0% | - | 0.00 |
| Amenity/Resort Fee Expense | - | 0.0% | - | 0.00 |
| **Total Departmental Expenses** | 6,156 | 28.3% | 26,306 | 95.19 |
| | | | | |
| **Departmental Income (Loss)** | 15,588 | 71.7% | 66,615 | 241.05 |
| | | | | |
| Undistributed Operating Expenses | | | | |
| Administrative & General | 2,440 | 11.2% | 10,428 | 37.73 |
| Information & Telecommunication Systems | 219 | 1.0% | 935 | 3.38 |
| Sales & Marketing | 910 | 4.2% | 3,891 | 14.08 |
| Franchise Fees | 645 | 3.0% | 2,758 | 9.98 |
| Utility Costs | 541 | 2.5% | 2,311 | 8.36 |
| Property Operation & Maintenance | 1,000 | 4.6% | 4,272 | 15.46 |
| **Total Undistributed Operating Expenses** | 5,755 | 26.5% | 24,595 | 89.00 |
| | | | | |
| **Gross Operating Profit (GOP)** | 9,833 | 45.2% | 42,020 | 152.05 |
| | | | | |
| Fixed Charges | | | | |
| Management Fee | 489 | 2.2% | 2,091 | 7.57 |
| Property Taxes | 1,779 | 8.2% | 7,600 | 27.50 |
| Insurance | 575 | 2.6% | 2,457 | 8.89 |
| Reserve for Replacement | - | 0.0% | - | 0.00 |
| **Total Fixed Charges** | 2,843 | 13.1% | 12,148 | 43.96 |
| | | | | |
| **Hotel Cash Flow** | 6,990 | 32.1% | 29,872 | 108.09 |

# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

560 SEVENTH AVENUE OWNER PRIMARY LLC,

Plaintiff,

-against-

DHG TSQ, LLC,

Defendant.

Index No. 655926/2021

<u>**JUDGMENT**</u>

    Defendant DHG TSQ, LLC, having made a motion for an order pursuant to CPLR

7510 and 7514 confirming the Final Award issued by Arbitrator Marc E. Isserles dated May 15,

2023 in favor of defendant and against plaintiff 560 Seventh Avenue Owner Primary LLC in the

total amount of $3,080,864.75, entering judgment in favor of defendant, awarding defendant its

reasonable attorneys' fees and expenses pursuant to Section 15.5 of the Hotel Management

Agreement (HMA), together with costs and disbursements of this action, awarding post-judgment

interest pursuant to CPLR 5003, and dismissing the action (the "Motion"), and due deliberation

having been had thereon; and upon all the pleadings and prior proceedings had herein; and upon

the Decision and Order of the Court dated July 5, 2023, granting the Motion and directing that a

judgment be entered in favor of defendant subject to the terms of the Decision and Order, it is

    ADJUDGED and DECLARED that plaintiff 560 Seventh Avenue Owner Primary

LLC's termination of defendant DHG TSQ, LLC is without legal basis under Section 4.1 of the

HMA, and is thus ineffective; and it is further

    ADJUDGED that defendant DHG TSQ, LLC, with an address of 200 West 55th

Street, Suite 42, New York, New York 10019, shall have judgment and recover against plaintiff

560 Seventh Avenue Owner Primary LLC, with an address of 31 West 27th Street, 9th Floor, New

York, New York 10001, in the amount of $3,111,115.25, and defendant shall have execution    X

thereof; and it is further

ORDERED and ADJUDGED that the Complaint is dismissed with prejudice.

ENTER:

_____

Jennifer Schecter, JSC  7/7/23

**F I L E D**

**Jul 13 2023**

**NEW YORK
COUNTY CLERK'S OFFICE**

_____
Clerk

2

23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
Pg 22 of 53

655926/2021

Judgment
Attorney for Judgment Creditor
JACKSON LEWIS PC
666 Third Avenue 29th Floor
New York, NY 10017
212-545-4067

1 – 1
FILED AND
DOCKETED
Jul 13 2023
AT        10:18 A    M
N.Y. CO. CLK'S OFFICE

# EXHIBIT D

# Mechanic's Lien

 ORIGINAL

**Claimant:** Flintlock Construction Services LLC

585 North Barry Avenue
Mamaroneck, NY   10543
914-630-7503
Andrew Weiss , Managing Member

**To:**

560 Seventh Avenue Owner Primary LLC
c/o Soho Properties        9FL
31 West 27th Street   Att: Sharif El-Gamal
New York, NY  10001

560 Seventh Avenue Owner Primary LLC
c/o Soho Properties  - 6FL
362 Fifth Avenue  Att; Sherif El-Gamal
New York, NY  10001

Margaritaville Hotels
Att: Legal Dept.
6900 Turkey Lake Road - Suite 200
Orlando, FL 32819

# Notice of Lien

**Amount**   $2,763,091.77

**Premises known as**

560 Seventh Avenue
New York, NY

**Block:**   1012
**Lot:**       29

OWS CRE Funding
Att: Loan Dept.
299 Park Avenue - 25FL
New York, NY 10171

Reed Smith LLP
Att: Gerard Hefner, Esq.
599 Lexington Avenue - 26FL
New York, NY 10022

White & Williams LLP
Att: Timothy Davis, Esq.
1650 Market Street
Philadelphia, PA 19103

105303

# NOTICE UNDER MECHANIC'S LIEN LAW

To the Clerk of the County of  **New York**  and all others whom it may concern:

**Please Take Notice,** that     Flintlock Construction Services LLC

as lienor(s) have and claim a lien on the real property hereinafter described as follows:

(1) The names and residences of the lienor(s) are  Flintlock Construction Services LLC
585 North Barry Avenue
Mamaroneck ,  NY    10543

Duly organized and existing under and by virtue of the laws of the State of New York

(2) The owner of the real property is 560 Seventh Avenue Owner Primary LLC
and the interest of the owner as far as known to the lienor(s) is Fee Simple

(3) The name of the party by whom the lienor(s) was (were) employed is:
560 Seventh Avenue Owner Primary LLC

The name of the party to whom the lienor(s) furnished or is (are) to furnish materials or for whom
the lienor(s) performed or is (are) to perform professional services is:
560 Seventh Avenue Owner Primary LLC

(4) The labor performed and     Supplied and Installed Concrete, Rebar, HVAC Equipment, Plumbing Materials, Fire
material furnished were      Protection Materials, Carpentry Materials, Elevators, Electrical Materials, Etc.

