UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

In re:                                                          Chapter 11

560 Seventh Avenue Owner Secondary LLC,                          Case No.  23-11071-PB

                                          Debtor.
--------------------------------------------------------------x


**DEBTOR'S MEMORANDUM OF LAW RELATING TO THE
APPLICATION OF BAD FAITH FACTORS TO THE MEZZANINE
LENDER'S MOTION TO LIFT THE AUTOMATIC STAY**


Goldberg Weprin Finkel Goldstein LLP
*Proposed Attorneys for the Debtors*
125 Park Avenue – 12th Floor
New York, New York 10017
(212) 221-5700

Kevin J. Nash, Esq.
J. Ted Donovan, Esq.

# TABLE OF CONTENTS

Page

Table of Authorities ...................................................................................... ii

Preliminary Statement.....................................................................................1

Background ........................................................................................................2

Legal Argument ................................................................................................5

Point I:  The Debtor's Chapter 11 Case was Filed in Good Faith ..................5

A.    Second Circuit Guideposts.................................................................6

B.    Procedural Standards Favor the Debtor ...........................................10

C.    The Existence of a Parent-Subsidiary Relationship also Establishes the Debtor's Good Faith ...............................................................................11

D.    Once the Hotel is Brought into the Analysis, the Pleasant Pointe/C-TC Factors Favor a Finding of Good Faith.............................................13

E.    The Debtor's Filing was Based Upon a Legitimate Use of the Bankruptcy Code .....................................................................................................15

Conclusion ......................................................................................................17

## TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page**

*Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989) .....................................................................5

*In re 68 West 127th Street LLC,* 285 BR. 838 (Bankr. S.D.N.Y. 2002) .............................9, 14

*In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751 (Bankr. S.D.N.Y. 1997) ...................................10

*In re C-TC 9th Avenue Partnership*, 113 F.3d 1304 (2d Cir. 1997) .................1, 5, 6, 7, 8, 9, 13

*In re Century/ML Cable Venture*, 294 B.R. 9 (Bankr. S.D.N.Y. 2003) ...................................10

*In re Clinton Centrifuge, Inc.*, 72 B.R. 900 (Bankr. E.D.Pa. 1987).........................................15

*In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222 (2d Cir. 1991) ..............................5, 6, 7, 13

*In re Consolidated. Distributors, Inc.,* 2013 WL 3929851 (Bankr. E.D.N.Y. 2013) ..........9, 10

*In re EHT USI, Inc.,* 630 B.R. 410 (Bankr. D. Del. 2021).......................................................11

*In re General Growth Properties, Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009) .................12, 13

*In re GVS Portfolio I B, LLC*, 2021 WL 2285285 (Bankr. D. Del. 2021) ........................ 11-12

*In re Hartford & York LLC*, 2014 WL 985449 (Bankr. E.D.N.Y. March 13, 2014) ...............9

*In re JER Jameson Mezz Borrower II LLC*, 461 B.R. 293 (Bankr. D. Del. 2011) .................11

*In re Johns-Manville Corp.*, 36 B.R. 727 (Bankr. S.D.N.Y. 1984) .................................. 10-11

*In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ..........................9

*In re Mazzeo*, 167 F.3d 139 (2d Cir. 1999)...........................................................................10

*In re Mirant Corp.*, 2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005).............................13

*In re PPI Enterprises (U.S.) Inc.,* 324 F.3d 197 (3d Cir. 2003).............................................15

*In re R & G Properties, Inc.*, 2009 WL 1076703 (Bankr. D. Vt. Apr. 16, 2009)............... 9-10

**Cases**                                                                                                                   **Page**

*In re RCM Global Long Term Corp. Appreciation Fund Ltd.*, 200 B.R. 514
    (Bankr. S.D.N.Y. 1996) ...................................................................................................9

*In re Rubin Family Irrevocable Stock Trust*, 2013 WL 6155606 (Bankr. E.D.N.Y. 2013) ....16

*In re Sletteland*, 260 B.R. 657 (Bankr. S.D.N.Y. 2001) ...........................................................10

*In re The Sunshine Group, LLC*, 2020 WL 1846940 (B.A.P. 9th Cir. Apr. 10, 2020)............14

*In re Sylmar Plaza, L.P.*, 314 F.3d 1070 (9th Cir. 2002)...........................................................15

