UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Hearing Date and Time:

August 31, 2023 at 10:00 a.m.

-------------------------------------------------------------x

In re:

Chapter 11

560 Seventh Avenue Owner Primary LLC,

560 Seventh Avenue Owner Secondary LLC,

Case No.  23-11289-PB

Case No.  23-11071-PB

                                                        Debtors.

Jointly Administered

-------------------------------------------------------------x

## DECLARATION OF SETHIAN POMERANTZ

Sethian Pomerantz declares the following under penalties of perjury pursuant to 28 U.S.C. §1746:

1.      I am the President and sole officer of 560 Seventh Avenue Owner Secondary LLC (the "Debtor"), which is the mezzanine entity holding the 100% membership interest of the Margaritaville Resort Times Square Hotel located at 560 Seventh Avenue, New York, NY (the "Hotel").

2.      I understand that the first phase of the motion of AREPIII MVTS LLC and CREP Times Square Hotel LLC (jointly, the "Mezz Lender") to lift the automatic stay relates to a threshold determination as to whether the commencement of the Chapter 11 case was done in good faith, applying various factors.  The Debtor's legal position, as set forth in its Memorandum of Law [ECF No. 19], is that the applicable factors cannot be applied in isolation without consideration of the Debtor being part of a consolidated business enterprise involving the Hotel at the epicenter.  In our view, the Court should employ a holistic approach to determine whether the Debtor in conjunction with the Hotel satisfies the applicable good faith factors.

3.      Thus, the central focus of this Declaration is to provide various facts supporting the contention that a holistic approach should be employed consistent with the fact that the Mezz

Lender made its senior mezzanine loan in 2021 (the "Mezzanine Loan") predicated upon the assets and operations of the Hotel, and not the Debtor standing alone.

**The Mezzanine Loan was Originated Based Upon a Consolidated Business Enterprise**

4.    To begin with, in conducting due diligence regarding the proposed mezzanine loan, the Mezz Lender reviewed the consolidated financial statements, projections and forecasts for the Hotel, knowing that the ultimate source of repayment was based on the Hotel's assets and revenues.  Indeed, the Mezzanine Loan was made on the strength of the Hotel's anticipated ability to repay the debt directly or through another refinancing.  The reporting given to the Mezz Lender in 2021 was mainly done on a consolidated basis.  This reporting included to the following items that have been identified in Debtor's Exhibits "B" and "N", respectively:

> B.    Consolidated financial statement 2020
> N-1    2021 Budget
> N-2    2021-2023 Annual Budget projections
> N-3    2022 – Monthly pro forma
> N-4    2023 – Monthly pro forma
> N-5    2024 – Monthly pro forma
> N-6    2025 – Monthly pro forma

5.    At the time, the construction of the Hotel had just been completed and was subject to existing senior and mezzanine loans issued by affiliates of Related Real Estate Partners ("Related").  The Mezzanine Loan was made simultaneously with the Hotel's refinancing of the senior mortgage loans in September 2021 by the current senior mortgage lender, OWS BCA Funding LLC (the "Senior Mortgage Lender"), and the mezzanine lenders.

6.    The prior senior and mezzanine loans issued by Related were interconnected with each other and in tandem provided financing for development.  In turn, the 2021 refinancing provided by the Senior Mortgage Lender and the Mezz Lender were also designed to work in tandem, based upon a highly developed intercreditor agreement executed contemporaneously with

the closing on the refinancing by the Senior Mortgage Lender, the Mezz Lender and the junior

mezzanine lender (the "Intercreditor Agreement") (*See*, Exhibit "E").   The Intercreditor

Agreement contemplated that cash flow from the Hotel would potentially be used to pay debt

service on the Senior Mortgage as well as the senior mezzanine loan.   Indeed, the first recital in

the Intercreditor Agreement references the Term Loan Agreement (*See*, Mezz Lender's Exhibit