**Block:**
1012

**Lot:**
29       The materials actually manufactured for but not delivered to the real property are  N/A

The agreed price and value of the labor
performed and value of the material furnished is      $100,029,866.67
The agreed price and value of the material actually mfd. for but not delivered to the real prop. is
The agreed fee for professional services is

Total agreed price and value $100,029,866.67

(5) The amount unpaid to the lienor(s) for said labor
performed and said material furnished is      $2,763,091.77
The amount unpaid to lienor(s) for material actually mfd. for but not delivered to the real prop. is

Total amount unpaid  $2,763,091.77

The total amount claimed for which this lien is filed is      $2,763,091.77
(6) The time when the first item of work was performed was      1/4/2018
The time when the first item of material was furnished was      1/4/2018
The time when the last item of work was performed was      2/22/2023
The time when the last item of material was furnished was      2/22/2023

(7) The property subject to the lien is situated in   New York, County of  New York , State of New York
Known as:   560 Seventh Avenue
New York ,  NY

That said labor and materials were performed and furnished and for and used, and that the professional services rendered were
used, in the improvement of the real property hereinbefore described.

Dated  July 13, 2023

Andrew Weiss ,  Managing Member of
**Flintlock Construction Services LLC**

105303

ORIGINAL

STATE OF NEW YORK, COUNTY OF   New York

Andrew Weiss  being duly sworn, says
that deponent is **Managing Member**  named in the within notice of lien and the lienor(s) mentioned in the foregoing notice of
lien; that deponent has read the said notice and knows the contents thereof, and that the same is true to deponent's own knowledge,
except as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be
true.

Andrew Weiss                    **Managing Member**

STATE OF NEW YORK, COUNTY OF

being duly sworn, says

that deponent is the    of
herein, that deponent has read the foregoing notice of lien and the same is true to deponent's own knowledge, except as to the matters
therein stated to be alleged upon information and belief, and that as to those matters deponent believes it to be true. The reason why this
verification is made by deponent is that deponent is an officer,
to wit, the    of
which is a    corporation, and deponent is familiar with circumstances herein based upon information provided.

State of New York

County of Nassau

On the  13  day of  July   in the year  2023 , before me, the undersigned, a Notary Public in and for said
State, personally appeared  Andrew Weiss, Managing Member  personally known to me or proved to me on the basis of
satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she
executed same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of
which individual acted, executed the instrument.

Signature of Notary Public

ZACHARY NASH
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01NA6304347
Qualified in Nassau County
Commission Expires May 27, 2026

2023 JUL 14  AM 9:02
FILED
NASSAU COUNTY
COUNTY CLERK

# Mechanic's Lien

ORIGINAL

*Claimant* **Broadtrade Group Inc.**

    1 Penn Plaza - Suite 4200
    New York, NY    10119
    **212-868-3088**
    **Gary Ling** , Director

*To:*

    560 Seventh Avenue Owner Primary LLC
    c/o SOHO Properties - 9FL
    31 West 27th Street    Att: Sharif El-Gamal
    New York, NY  10001

    Flintlock Construction Services LLC
    Att: Andrew Weiss
    585 North Barry Avenue
    Mamaroneck, NY  10543

    Margaritaville Hotels
    Att: Legal Dept.
    6900 Turkey Lake Road - Suite 200
    Orlando, FL 32819

# Notice of Lien

*Amount*   **$302,158.56**

*Premises known as*

**207 West 40th Street "Margaritaville Resort"**
**New York, NY**

| *Block:* | 1012 | OWS CRE Funding<br>Att: Loan Dept.<br>299 Park Avenue - 25FL<br>New York, NY 10171 |
| --- | --- | --- |
| *Lot:* | 29 | |

                    Reed Smith LLP
                    Att: Gerard Hefner, Esq.
                    599 Lexington Avenue - 26FL
                    New York, NY 10022

                    White & Williams LLP
                    Att: Timothy Davis, Esq
                    1650 Market Street
                    Philadelphia, PA 19103

105251

# NOTICE UNDER MECHANIC'S LIEN LAW

*ORIGINAL*

To the Clerk of the County of   **New York**   and all others whom it may concern:

**Please Take Notice,**   that   Broadtrade Group Inc.

as lienor(s) have and claim a lien on the real property hereinafter described as follows:

(1) The names and residences of the lienor(s) are  Broadtrade Group Inc.
1 Penn Plaza - Suite 4200
New York ,  NY    10119

being a Corporation  Duly organized and existing under and by virtue of the laws of the State of New York

(2) The owner of the real property is 560 Seventh Avenue Owner Primary LLC
and the interest of the owner as far as known to the lienor(s) is  Fee Simple

(3) The name of the party by whom the lienor(s) was (were) employed is:
Flintlock Construction Services LLC

The name of the party to whom the lienor(s) furnished or is (are) to furnish materials or for whom
the lienor(s) performed or is (are) to perform professional services is:
Flintlock Construction Services LLC

(4) The labor performed and     Supplied and Installed HVAC Equipment, Electrical Materials, Plumbing Materials, Etc.
material furnished were

**Block:**
1012

**Lot:**
29        The materials actually manufactured for but not delivered to the real property are  N/A

The agreed price and value of the labor
performed and value of the material furnished is        $25,226,162.49
The agreed price and value of the material actually mfd. for but not delivered to the real prop. is
The agreed fee for professional services is

Total agreed price and value $25,226,162.49

(5) The amount unpaid to the lienor(s) for said labor
performed and said material furnished is              $302,158.56
The amount unpaid to lienor(s) for material actually mfd. for but not delivered to the real prop. is

Total amount unpaid  $302,158.56

The total amount claimed for which this lien is filed is        $302,158.56
(6) The time when the first item of work was performed was      1/5/2019
The time when the first item of material was furnished was     1/5/2019
The time when the last item of work was performed was       11/17/2022
The time when the last item of material was furnished was     11/17/2022

(7) The property subject to the lien is situated in   New York, County of  New York ,State of New York
Known as:      207 West 40th Street "Margaritaville Resort"
New York ,   NY

That said labor and materials were performed and furnished for and used, and that the professional services rendered were
used, in the improvement of the real property hereinbefore described.