*In re U.I.P. Engineered Prod. Corp.*, 831 F.2d 54 (4th Cir. 1987) ..........................................11

*In re Walden Ridge Development LLC*, 292 B.R. 58 (Bankr. N.J. 2003)..................................16

*Koutsagelos v. PII SAM, LLC*, 2013 WL 2898120 (E.D.N.Y. June 13, 2013).........................10

*Matter of James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992) ..................................................5

*Matter of Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986) .................................................5

*Matter of Madison Hotel Associates*, 749 F.2d 410 (7th Cir. 1984).........................................15

*Matter of Ofty Corp.*, 44 B.R. 479, 482 (Bankr. D. Del. 1984) ................................................14

*Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828
    (W.D.Ky. 1992) .....................................................................................................1, 8

**Preliminary Statement**

This Memorandum of Law is respectfully submitted on behalf of 560 Seventh Avenue Owner Secondary LLC (the "Debtor") in response to the Court's inquiry as to whether cause exists to lift the automatic stay based upon the application of the "bad faith" factors set forth in *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828 (W.D.Ky. 1992) as adopted by the Second Circuit in *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304 (2d Cir. 1997) ("*C-TC*") (hereinafter, the "*Pleasant Pointe* Factors" or the "*C-TC* Factors"). Although AREPIII MVTS LLC and CREP Times Square Hotel LLC (jointly, the "Mezz Lender") sought relief from the automatic stay under the alternative provisions of 11 U.S.C. §362(d)(1) and (2) they did so without raising the issue of a bad faith filing. Nevertheless, the Court made this inquiry independently pursuant to Order dated August 2, 2023. The Debtor appreciates the opportunity to brief the applicability of the relevant factors and intends to establish at the upcoming evidentiary hearing (currently scheduled for August 31, 2023) that the Chapter 11 case was filed in absolute good faith based upon the Debtor's combined objective and subjective intent and ability to reorganize simultaneously with the Hotel[1] in an effort to enhance and achieve maximum value for the assets involved.

In examining good faith standards, the Court should avoid the impulse to view the Debtor's membership interest in isolation. Instead, the Court should adopt a holistic approach with due recognition that the Debtor is part of an integrated business structure under which the Hotel has tremendous enterprise value that can generate funds to flow upstream to the Mezz Lender once full stabilization is reached. Thus, a determination of the Debtor's good faith

---

[1] The Hotel has been previously defined to mean the Margaritaville Resort Times Square Hotel located at 560 Seventh Avenue, New York, NY, which is owned and operated by 560 Seventh Avenue Owner Primary LLC (sometimes, the "Hotel Owner")

1

should not be made mechanically by simply adding and subtracting the various *Pleasant Pointe* or C-*TC* Factors. The analysis is far more nuanced – as the Debtor's decision to seek Chapter 11 relief is inextricably tied to the overriding goal of gaining a breathing spell to permit the Hotel to achieve full stabilization, resolve a myriad of claims, and overcome the obvious burdens presented by opening during the Covid-19 pandemic. These burdens have been exacerbated by unprecedented interest rate increases over the last year which impeded prior refinancing efforts.

Generally speaking, mezzanine borrowing is often used to augment senior mortgage loans utilizing a single borrower – single lender scenario with equity serving as collateral. Thus, standing alone a mezzanine entity with a single creditor would have little chance to sustain a bankruptcy filing on good faith grounds if a strict formulistic approach is always employed. While the Debtor falls into a conventional mezzanine loan model, it still remains eligible for Chapter 11 protection. At the evidentiary hearing, evidence will be introduced that that the Debtor has both the ability and intent to effectuate a valid reorganization. So long as the Hotel and the Debtor can establish these prong in the context of a legitimate business purpose – both from a subjective and objective standpoint (which they can do) dismissal or relief from the automatic stay should not be granted on the basis of bad faith.

### Background

The relevant facts relating to a determination of the Debtor's good faith will be developed at the scheduled evidentiary hearing, but certain background information is important to put the legal analysis in its proper context.