"4"), which contains the following provisions relating to the Hotel being the source of repayment

to the Mezz Lender:

> **Section 3.7    Transfer to and Disbursements from the Cash Management Account.**
> (b)  Following the occurrence of a Cash Sweep Event, subject to the terms of Section 3.20 hereof, Lender or Cash Management Bank shall disburse the funds in the Cash Management Account in the following order of priority:
> (x)  Ninth, funds sufficient to pay (A) the Monthly Mezzanine Debt Service Payment Amount and (B) any Net Liquidation Proceeds After Debt Service, shall be deposited into the Mezzanine Loan Account to be applied in accordance with the Mezzanine Loan Agreement;
>
> **Section 3.15 Mezzanine Account.**
> Lender shall withdraw funds from the (i) Mezzanine Loan Account to pay the Monthly Mezzanine Debt Service Payment Amount by the date and time when due, together with any late payment charges or interest accruing pursuant to the Mezzanine Loan Documents (ii) Junior Mezzanine Loan Account to pay the Monthly Junior Mezzanine Debt Service Payment Amount by the date and time when due, together with any late payment charges or interest accruing pursuant to the Junior Mezzanine Loan Documents.

7.       The Debtor was able to remain current with the Mezz Lender through February,

2023 and made a total of five monthly pre-petition payments, plus an initial $1,450,000 at the loan

closing, for a total of $5,680,097.65, as listed in Exhibit "G".

8.       The corporate structure of the Hotel (*See,* Exhibit "H") has multiple levels of

membership interests as part of the Hotel's overall financing, with the senior mortgage loan

representing the direct obligations of the Hotel.   Supplementing this mortgage financing are the

two mezzanine loans (senior and junior) obtained by the Debtor's own 100% member, 560 Seventh Owner Mezz LLC, based upon $57 million from the Mezz Lender and $85 million from the junior mezzanine lender, by Global One Real Estate Investment Trust and its affiliates ("Global One").

9.      The membership interests of 560 Seventh Owner Mezz LLC are held by a joint venture known as 560 Seventh Avenue JV LLC.  This joint venture is the beneficial owner of the Hotel, which files consolidated income tax returns covering the Hotel and its direct and indirect members.  Copies of the joint venture consolidated returns relating to the Hotel have been identified as Exhibits A-1 to A-5.

10.      After the senior and mezzanine loans were made in 2021, all subsequent reporting to the respective lenders was done on a joint and consolidated basis, with the Hotel and Debtor providing joint financial statements and monthly profit and loss statements.  This reporting is reflected in the Debtor's Exhibits "B", "C", "D-1", "D-2", "D-3" and "D-4".

11.      All of this confirms that the Mezzanine Loan was part and parcel of the overall corporate financing of the Hotel, tied to its assets and operations.  This is not to say that the corporate separateness of the Debtor from the Hotel was intended to be disregarded, but all of the various levels in the Hotel's organizational chart form a common business enterprise.

### The Business of the Hotel is Improving, Which Supports the Debtor's Good Faith in Seeking Chapter 11 Relief

12.      The property was original acquired in 2014 and refinanced in 2019.  After several years of development and two years of active construction from 2019 to 2021, the Hotel opened as New York City was emerging from the Covid-19 pandemic.

13.      The Hotel as presently constituted operates as a resort hotel under the Margaritaville banner pursuant to license and sublicense agreements.  It contains 234 guest rooms

4

and 34,271 square feet of retail space.  The Hotel was appraised in May 2023 as having a value of between $266 million and $350 million, and it employs approximately 75 people.

14.     It was envisioned that the Hotel would achieve its stabilization by 2023, but challenging market conditions have delayed stabilization into 2024 or early 2025.  By full stabilization, I am referring to the leasing of all rental space and completion of a build-out or relocation of the Garment Center synagogue.

15.     Beginning this year, the Hotel turned a corner and occupancy rates are on a clear upswing, rising from 63% in January 2023 to 95% and higher for April, May, June and July.