Dated  July 11, 2023

**Mark Nash , as Agent of**
**Broadtrade Group Inc.**
**For Filing Purposes Only**

2023 JUL 11  AM 9: 50
FILED
COUNTY CLERK
N.Y. COUNTY

105251



STATE OF NEW YORK, COUNTY OF                                                    INDIVIDUAL OR PARTNER

being duly sworn, says
that deponent is  of the co-partnership named in the within notice of lien and the lienor(s) mentioned in the foregoing notice of lien;
that deponent has read the said notice and knows the contents thereof, and that the same is true to deponent's own knowledge, except
as to the matters therein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true.

STATE OF NEW YORK, COUNTY OF    New York                                                    CORPORATION

Mark Nash   being duly sworn, says
that deponent is the  Agent  of  Broadtrade Group Inc.
herein, that deponent has read the foregoing notice of lien and the same is true to deponent's own knowledge, except as to the matters
therein stated to be alleged upon information and belief, and that as to those matters deponent believes it to be true. The reason why this
verification is made by deponent is that deponent is an officer,
to wit, the  Agent  of Broadtrade Group Inc.
which is a  Domestic  corporation, and deponent is familiar with circumstances herein based upon information provided.

**Mark Nash , as Agent of**
**Broadtrade Group Inc.**
**For Filing Purposes Only**

State of  New York

County of  Nassau

On the __11__ day of __July__ in the year __2023__, before me, the undersigned, a Notary Public in and for said
State, personally appeared  Mark Nash, Agent   personally known to me or proved to me on the basis of
satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she
executed same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of
which individual acted, executed the instrument.

Signature of Notary Public

LALLCHAN HARDEO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6401618
Qualified in Queens County
Commission Expires December 16, 2023

2023 JUL 11 AM 9:50
N.Y. COUNTY
FILED
COUNTY CLERK

**EXHIBIT E**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------X

GARMENT CENTER CONGREGATION,                          :
                                                      :   Index No.: 654427/2022
                                     Plaintiff,       :   Date Purchased: 11/18/22
                                                      :
                  -against-                           :
                                                      :
SEVENTH AVENUE DEVELOPMENT, LLC,                      :   **VERIFIED AMENDED**
560 SEVENTH AVENUE OWNER LLC, 560                     :   **<u>COMPLAINT</u>**
SEVENTH AVENUE OWNER PRIMARY                          :
LLC and STEWART TITLE INSURANCE                       :
COMPANY,                                              :
                                                      :
                                     Defendants.      :

-----------------------------------------------------------X

Plaintiff Garment Center Congregation ("GCC," the "Congregation," or "Plaintiff"), as and for its complaint against defendants Seventh Avenue Development, LLC, 560 Seventh Avenue Owner LLC, 560 Seventh Avenue Owner Primary LLC (collectively, "Developer") and Stewart Title Insurance Company, alleges and says:

### <u>INTRODUCTION AND NATURE OF THE ACTION</u>

1.  GCC is an iconic and vibrant Jewish congregation established in Manhattan over 90 years ago. Until recently, it was a thriving congregation, with its synagogue housed at West 40th Street and Seventh Avenue in Manhattan's Garment District since 1965. GCC was forced to vacate the space for temporary quarters in 2014, as Developer undertook redevelopment of the property. Developer purchased the property from The New School in 2014 with plans to build a hotel, and had committed to providing GCC with an updated, modern synagogue at the redeveloped site and to secure and pay for suitable temporary space in the neighborhood for GCC until the new building – and the new synagogue – was completed. GCC has a long-term lease that entitles it to prominent space in the building and temporary housing in the case of any renovations, and Developer promised it would fulfill their obligations.

2.      With callous disdain for GCC and its congregants, Developer has utterly failed to honor its commitments. Developer let the lease for temporary space for GCC lapse and has failed to move forward with the build-out of the new synagogue. As a result, the Congregation has been homeless since 2020, with no ability to hold in-person services or activities.  Developer completed the redevelopment of the property in 2021. The property is now the location of Jimmy Buffett's Margaritaville Resort Times Square, but plaintiffs are still looking for their lost synagogue.

3.      The Congregation, which for years held three services daily in addition to services on holidays and other special occasions, had long been a valuable and beloved resource not only for a strong and dedicated membership comprised mainly of Jews who worked in midtown (with a few notable celebrities, such as Jackie Mason, counted among the High Holy Days regulars), but also for a steady stream of international visitors to New York, including worshippers from Israel, France, England, Australia and South Africa.  The location of the synagogue was a significant factor in maintaining its popularity, as it was easily accessible from Penn Station, Grand Central Station, the Port Authority, and Times Square.

4.      Sadly, since the time that GCC was forced by Developer to temporarily leave its longstanding home for smaller, temporary quarters in 2014 (at 1384 Broadway), as a result of Developer's purchase and demolition of the premises, and particularly since GCC was rendered homeless in 2020 because Developer defaulted in its rent obligation and failed to renew the lease at GCC's temporary location, GCC has been experiencing a drastic decline in its membership and its very survival has been threatened by Developer's various breaches. Apparently more concerned with its bottom line and demonstrating no interest in honoring its commitments to GCC, Developer has refused to rebuild the Congregation's synagogue.