The Debtor was first organized as a Delaware limited liability company on October 5, 2017. At the time, the property on which the Hotel was subsequently built was owned by a prior affiliate, 560 Seventh Avenue Owner LLC. In or around 2019, the property was transferred to

2

the current Hotel Owner (560 Seventh Avenue Owner Primary LLC). The Debtor became an active equity holder in conjunction with construction financing obtained from a consortium of lenders affiliated with the Related Companies (the "Related Loans"). Full scale construction was launched in 2019 and the Hotel was completed and opened in July 2021.

Shortly thereafter, the Related Loans were refinanced by a new series of loans made by the current set of lenders which all closed together on or about September 13, 2021. The multi-tiered loan structure is subject to a comprehensive Intercreditor Agreement. The Intercreditor Agreement established relative priorities in the Hotel and equity collateral among the Senior Mortgage Lender (OWS BCA Financing LLC) and the senior and junior mezzanine lenders. As part of the refinancing, the Hotel also entered into a cash management agreement with the Senior Mortgage Lender which contains several waterfalls including potential payments of monthly debt service to the Mezzanine Lender. Admittedly, these payments are down in the waterfall of priorities, but they do exist.

The Hotel's branded franchise with Margaritaville Enterprises has been in place since the opening. It adds great value to the Hotel, which contains 234 guest rooms, plus 34,271 square feet of retail space. Most of the retail space, save for approximately 5,000 square feet on the corner of 40th Street, is leased to an affiliate of International Meal Company, Inc. known as IMCMV Times Square LLC ("IMC"). IMC operates a restaurant at the Hotel and pays approximately $300,000 per month in rent while providing food and beverage services to Hotel guests and patrons. A group of private investors involved with the Hotel from the start have contributed equity capital of approximately $77 million to complete the development.

The Hotel experienced significant growing pains after opening in 2021. However, the Hotel is now enjoying an upswing in occupancy and revenues. Starting in May 2023, occupancy

3

rates have climbed to 95% or more with continued strong occupancy projected through the balance of 2023 and into 2014.  The occupancy levels in July were about 97%.  Moreover, the Hotel is now generating consistent monthly revenues of at least $2.65 million per month since May.

Although operations are stabilizing, the Hotel remains subject to several significant financial and legal issues, including pending litigations with the hotel manager, an affiliate of Dream Hotel Group ("DHG"), and the Garment Center Congregation (the "GCC") relating to leasing and redevelopment of basement space at the Hotel.  The Hotel's franchise with Margaritaville and the food and beverage leases are in default and need to be cured and reinstated.

The respective loans to the current lenders went into default as of April 1, 2023, leading to the noticing of an Article 9 UCC foreclosure sale of equity collateral by the Mezz Lender.  This galvanized the need for bankruptcy filings by both the Debtor and, imminently at this point, the Hotel.

Over the last three (3) weeks, the Hotel has readied itself for a Chapter 11 filing, which required significant preparatory work.  Among other things, the Hotel obtained a term sheet for potential DIP financing in the total sum of $170 million, and pursued negotiations with the Senior Mortgage Lender on cash management, use of cash collateral, and protocols for monthly reporting of Hotel collections and payment of expenses.  The cash collateral negotiations have taken the better part of two weeks but are now substantially concluded.  Additionally, in advance of the Hotel's Chapter 11 filing an important agreement was reached with the Hotel and Gaming Trades Council (the "Union").  The Hotel signed a MOU which eliminated the potential of fines and will insure labor peace at the Hotel.

4

Given the multitude of financial issues facing the Hotel, it cannot be said that the bankruptcy option constitutes a litigation tactic to stave off a single creditor. Rather, the Hotel has dozens of creditors and 75 employees and is invoking Chapter 11 following a carefully considered decision involving Independent Managers to attempt to restructure an ever-improving business enterprise that has a clear path of reaching full stabilization.

**Legal Argument**

**I.        The Debtor's Chapter 11 Case was Filed in Good Faith**

The Debtor filed this Chapter 11 case as part of an overall effort to restructure the Hotel's outstanding debts and obligations while it seeks full stabilization and ultimately maximum value for the assets. This is manifestly a legitimate business purpose worthy of Chapter 11 protection. There is nothing in the Bankruptcy Code that makes a company facing foreclosure somehow ineligible for Chapter 11 relief even if it frustrates a foreclosing creditor. In the familiar words of the legendary former Judge Richard Posner of the Seventh Circuit, "[i]t is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?" *Matter of James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992).