16.     In addition to room revenues, the Hotel also receives $300,000 in monthly income from a food and beverage lease with International Meal Company, Inc. ("IMC"), a preferred vendor of the franchisor, Margaritaville Enterprises ("Margaritaville"), which operates a restaurant at the Hotel while also providing food and beverage services to Hotel guests and patrons.

17.     With occupancy improving, the Debtor continues to pursue potential DIP financing with Cirrus REP Funding LLC ("Cirrus").  An initial term sheet was forwarded on July 28, 2023 (*See,* Exhibit "K"), and the Debtor expects to obtain an updated term sheet prior to the hearing based upon ongoing discussions and a significant delivery of operating information and budgets to Cirrus as part of its due diligence.  (*See*, Exhibits "L-1", "L-2", "L-3", "L-4", "L-5" and "L-6").  It is anticipated that the updated term sheet will reduce the outstanding matters remaining open for due diligence.  The proposed DIP lender was interested in the types of projections and reporting that support the good faith of the Chapter 11 filing, reflecting that the Hotel has the prosect for a full turn around.

18.     A further indication of the Hotel's improving operations is the execution of a Memorandum of Understanding with Hotel and Gaming Trades Council, AFL-CIO (the "Hotel

Union") achieved labor peace and eliminated the prospect of substantial fines and penalties *See,* Exhibit "F"). At this point the work force at the Hotel is very stable, and we believe that the Union supports senior management's efforts to retain control. The total current payroll is approximately $102,000 per week, as reflected on Exhibit "I".

19.     Overall, revenues have increased, and Hotel revenues are projected to exceed $30 million for 2023, as shown in the current operating budget contained in Exhibit "J" and the projections going forward as set out in Exhibit "M".

**Using a Holistic Approach, the Debtor and the Hotel Meet the *C-TC* Factors**

20.     On a holistic approach, the Debtor and the Hotel certainly meet the *C-TC* factors.

21.     Taken together, the Debtor and the Hotel have substantial assets, including the real property and the operating assets of the Hotel. There are more than 100 unsecured creditors, including trade debt, suppliers, service providers and the like, with total unsecured debt estimated to be in excess of $11 million. As noted, the Hotel employs 75 people.

22.     The Hotel operations are generating significant cash flow, and, as set forth in the interim cash collateral order, are sufficient to meet current expenses, including payment of partial debt service to the Senior Mortgage Lender. Once the Hotel reaches full stabilization, the Debtor projects that it will be able to begin making debt service payments to the Mezz Lender.

23.     Utilizing the holistic approach, it is clear that the Mezzanine Loan is part of a broader enterprise. The Intercreditor Agreement, Term Loan Agreement and related loan documents also establish that the Mezz Lender looked to the value of the Hotel to support its claim.

24.     I, together with other representative of the Hotel management team and our counsel, met with the Senior Mortgage Lender and negotiated the terms of a cash collateral order.

25.     Throughout the process, we have remained in close contact with representatives of the Franchisor, as well as the food and beverage provider, IMC.  Notwithstanding certain defaults in our agreements with these entities, the relationship remains positive, and we anticipate that both the Franchisor and IMC will continue to remain positive with respect to current management's efforts to stay in control of the Debtor and the Hotel.

26.     Perhaps, most importantly, the Debtor has taken steps, as outlined above, to solicit DIP  financing as a first step in refinancing the senior mortgage loan, provide liquidity and as a prelude to obtaining exit financing.  As noted above, the initial Term Sheet with Cirrus provides for up to $170 million in financing (*See*, Exhibit "K", anticipated to be revised and updated).

27.     Accordingly, I believe that we can demonstrate both that the Debtor and the Hotel have the intention, desire and means to reorganize within a reasonable period of time, meeting both the objective and subjective prong of good faith.

Dated: New York, NY
          August 28, 2023

_____
          Sethian Pomerantz