FILED: NEW YORK COUNTY CLERK 06/14/2023 04:27 PM
NYSCEF DOC. NO. 45

INDEX NO. 654427/2022
RECEIVED NYSCEF: 06/14/2023

23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
Pg 33 of 53

5.      GCC brings this action to enforce its rights and recover its damages. GCC seeks specific performance with respect to Developer's obligation to build the new synagogue to GCC's specifications; appropriate declaratory and injunctive relief; and monetary damages against Developer, who must be held accountable for its various breaches and tortious acts.

## THE PARTIES

6.      At all relevant times, plaintiff GCC was and is a corporation organized and existing under the Religious Corporations Law of the State of New York, with a place of business in New York, New York.

7.      Upon information and belief, at all relevant times, defendant Seventh Avenue Development, LLC ("Seventh Avenue Development") was and is a limited liability company organized and existing under Delaware law, with a place of business located at c/o Soho Properties Inc., 31 West 27th Street, 9th Floor, New York, New York.

8.      Upon information and belief, at all relevant times, defendant 560 Seventh Avenue Owner LLC was and is a limited liability company organized and existing under Delaware law, with a place of business located at c/o Soho Properties Inc., 31 West 27th Street, 9th Floor, New York, New York.  Upon information and belief, 560 Seventh Avenue Owner LLC is successor to Seventh Avenue Development.

9.      Upon information and belief, at all relevant times, defendant 560 Seventh Avenue Owner Primary LLC was and is a limited liability company organized and existing under Delaware law, with a place of business located at c/o Soho Properties Inc., 31 West 27th Street, 9th Floor, New York, New York.  Upon information and belief, 560 Seventh Avenue Owner Primary LLC is successor to 560 Seventh Avenue Owner LLC. (560 Seventh Avenue Owner Primary LLC, 560 Seventh Avenue Owner LLC and Seventh Avenue Development are collectively referred to herein as "Developer").

10.     Upon information and belief, 560 Seventh Avenue Owner Primary LLC is the current owner of the real property at 750 Seventh Avenue (also known as 205 West 40th Street).

11.     Upon information and belief, at all relevant times, defendant Stewart Title Insurance Company ("Stewart Title") was and is a company duly organized and existing under New York law, with a place of business located at 140 East 45th Street, New York, New York. Stewart Title Insurance Company is named as a defendant because it is the Escrow Agent under escrow agreements that are the subject of relief requested in this action.

## FACTUAL BACKGROUND

### The 1977 Sale and Leaseback of the Premises at 750 Seventh Avenue

12.     GCC was founded in New York City in 1931 and has become a highly regarded and beloved congregation, with many laudatory news stories written about it over the years.

13.     Initially, the Congregation worshipped in the back of a barbershop, and then above a tobacconist in Herald Square.  In 1965, the Congregation purchased the real property at 750 Seventh Avenue (also known as 205 West 40th Street) (the "Premises") and relocated to the building at the Premises (the "Building"), where it operated a synagogue and maintained offices in the basement and on the ground floor.

14.     Pursuant to a contract of sale dated April 21, 1977, GCC sold the Premises to industrialist and philanthropist Albert A. List ("List"), a member of the Congregation, who sought to use the remainder of the Building for the New School for Social Research (now known as the New School).  As part of the transaction, GCC and List entered into a written lease agreement dated May 4, 1977 (as amended, the "Lease"), in which space on the ground floor and in the basement of the Building was leased to GCC (as "Tenant") by List (as "Landlord") for a term of 99 years, at a rental of $1.00 per year.  (A copy of the Lease is attached hereto as Exhibit "A").  Currently, the Congregation's lease is set to expire in 2076.

FILED: NEW YORK COUNTY CLERK 06/14/2023 04:27 PM
INDEX NO. 654427/2022
NYSCEF DOC. NO. 45
23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
RECEIVED NYSCEF: 06/14/2023
Pg 35 of 53

15.     Under the Lease, Landlord agreed to "maintain and make all structural and non-structural repairs to the demised premises," and to "pay all ordinary and necessary costs of the operation and maintenance of the demised premises of whatsoever kind or nature, including but not limited to the cost of public liability and fire and extended coverage insurance (including insurance on [the Congregation's] contents) . . . ." Ex. A, § 44.

16.     The Lease also provides that if, "at any time after the fortieth (40) anniversary of the commencement date of this lease [*i.e.*, after May 2017]," the Landlord "desires to demolish the [Building], the Landlord may . . . require [the Congregation] to vacate the demised premises, provided that Landlord agrees . . . to provide Interim Quarters . . . for [the Congregation] at Landlord's expense and to include in the new improvement to be constructed at the site of the demised premises . . . a synagogue and general offices for [the Congregation] at least equal to the demised premises in size and quality," with the new improvement subject to the Congregation's approval. Ex. A, § 43.

17.     On or about June 29, 1978, pursuant to an Assignment of Leases, the Lease was assigned by List to The New School.

**Developer's Purchase of the Premises and Agreements with the Congregation**

18.     Developer purchased the Premises from The New School pursuant to an Agreement of Sale dated September 27, 2013. As part of the transaction, Developer assumed the Landlord's obligations under the Lease, and became the Successor Landlord.

**The First Lease Amendment**

19.     Intent on immediately redeveloping the Premises to maximize its commercial value, Developer sought to have the Congregation temporarily vacate the Building approximately three years earlier than the Congregation was required to vacate under the Lease. On or about February 7, 2014, a First Amendment to Lease (the "First Lease Amendment") was

23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
Pg 36 of 53

entered into between Developer and GCC, in which GCC agreed to temporarily relocate from the Building earlier than the date provided for in the Lease in order to permit redevelopment of the Premises. (A copy of the First Lease Amendment is attached hereto as Exhibit "B").

20.     Under the First Lease Amendment, Developer promised to design and construct at the Premises, with the Congregation's input, a fully remodeled, updated synagogue no smaller than the original one, with "programming and minimum specifications" that "shall be consistent with the use currently being made of the Demised Premises by [the Congregation] [the "Permanent Quarters"]." *See* Ex. B, § 6 & Sched. III.