To sustain a bankruptcy filing against a claim of bad faith, the Debtor must assuage the Court and creditors that "from the date of filing, the debtor has . . . [a] reasonable probability of emerging from the bankruptcy proceedings and . . . [a] realistic chance of reorganizing". *C-TC, supra,* at 1310, *citing In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991) ("*Cohoes*"). While the Bankruptcy Court can dismiss a case for cause under Section 1112(b), bad faith is not an enumerated ground, although it is widely accepted that good faith is a prerequisite to the right for bankruptcy. *See, Matter of Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986); *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989). Without express statutory

5

guidance, Courts have employed a multi-factor test to define good faith, taking into consideration the totality of the circumstances presented in each case.

### A. Second Circuit Guideposts

In the Second Circuit, the framework for a good faith/bad faith analysis emanates out of the *Cohoes* and *C-TC* cases, which are reviewed to better understand the genesis and underpinnings of the *C-TC* Factors. A thorough reading of these decisions lends clear support for utilizing a holistic approach in assessing the Debtor's good faith to take into account Hotel operations and the fact that the Debtor is part of a larger business enterprise.

In *Cohoes, supra,* an attack was made under Rule 11 after a bankruptcy petition was filed to challenge the constitutionality of a state court default judgment terminating a lease. One of the questions posed was "whether it is frivolous for a corporation in financial distress, but not *in extremis,* to make a Chapter 11 filing if one of the purposes for the filing is to attack collaterally a state court default judgment"? *Cohoes, supra,* 931 F.2d at 224.

The Circuit Court answered this question squarely in the negative and reversed an award of sanctions. In reaching this conclusion, the Circuit Court of Appeals made a number of important observations which should help guide the Court here:

> A petition for Chapter 11 bankruptcy may be deemed frivolous if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings. *See, e.g., Carolin Corp. v. Miller,* 886 F.2d 693, 698–702 (4th Cir. 1989); *In re Coffee Cupboard, Inc.,* 119 B.R. 14, 17–18 (E.D.N.Y. 1990); *In re Marion Street Partnership,* 108 B.R. 218, 223 (Bankr. D.Minn. 1989). Generally, courts should conclude that a debtor has no demonstrable intent to reorganize only if, upon considering the totality of the circumstances, there is substantial evidence to indicate that the debtor made a bad faith filing. *See* 5 C. King, *Collier on Bankruptcy* § 1112.03, at 112–33 (15th ed. 1989).

*Id.,* at 227 (emphasis supplied). The Court went on to state that:

6

> Filing a bankruptcy petition with the intent to frustrate creditors does not by itself "establish an absence of intent to seek rehabilitation." *Banque de Financement, S.A. v. First National Bank,* 568 F.2d 911, 917 (2d Cir. 1977). Indeed, because a major purpose behind our bankruptcy laws is to afford a debtor some breathing room from creditors, it is almost inevitable that creditors will, in some sense, be "frustrated" when their debtor files a bankruptcy petition. *See, e.g., In re Food Workshop, Inc.,* 70 B.R. 962, 967 n. 3 (Bankr. S.D.N.Y. 1987). In reality, there is "a considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose." *Collier* § 1112.03, at 1112–33.

*Id.,* at 228.

In the Second Circuit's subsequent opinion on good faith, in *C-TC*, the debtor there, being a partnership in dissolution, was deemed ineligible for bankruptcy relief as a matter of law. This alone mandated dismissal of the bankruptcy case. In fact, the matter was largely decided in the lower courts on the basis of the debtor's ineligibility without any discussion by the District Court of bad faith. The Circuit Court of Appeals affirmed the Debtor's ineligibility, and then took the opportunity to address the concept of bad faith, reinforcing the framework previously laid out in *Cohoes*:

> When it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the Chapter 11 petition may be frivolous. *In re Cohoes Indus. Terminal, Inc.,* 931 F.2d at 227. Further, "an entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally—the debtor must have some intention of reorganizing." *Id.* at 228.

*C-TC, supra,* 113 F.3d at 1310. From there, the Circuit Court recognized that policies supporting good faith are based upon a balancing of various competing interests:

> The good faith standard applied to bankruptcy petitions "furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy." *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1071 (5th Cir. 1986). Further,
>
> > [t]he purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in

7

> which to return to a viable state. "[I]f there is not a potentially viable
> business in place worthy of protection and rehabilitation, the Chapter 11
> effort has lost its *raison d'etre* ...."
> *In re Winshall Settlor's Trust,* 758 F.2d 1136, 1137 (6th Cir. 1985).