21.     The First Lease Amendment also provides that Developer will provide the Congregation, "at [Developer's] sole cost and expense," a "lease or other occupancy agreement ('Interim Quarters Lease')," and to pay all the costs of operating the synagogue at that temporary location, "for a term . . . to continue until and terminate no earlier than[] the date that [the Congregation's] occupancy has been restored . . . into the Permanent Quarters" at 560 Seventh Avenue. *See* Ex. B, § 4.

22.     Developer committed to "pay[] all of the costs of, and perform[] all of the other obligations . . . under the Interim Quarters Lease and otherwise relating to[] the temporary occupancy by Tenant of the Interim Quarters (notwithstanding any delays in . . . Landlord's construction of the New Building)," including moving and storage costs. *See* Ex. B (First Amendment to Lease) § 4 & Sched. I; *see also* Ex. A (Lease) § 43 ("Landlord agrees to pay all costs of moving Tenant to the Interim Quarters, all occupancy costs at such location as are paid by Landlord at the demised premises under this lease, all costs of storage of Tenant's personal property and fixtures not used at the Interim Quarters, and all costs of moving Tenant from the Interim Quarters to the New Building, and will replace or restore any of Tenant's personalty damaged in said moves.").

FILED: NEW YORK COUNTY CLERK 06/14/2023 04:27 PM
NYSCEF DOC. NO. 45
23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
INDEX NO. 654427/2022
RECEIVED NYSCEF: 06/14/2023
Pg 37 of 53

23.     The First Lease Amendment further provides that prior to GCC's move into the Interim Quarters, Developer shall provide to GCC, for GCC's approval prior to construction of the new building, draft programming and minimum specifications for the Permanent Quarters. (Ex. B, § 6).

24.     In consideration for the Congregation's agreement to temporarily vacate the Premises before the end of the 40-year waiting period, Developer agreed, as set forth in the First Lease Amendment, to pay to GCC the total sum of $5 million, as follows:

• $100,000 on the Effective Date of the First Lease Amendment;

• $2,400,000 to be paid to GCC simultaneously with GCC's move-out of the Premises; and

• $2,500,000 (the "Payout Escrow") to be paid by Developer into escrow and released to GCC upon completion of the project, abandonment of the project, or an intervening default by Developer of its obligations under the parties' agreements.

25.     As a further inducement for GCC to vacate the Building prior to the 40-year waiting period, Developer promised to pay GCC's attorneys' fees and owner's representation fees for the project.  *See* Ex. B (First Amendment to Lease), § 4.

26.     The First Amendment also provides that, "[i]n the event [the Landlord] or [the Congregation] commences an action or proceeding against the other party with respect to the Lease, as modified by this Amendment," the Congregation shall be "entitled to recover its expenses, including reasonable legal fees and expenses in connection therewith," if "Tenant is the prevailing party." *See* Ex. B (First Amendment to Lease), § 13.

**The Second Lease Amendment/Interim Quarters at 1384 Broadway**

27.     On or about December 3, 2014, Developer and the Congregation entered into a Second Amendment to Lease (the "Second Lease Amendment"), in which the parties identified

FILED: NEW YORK COUNTY CLERK 06/14/2023 04:27 PM
NYSCEF DOC. NO. 43
23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
Pg 38 of 53
INDEX NO. 654427/2022
RECEIVED NYSCEF: 06/14/2023

the "Interim Quarters" as a portion of the premises at 1384 Broadway. (A copy of the Second Lease Amendment is attached hereto as Exhibit "C").

28.     Because the space at 1384 Broadway was insufficient for larger events, the Developer also promised to provide the Congregation with access to Gotham Hall, an event space at 1356 Broadway, and to pay all event-related costs, during the High Holidays. *See* Ex. C, §§ 4, 8.

29.     Developer agreed to pay an additional $1 million into escrow to secure the payment of any amounts past due by Developer under the 1384 Broadway lease or the agreement with Gotham Hall, or the cost to perform any obligation that Developer failed to perform under such lease or agreement (the "Security Escrow"). *See* Ex. C (Second Amendment to Lease), § 7.

30.     On or about December 8, 2014, Developer entered into a lease with the owner of 1384 Broadway for the Interim Quarters, and simultaneously entered into a sublease with the Congregation for the Interim Quarters.

31.     The Congregation moved out of the Premises and into the leased space at 1384 Broadway in December 2014.

32.     Almost immediately after the Congregation vacated the Premises, Developer failed to make timely rent payments at 1384 Broadway and failed to cover other costs of the Congregation's temporary occupancy there. Developer also eventually failed to provide the Gotham Hall space to the Congregation for the High Holidays.

33.     As a result of Developer's ongoing failure to pay rent and other costs for the Interim Quarters, the landlord at 1384 Broadway commenced an action in New York State Supreme Court in September 2020 against, *inter alia*, Developer and GCC. The lawsuit, combined with Developer's refusal to renew the 1384 Broadway lease beyond its June 30, 2020

23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
Pg 39 of 53

expiration, resulted in GCC's inability to return to the Interim Quarters after it had temporarily vacated the space in March 2020 due to COVID-19 restrictions.

34.    On or about August 11, 2020, the landlord at 1384 Broadway offered to allow the Congregation to continue its occupancy by entering into a new lease directly with the landlord. On August 18, 2020, the Congregation requested the release of the Security Escrow and the Payout Escrow so that it could enter into such a new lease.  Both the Security Escrow and the Payout Escrow were immediately due to the Congregation because of Developer's breaches of the Amended Lease. However, Developer objected to the Congregation's request, falsely claiming that there was no basis for the release of the monies.  Because there was a dispute between the parties, the escrow agent did not distribute the monies to the Congregation. Accordingly, GCC could not continue its occupancy at 1384 Broadway.

35.    After the resumption of in-person services and activities by religious congregations in New York City during the COVID-19 pandemic, Developer failed to secure a new temporary space for GCC.

**The Escrow Agreements**

36.    Pursuant to the First Lease Amendment, an escrow agreement was entered into by and among GCC, Developer and Stewart Title ("Escrow Agent") on or about April 3, 2014 (the "2014 Escrow Agreement"), with respect to the Payout Escrow ($2.5 million).