*Id.*, at 1310.  Noting that bad faith is not *per se* an enumerated ground for dismissal under

Section 1112(b), the Second Circuit then looked to and applied the *Pleasant Pointe* Factors

which have become popularly known in New York as the *C-TC* Factors.  These factors are

identified as follows:

(1)    the debtor has only one asset;

(2)    the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3)    the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4)    the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5)    the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)    the debtor has little or no cash flow;

(7)    the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8)    the debtor has no employees.

*C-TC, supra,* 113 F.3d at 1311.

While the *C-TC* Factors certainly help define bad faith, the lynchpin of the analysis still

revolves around the dual inquiry of whether, on the filing date, there was no reasonable

likelihood that the debtor intended to reorganize and no reasonable prospect that the debtor was

able to reorganize.  Applied to this case, this requires the Mezz Lender to establish both an

objective futility and subjective bad faith to prevail at the evidentiary hearing.  Both prongs have

8

to be met before a petition can be dismissed for bad faith. *See, In re 68 West 127th Street LLC,* 285 BR. 838, 846 (Bankr. S.D.N.Y. 2002) [analyzing *C-TC* and holding that "[t]he critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy."]; *In re Kingston Square Assocs.,* 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ["[T]he standard in this Circuit is that a bankruptcy petition will be dismissed if both objective futility and subjective bad faith in filing the petition are found." (emphasis in original)]; *In re RCM Global Long Term Corp. Appreciation Fund Ltd.,* 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ["In this Circuit, a petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found . . . But a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing."].

Significantly, for our purposes, the dual prongs of both objective futility and objective bad faith provide important historical context for the Debtor's core position that in making a good faith assessment the Court should apply a holistic approach. Indeed, the Second Circuit in *Cohoes* specifically urged courts to look to the "totality of circumstances", which is a clear endorsement for applying a holistic approach.

Thus, the Court should "not engage in a mechanical counting exercise to determine whether the Debtor filed this bankruptcy case in bad faith. These factors are to be considered in the context of the totality of the circumstances and not in a vacuum. No one factor is determinative of good faith . . . ." (internal quotation marks and citations omitted) *In re Consolidated. Distributors, Inc.,* 2013 WL 3929851 at *7 (Bankr. E.D.N.Y. 2013). *See, also, In re Hartford & York LLC,* 2014 WL 985449, *4 (Bankr. E.D.N.Y. March 13, 2014); *In re R & G*

*Properties, Inc.*, 2009 WL 1076703, at *2 (Bankr. D. Vt. Apr. 16, 2009) ["Simply checking off

these factors on the list does not prove bad faith."].

### B.  Procedural Standards Favor the Debtor

While the issue of bad faith was raised independently by the Court, the Debtor still enjoys

all procedural advantages, with the initial burden of proof squarely resting on the Mezz Lender:

> Neither the statute nor the legislative history defines the term 'for cause' and the
> legislative history gives only very general guidance.  Thus the 'facts of each
> request will determine whether relief is appropriate under the circumstances. The
> burden is on the moving party to make an initial showing of "cause" for relief
> from the stay. Only if the movant makes such a showing does any burden shift to
> the debtor; absent a showing of cause, the court should simply deny relief from
> the stay.

*In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999) (internal citations and quotation marks omitted).

Moreover, the Federal District Court in Brooklyn has explained, "bankruptcy courts are

advised to adopt a holistic approach, where 'the facts of each [case] will determine whether relief

is appropriate under the circumstances'".  *Koutsagelos v. PII SAM, LLC*, 2013 WL 2898120, at

*4 (E.D.N.Y. June 13, 2013) (*quoting Mazzeo*).