37.    Pursuant to the Second Lease Amendment, a second escrow agreement was entered into by and among GCC, Developer and Escrow Agent on or about May 29, 2015 (the "2015 Escrow Agreement"), with respect to the Security Escrow ($1 million).  (The 2014 Escrow Agreement and the 2015 Escrow Agreement are collectively referred to herein as the "Escrow Agreements").

38.     In a series of six agreements dated between June 30, 2017 and August 21, 2018 (the "Interim Escrow Agreements"), Developer and GCC agreed to allow money from the Payout Escrow and the Security Escrow to be used to pay certain debts owed by Developer under the Amended Lease, the 1384 Broadway lease, and the 1384 Broadway sublease.

39.     The Congregation was induced to enter into these Interim Escrow Agreements because Developer's principal, Sharif El-Gamal, represented to officers of the Congregation that Developer did not have funds to pay the unpaid debts and threatened the Congregation that Developer would become insolvent and the 560 Seventh Avenue redevelopment project would fail, and the Congregation would never be restored to the Building, if Developer or its affiliates did not immediately pay Developer's debts.

40.     Under the Interim Escrow Agreements, Mr. El-Gamal, the principal of Developer, committed to replenish both the Payout Escrow and the Security Escrow to the extent that funds were released by the Escrow Agent to creditors of Developer as demanded by Developer.

41.     Pursuant to the Interim Escrow Agreements, a total of approximately $800,000 has been released from escrow to Developer and/or vendors or creditors of Developer.  The time for replenishment by Developer under each of the Interim Escrow Agreements has expired, and Developer has failed to replenish the escrow funds for the benefit of the Congregation.

**Developer Fails to Move Forward with Building the New Synagogue**

42.     Developer completed construction of a hotel at the Premises in or about June 2021.  The newly-built hotel at the Premises, Jimmy Buffett's Margaritaville Resort Times Square, opened to the public in July 2021.

43.     On September 29, 2021, Developer's principal, Sharif El-Gamal, met with the Congregation at the Premises and conducted a walk-through of the space that is to house the Permanent Quarters.  The space allocated for the Permanent Quarters was only a fraction of the

required square footage pursuant to the Amended Lease. Moreover, although the Margaritaville Resort was completed and open for business, very little construction had been done to rebuild the synagogue, and the space appeared to be used for storage by Developer for a restaurant at the hotel. Developer failed to provide the Congregation with design, programming, and minimum specification documents for the new synagogue.

44.    Following the September 29, 2021 meeting, the Congregation sent multiple requests to Developer for additional information regarding construction and a timeline.

45.    On October 21, 2021, Developer provided a proposal to the Congregation for the new synagogue, which had substantial infirmities. Among other things, the space proposed for the Congregation was approximately 50% smaller than the Permanent Quarters required by the Amended Lease. In the main sanctuary alone, the proposal was for 179 seats, down from 300 in the original space. In addition, the proposed quarters did not include the equipment, functionality or amenities to which the Congregation is entitled under the Amended Lease.

46.    The Congregation sent follow-up requests for additional information to Developer on October 27, 2021 and November 4, 2021. These requests were ignored.

47.    Failing to receive a viable plan from Developer regarding the construction, on December 6, 2021, the Congregation formulated and sent to Developer a scope of work plan and proposed schedule for the construction. The proposed schedule included a submission of concept design deadline of January 3, 2022 and a submission of schematic design phase deadline of January 31, 2022.

48.    Developer initially advised that the scope and proposed schedule were "reasonable" and that it would use its good faith efforts to comply. However, apparently unwilling to build a synagogue in the hotel, Developer has failed to follow through. Upon

FILED: NEW YORK COUNTY CLERK 06/14/2023 04:27 PM
NYSCEF DOC. NO. 43

INDEX NO. 654427/2022
RECEIVED NYSCEF: 06/14/2023

23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
Pg 42 of 53

information and belief, to date Developer has not performed any of this work and has not obtained a temporary certificate of occupancy for the synagogue.

49.     In early 2022, Developer expressed an interest in reaching a settlement with the Congregation whereby the Congregation would be compensated in return for surrendering its leasehold interest in the Premises.  This proposal would leave the Congregation homeless and at the mercy of the real estate market to locate, acquire and renovate a new sanctuary, offices and other facilities. However, after months of delays and stall tactics, it has become apparent that Developer has no intention either to document an agreement to compensate the Congregation or to move forward with the build-out of the Permanent Quarters.

50.     Upon information and belief, since 2014, Developer has intentionally withheld or delayed performing its obligations in the hopes that the Congregation's temporary dislocation would result in depletion or death of its membership, collapse of its community and cessation of its religious and social activities, thereby no longer requiring the new synagogue at 560 Seventh Avenue.

51.     Time is of the essence for the Congregation, as its very survival depends on its ability to resume holding in-person services and activities.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Breach of Contract/Specific Performance)**

52.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 51 above as if set forth fully herein again at length.

53.     The Lease, together with the First Lease Amendment and Second Lease Amendment (collectively the "Amended Lease"), constitutes a valid and binding contract between GCC and the Developer.

54.     GCC has performed all of its obligations under the Amended Lease.

55.     Developer has not performed, but is able to perform, its obligations under the Amended Lease.

56.     Under the Amended Lease, Developer must, *inter alia*, provide the Congregation with Permanent Quarters that meet certain specifications, including that the Permanent Quarters must "contain at least the same square feet as the square footage of the Demised Premises." *See* Ex. B (First Amendment) Sched. III.

57.     Developer has indicated to the Congregation that it has no intention of building Permanent Quarters consistent with the minimum requirements set forth in the Amended Lease, or allowing such Permanent Quarters to be built, and to date has failed to build the Permanent Quarters.

58.     If the Congregation is deprived of the unique synagogue space it was promised, the Congregation will have no adequate remedy at law.