It is also noteworthy that dismissal for bad faith is to be used sparingly to avoid denying

bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances." *In re*

*Century/ML Cable Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003).  *See also*, *In re*

*Consolidated Distributors, Inc., supra*, 2013 WL 3929851 at *7, fn. 47 ["Many courts have held

that dismissal on bad faith grounds should be granted sparingly"]; *In re Sletteland*, 260 B.R. 657,

662 (Bankr. S.D.N.Y. 2001) [noting that courts dismiss cases on bad faith grounds sparingly]; *In*

*re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997) [same]; *In re Johns-*

*Manville Corp.*, 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984) [dismissal on bad faith grounds should

10

be granted sparingly, and only upon a clear showing of abuse of bankruptcy process, avoiding an

"intense focus on the debtor's motives in filing"].

### C. The Existence of a Parent-Subsidiary Relationship Also Establishes the Debtor's Good Faith

The need to apply a holistic approach is particularly apt in cases involving parent and

subsidiary companies. In these situations, Courts view good faith through the prism of the larger

business enterprise. For example, a holistic approach was utilized by the Court in *In re EHT*

*USI, Inc.*, 630 B.R. 410 (Bankr. D. Del. 2021), where the Court noted that

> in the context of large, complex, multi-debtor chapter 11 cases,
> nonoperational holding companies routinely file for bankruptcy. This is
> consistent with the principle that when a business enterprise includes multiple
> debtors, the dismissal analysis is not performed with respect to a debtor in
> isolation—the court must consider such debtors "holistically."

*Id.*, at 430–31. Similarly, the Fourth Circuit Court of Appeals noted that "[i]t was clearly

Congress' intention to allow a parent and its subsidiaries to be reorganized in a single

proceeding, thereby effectuating its general policy that the entire administration of an estate

should be centralized in a single reorganization court. *In re U.I.P. Engineered Prod. Corp.*, 831

F.2d 54, 56 (4th Cir. 1987) (internal quotations marks omitted). Based on this, the Fourth Circuit

affirmed the denial of motions to dismiss filings by subsidiaries when the parent corporation

filed in good faith, explaining that:

> it was clearly sound business practice for Eastmet to seek Chapter 11
> protection for its wholly-owned subsidiaries when those subsidiaries were
> crucial to its own reorganization plan . . . The bankruptcy court correctly . . .
> recognized that there existed an "identity of interest" between Eastmet and its
> wholly-owned subsidiaries that justified the protection of the subsidiaries as
> well as the parent corporation.

*Id.*, at 56.[2]

---

[2] Research reflects that the Delaware Bankruptcy Court found bad faith in *In re JER Jameson*
*Mezz Borrower II LLC*, 461 B.R. 293 (Bankr. D. Del. 2011) and *In re GVS Portfolio I B, LLC*,

11

Critically, the Mezz Lender relied upon the Hotel's value when it made the mezzanine loan and counted on the operations of the Hotel to generate the income to repay the loan. As Judge Gropper explained in *In re General Growth Properties, Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009):

> Movants argue that the SPE or bankruptcy-remote structure of the project-level Debtors requires that each Debtor's financial distress be analyzed exclusively from its perspective, that the Court should consider only the financial circumstances of the individual Debtors, and that consideration of the financial problems of the Group in judging the good faith of an individual filing would violate the purpose of the SPE structure. There is no question that the SPE structure was intended to insulate the financial position of each of the Subject Debtors from the problems of its affiliates, and to make the prospect of a default less likely. There is also no question that this structure was designed to make each Subject Debtor "bankruptcy remote." Nevertheless, the record also establishes that the Movants each extended a loan to the respective Subject Debtor with a balloon payment that would require refinancing in a period of years and that would default if financing could not be obtained by the SPE or by the SPE's parent coming to its rescue. Movants do not contend that they were unaware that they were extending credit to a company that was part of a much larger group, and that there were benefits as well as possible detriments from this structure. If the ability of the Group to obtain refinancing became impaired, the financial situation of the subsidiary would inevitably be impaired.

*Id.*, at 61. Citing favorably to *U.I.P.*, Judge Gropper held that "[t]he point is that a judgment on an issue as sensitive and fact-specific as whether to file a Chapter 11 petition can be based in good faith on consideration of the interests of the group as well as the interests of the individual debtor." *Id.*, at 62. This reasoning and rationale applies here since it is undeniable that the Mezz

---

2021 WL 2285285 (Bankr. D. Del. 2021). However, there are significant distinctions between those decisions and the instant case, the most important being that, in each of those cases, the mezzanine debtor stood alone, without a corresponding filing in the same court by the operating company. Moreover, unlike the dual objective futility and subjective bad faith approach in the Second Circuit, as the Court explained in *GVS*, in the Third Circuit "the 'good faith' filing requirement is based more on objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor" *In re GVS Portfolio I B. LLC*, *supra*, 2021 WL 2285285 at *6 (internal quotation marks and citations omitted).