59.     By reason of the foregoing, Plaintiff is entitled to an order directing Developer to comply with the terms of the Amended Lease and build the Permanent Quarters, to the specifications provided by the Congregation, in a timely fashion.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract/Monetary Damages)

60.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 59 above as if set forth fully herein again at length.

61.     Developer also has breached its obligations under the Amended Lease by, *inter alia*, failing to make required payments to GCC, including but not limited to the $2.5 million Payout Escrow, failing to provide Interim Quarters to GCC and failing to pay for various expenses of the Congregation.

62.     As a result of Developer's breaches of the Amended Lease, Plaintiff has suffered and will continue to suffer damages, including but not limited to out-of-pocket expenses, loss of

use, and consequential damages, in an amount to be determined at trial, together with attorneys'

fees, costs and interest.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Declaratory Judgment)

63.     Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs 1 through 62 above as if set forth fully herein again at length.

64.     There is a justiciable controversy between Plaintiff and Developer regarding the

specifications of the synagogue space that must be delivered to the Congregation.

65.     If the Congregation is deprived of the unique synagogue space it was promised,

the Congregation will have no adequate remedy at law.

66.     By reason of the foregoing, Plaintiff is entitled to an order declaring that

Developer must comply with the terms of the Amended Lease and build the Permanent Quarters,

to the specifications provided by the Congregation, in a timely fashion.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Injunctive Relief)

67.     Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs 1 through 66 above as if set forth fully herein again at length.

68.     Plaintiff is threatened with the continued loss of members of the Congregation,

and possible extinction, based on Developer's aforementioned breaches of the Amended Lease.

69.     Developer has no justifiable basis in law or fact for its failures to comply with the

Amended Lease.

70.     Upon information and belief, Developer is using the space in which the new

synagogue is supposed to be built for storing construction and/or other equipment and items.

Moreover, upon information and belief, the side entrance to the Building, which is supposed to

be for access to the eventual new synagogue, is adorned with a marquee that states "Rooftop Bar."

71.     Plaintiff has suffered irreparable harm and will continue to suffer irreparable harm, which cannot be compensated with money damages, if Developer is not enjoined from using the space at the Premises that is supposed to house the Permanent Quarters for any purpose aside from the construction of the Permanent Quarters.

72.     Plaintiff has no adequate remedy at law.

73.     By reason of the foregoing, Plaintiff is entitled to injunctive relief enjoining Developer from using the space at the Premises that is supposed to house the Permanent Quarters for any purpose aside from the construction of the Permanent Quarters.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

74.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 73 above as if set forth fully herein again at length.

75.     Developer failed to perform its obligations under the Amended Lease in good faith and did not use its best efforts to deal fairly with the Congregation.  In fact, Developer acted to frustrate the Congregation's ability to enjoy the benefits of its bargain by, *inter alia*, failing to build the Permanent Quarters for the Congregation in a timely fashion.

76.     By intentionally failing to build the Permanent Quarters in a timely fashion, Developer injured the right of the Congregation to receive the full benefits of the parties' agreement.

77.     As a result of the foregoing, Developer has frustrated the purpose of the parties' agreement and breached the implied covenant of good faith and fair dealing.

78.     Plaintiff has no adequate remedy at law.

79.     By reason of the foregoing, Plaintiff is entitled to an order directing Developer to build the Permanent Quarters, to the specifications required provided by the Congregation, in a timely fashion.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Declaratory Judgment – Escrow Agreements)**

80.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 79 above as if set forth fully herein again at length.

81.     There is an actual and justiciable controversy between Plaintiff and Developer with respect to the release (and replenishment) of funds pursuant to the Escrow Agreements and Interim Escrow Agreements, which controversy requires immediate resolution.

82.     Plaintiff has no adequate remedy at law.

83.     By reason of the foregoing, Plaintiff is entitled to an order declaring that Developer must fully replenish the funds removed from escrow pursuant to the Interim Escrow Agreements and that the Payout Escrow funds in the total amount of $2.5 million) be released to plaintiff, and directing the Escrow Agent to deliver such funds to Plaintiff.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**(Unjust Enrichment)**

84.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 83 above as if set forth fully herein again at length.

85.     By reason of the foregoing, Developer has been unjustly enriched at Plaintiff's expense.

86.     Plaintiff has no adequate remedy at law.

87.     In equity and good conscience, Developer should not be allowed to retain the benefits of the Amended Lease without duly compensating Plaintiff therefor.

88.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, together with attorneys' fees, costs and interest.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.     On the First Cause of Action, directing Developer to comply with the terms of the Amended Lease and build the Permanent Quarters, to the specifications provided by the Congregation, in a timely fashion;

B.     On the Second Cause of Action, awarding plaintiff damages against Developer in an amount to be proven at trial, together with attorneys' fees and interest thereon;

C.     On the Third Cause of Action, declaring that Developer must comply with the terms of the Amended Lease and build the Permanent Quarters, to the specifications provided by the Congregation, in a timely fashion;

D.     On the Fourth Cause of Action, enjoining Developer from using the space at the Premises that is supposed to house the Permanent Quarters for any purpose aside from the construction of the Permanent Quarters;

E.     On the Fifth Cause of Action, directing Developer to build the Permanent Quarters, to the specifications required provided by the Congregation, in a timely fashion;

F.     On the Sixth Cause of Action, declaring that Developer must fully replenish the funds removed from escrow pursuant to the Interim Escrow Agreements and that the funds in escrow (the Payout Escrow and the Security Escrow) be released to plaintiff, and directing the Escrow Agent, defendant Stewart Title Insurance Company, to deliver the funds to Plaintiff;

G.     On the Seventh Cause of Action, awarding plaintiff damages against Developer in an amount to be proven at trial, together with attorneys' fees and interest thereon;

H.     Awarding plaintiff reasonable attorneys' fees and costs; and

I.      Granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        June 12, 2023

                              **TARTER KRINSKY & DROGIN LLP**
                              *Attorneys for Plaintiff*

                        By:     */s/ Debra Bodian Bernstein*
                                Richard C. Schoenstein
                                Debra Bodian Bernstein
                                1350 Broadway
                                New York, New York 10018
                                Tel.: (212) 216-8000
                                Fax: (212) 216-8001
                                rschoenstein@tarterkrinsky.com
                                dbernstein@tarterkrinsky.com