Lender extended credit to the Debtor because it is part of a larger business enterprise. Hence, the invocation of Chapter 11 by the Debtor as part of any overall effort to restructure the Hotel is not bad faith. *See, also In re Mirant Corp.*, 2005 WL 2148362, at *5-6 (Bankr. N.D. Tex. Jan. 26, 2005) ["the court holds that MirMA, as a key and integrated member of the Mirant corporate family, was placed in chapter 11 in good faith."].

Given the parent-subsidiary relationship, the above authorities certainly lend important support for applying a holistic approach in analyzing the *C-TC* Factors based upon the Debtor's affiliation and connection with the Hotel operations.

**D. Once the Hotel is Brought into the Analysis, the Pleasant Pointe/C-TC Factors Favor a Finding of Good Faith**

If the Court rejects a holistic approach based on the totality of the circumstances, as mandated by *Cohoes*, then the *C-TC* Factors are difficult to overcome. But, if the Court looks at the issue of good faith holistically, taking into account the parent-subsidiary relationship between the Debtor and the Hotel (as the Mezz Lender did when it made the loan in the first place) then the relevant factors fall in the Debtor's favor.

1. There is only one asset: On paper the Debtor's only asset is its membership interest in the Hotel. However, examining holistically the Debtor's membership interest juxtaposed with the operating Hotel, the Debtor is part of a larger enterprise through which the value of the Debtor's asset truly arises. *In re General Growth Properties, Inc., supra*, (refusing to dismiss special purpose entity debtors which had been formed as part of a large enterprise).

2. There are few unsecured creditors: The Mezz Lender is the only direct creditor of the Debtor. However, the Hotel has almost 100 unsecured trade creditors alone potentially owed more than $17.5 million.

3. The one asset is the subject of a foreclosure based on a default on the debt: Again, formalistically, the Debtor's membership interest was subject to foreclosure but holistically, the Hotel was not.

4. The financial condition is a two-party dispute which can be resolved in pending state court action: The holistic approach urged by the Debtor makes clear that the

13

mezzanine loan is part of a much large enterprise which is not subject to a single state court action. In fact, absent a centralized forum presented by Chapter 11, the Hotel could find itself in a wave of litigations that will undermine all efforts at refinancing. The Intercreditor Agreement also establishes that the Mezz Lender counted on the value of the Hotel to support its claim against the equity in the Hotel.

5. Timing of the filing evidences intent to delay or frustrate legitimate efforts by secured creditor to enforce its rights: While the petition was filed on the eve of a non-judicial Article 9 foreclosure sale, courts have held that that is not a *per se* basis to find bad faith. *See In re The Sunshine Group, LLC*, 2020 WL 1846940, at *7 (B.A.P. 9th Cir. Apr. 10, 2020); *Matter of Ofty Corp.*, 44 B.R. 479, 482 (Bankr. D. Del. 1984) ["The filing of a petition to avoid liquidation does not always constitute grounds for dismissal."]. Here, the timing was dictated by the UCC auction sale, but the decision of whether to file was made in conjunction with an anticipated bankruptcy by the Hotel so as to preserve and protect the greater enterprise value.

6. No cash or employees: While the Debtor has no employees, the Hotel certainly does. The Debtor also has potential cash flow moving up the waterfall once full stabilization is achieved, while there is a history of the Mezz Lender receiving debt service payments prior to April 1, 2023 either from reserves or capital infusions.

7. The Debtor cannot meet current expenses: The Debtor has no significant expenses to fund going forward as compared to the Hotel, which has revenues to pay its operating expenses.

**E. The Debtor's Filing was Based upon a Legitimate Use of the Bankruptcy Code**

Here, the evidence will <u>not</u> support a finding of either objective or subjective futility. To the contrary, the Debtor understands the imperative for the Hotel to procure a refinancing as the centerpiece of bankruptcy. There is nothing in the Bankruptcy Code that precludes the Debtor from attempting to accomplish what it cannot do in the face of a UCC-9 foreclosure – obtain the time to procure necessary refinancing, which is the best solution for the Debtor and the Hotel.