FILED: NEW YORK COUNTY CLERK 06/14/2023 04:27 PM
NYSCEF DOC. NO. 43

23-11071-pb    Doc 22    Filed 08/01/23    Entered 08/01/23 18:12:36    Main Document
Pg 49 of 53

INDEX NO. 654427/2022

RECEIVED NYSCEF: 06/14/2023

### VERIFICATION

STATE OF NEW YORK    )
                              ss:
COUNTY OF NASSAU    )

        Arnold Brown, being duly sworn, deposes and says:

1. I am the President of plaintiff herein.

2. I have read the foregoing Verified Amended Complaint and know the contents thereof. The same is true as to my knowledge, except those matters therein which are stated to be alleged upon information and belief and as to those matters I believe them to be true.

                                                  _____
                                                  Arnold Brown
                                                  President

Sworn to and subscribed before
me this 12" day of June, 2023

_____
Notary Public

KABIR S BHINDER
Notary Public - State of New York
NO. 01BH6424044
Qualified in Suffolk County
My Commission Expires Oct 25, 2025

# EXHIBIT F

| Accusation made by the Debtor | Secured Party's Responses |
|---|---|
| Going forward, it is projected that the hotel can generate sufficient revenues to pay post-petition debts, including some level of debt service owed to the Senior Mortgage Lender | By the Debtor's own statements and exhibits, the property is irreparably under water, with approximately $400M of debt and unpaid liabilities far exceeding any estimate of current or future value.

The term sheet for DIP financing presented by the Debtor calls $170M of proceeds which will require $27M of payments over the twelve month period, not including debt service to the Loan or the Junior Mezz Loan. The hotel is projected to generate $13M of net income according to the Debtor's evaluator. |
| Secured Party has moved without any true evidentiary support | Overwhelming support is provided in Secured Party's previous submissions as well as this statement for the fact that (1) the Debtor is completely under water with no hope of recovery, (2) mismanagement has resulted in numerous defaults and judgments against the hotel which put the franchise and lease agreements at risk, with tens of millions of dollars of unfunded commitments and payables, (3) several millions of dollars have been diverted from the property, (4) contracts have been amended to the detriment of the property without obtaining approval from lenders or even providing notice to lenders, and the Debtor made efforts to conceal/obfuscate those amendments so that lenders would not discover them, and (5) debt service payments under the Debtor's proposed restructuring plan would far outweigh property cash flows, sinking the hotel deeper and deeper into debt and putting Secured Lender's collateral at risk. |
| The Chapter 11 case is symbiotically tied to the upcoming Chapter 11 bankruptcy filing by the hotel itself | The two bankruptcy cases are completely independent. Whether the hotel is solvent or not has no bearing on whether the Debtor is solvent |
| The collateral is not declining in value | The property value is absolutely at risk of collapse due to the various defaults and judgments which the Debtor has allowed.

Secured Party has been compelled to make millions of dollars of protective advances in order to keep critical stakeholders paid and the Senior Loan in compliance.

The Debtor's proposed DIP financing would cost the property over $27M of fees and interest over a 12 month period, which is well in excess of cash flows that the hotel is expected to generate. On top of that, interest accruals on the Loan and Junior Mezzanine loan would put the hotel another $19 M in debt. |

| | |
|---|---|
| | Combined debt service of $4M per month during the restructuring period (when the hotel is expected to generate less than $2M per month of cash flows) will require significant equity infusions from Secured Party, which is not realistic given how clearly under water their equity position is. Absent a capital infusion of between $30M and $50M to keep the property afloat, the property's indebtedness levels will escalate to the point where Secured Party's position is wiped out – that more than satisfies the definition of "collateral that is declining in value" |
| Payables to the franchisor and tenant were not funded as a consequence of the cash flow sweep | The Debtor has its timelines wrong and has this statement backwards – the missed payments occurred before the cash flow sweep was put into effect, when the Debtor was diverting millions of dollars from the property. The cash flow sweep was a consequence of the payables, and not the other way around |
| Secured Lender does not provide any support for their $87M claim, which appears to include runaway interest | The payoff amount of the Loan is spelled out clearly in the loan agreement and the Debtor had knowledge of the exact amount that would be due upon maturity prior to entering into the Loan. This is extremely disingenuous to plead ignorance of agreed-upon loan terms

Accrued Balance on Loan (as of July 10, 2023):

Initial Loan:                                  $        57,000,000
Repayment (1.5x)                          $        85,500,000
less: 50% of Origination Fee:        $            (725,000)
less: Payments made to-date:       $         (4,230,098)
plus: Protective Advances:            $          3,716,838
plus: Default Interest:                    $          1,385,974
plus: Late Charges:                        $              289,223
plus: Legal Fees (estimated):         $              500,000
                                                        $        86,436,938 |
| The fact that various items were not paid is consistent with accrual accounting and does not mean that reports were false or misleading | There's a world of difference between managing the timing of payments to vendors and the practices in which the Debtor engaged. On a monthly basis over the entire Loan term, the Debtor was reporting to all lenders that these payments were made and was diverting funds for those payments from the funds remitted to the lenders, in gross violation of the loan provisions. This fraudulent activity siphoned millions of dollars from the property for the benefit of the Debtor and to the detriment of lenders and the vendors |
| The GCC matter will be resolved once GCC makes up its mind as to how it wants to proceed | This position grossly misstates the facts surrounding the GCC space. Suffice it to say that the Debtor was in violation of its commitments to the congregation before the ink was even dry on the agreement, by failing to procure |

|  | acceptable temporary worship space, failing to pay the relocation costs and rent, failure to even commence building out the replacement space or engage with the congregation in good faith to resolve their differences, resulting in a religious community with decades of history in NYC being homeless for years with no place to hold their services.  This is emblematic of how this Debtor conducts its business and how little regard it has for binding legal agreements or matters of law. |