As Judge Drain explained in *In re 68 W. 127 St., LLC, supra*, 285 B.R. at 844:

Keeping the primary focus on the permissible uses of the Bankruptcy Code is important because, taken out of context, the exercise of certain rights under the Code that are perfectly legitimate may appear hurtful, even malicious, yet the exercise of a statutory right or remedy should rarely, if ever, be said to be in bad faith.

14

A similar sentiment was expressed by the Court in *In re Clinton Centrifuge, Inc.*, 72 B.R. 900,

905 (Bankr. E.D.Pa. 1987), which explained that:

> Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose which it was not intended. When a debtor is motivated by plausible legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case.

The Ninth Circuit Court of Appeals has held that a strategy to invoke the rehabilitative

features of the Bankruptcy Code is not bad faith *per se*. *See, In re Sylmar Plaza, L.P.*, 314 F.3d

1070 (9th Cir. 2002). There, the lender challenged the debtor's good faith in connection with

confirmation of the plan, arguing that the plan "was crafted solely to permit the debtors to take

advantage of the Bankruptcy Code to profit personally at the expense of a creditor". *Id.,* at

*1074.* In rejecting this argument, the Ninth Circuit stated:

> that a creditor's contractual rights are adversely affected does not by itself warrant a bad faith finding. In enacting the Bankruptcy Code, Congress made a determination that an eligible debtor should have the opportunity to avail itself of a number of Code provisions which adversely alter creditors' contractual and nonbankruptcy rights. The fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith".

*Id.*, at 1075 (internal citations and quotation marks omitted).

Similarly, in *Matter of Madison Hotel Associates,* 749 F.2d 410 (7th Cir. 1984), the

Seventh Circuit upheld the confirmation of a plan finding that the use of Section 1124 to cure

and reinstate a mortgage was a proper reason for a Chapter 11 filing. Other courts have likewise

found good faith when debtors have filed Chapter 11 to take advantage of various types of relief

afforded under Bankruptcy Code that are not otherwise available in state court. For example, in

*In re PPI Enterprises (U.S.) Inc.,* 324 F.3d 197, 211 (3d Cir. 2003) the Court found good faith

in a petition filed primarily to take advantage of the Section 502(b)(6) cap on a landlord's claim.

In *In re Rubin Family Irrevocable Stock Trust*, 2013 WL 6155606, \*11 (Bankr. E.D.N.Y. 2013), Judge Eisenberg found good faith in the filing of a Chapter 11 petition for the primary purpose of avoiding having to post an appeal bond. ["the Debtors' conduct here does not evidence an intention *unreasonably* to deter or hinder creditors through abuse of the bankruptcy process, but rather to prevent a chaotic dismemberment of their assets" (internal quotation marks and citations omitted]. *See, also, In re Walden Ridge Development LLC*, 292 B.R. 58, 64 (Bankr. N.J. 2003) ["In summary, the test to be applied by this Court relative to a motion to dismiss is an examination of the totality of the circumstances, not rigid application of specific factors . . . It is undisputed that the Debtor's motive in filing Chapter 11 was to preserve its Purchase Contract. The preservation of value is a permissible motive for filing Chapter 11 and the good faith requirement must be viewed in context with Congress' intent to promote reorganization"].

Much has been said about the Debtor's good faith under applicable criteria, but in the final analysis the assessment will likely boil down to a simple calculus: Does the Court look at bad faith holistically or in isolation. In the Debtor's view, for all of the reasons set forth above, a holistic approach is required, whereupon the *bona fides* of the Debtor's Chapter 11 filing can and should be sustained.

16

## Conclusion

For all of the foregoing reasons, the Debtor's Chapter 11 petition was filed in good faith and should not be dismissed once a holistic approach is employed to analyze the *Pleasant Pointe* Factors and *C-TC* Factors.

Dated: New York, New York
      August 10, 2023

                                    Goldberg Weprin Finkel Goldstein LLP
                                    *Proposed Attorneys for the Debtor*
                                    Kevin J. Nash, Esq.
                                    125 Park Avenue – 12th Floor
                                    New York, New York 10017
                                    (212) 221-5700

                                    By:    /s/ Kevin J. Nash