UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------
In re:

560 SEVENTH AVENUE OWNER SECONDARY LLC,

Debtor.
------------------------------------

Case #23-11071-pb
New York, New York
August 3, 2023
11:00 o'clock calendar

INITIAL CASE CONFERENCE; DOC 10, MOTION FOR RELIEF FROM
STAY FILED BY HARVEY A. STRICKON ON BEHALF OF AREPIII MVTS, LLC
AND CREP TIMES SQUARE HOTEL LLC

- APPEARANCES BEFORE THE HONORABLE PHILIP BENTLEY -

| | |
|---|---|
| For debtor: | KEVIN J. NASH, ESQ.<br>Goldberg Weprin Finkel Goldstein LLP<br>125 Park Avenue, 12th Floor<br>New York, New York 10017<br>(212) 301-6944<br>kjnash@gwfglaw.com |
| For 560 Seventh Avenue: | JOSEPH E. CZERNIAWSKI, ESQ.<br>Condon & Forsyth LLP<br>7 Times Square<br>New York, NY 10036<br>(212) 894.6824<br>jczerniawski@condonlaw.com |
| For AREPIII MVTS, LLC and<br>CREP Times Square Hotel LLC: | HARVEY A. STRICKON, ESQ.<br>Paul, Hastings, Janofsky Walker LLP<br>75 East 55th Street<br>New York, New York 10022-3205<br>(212) 318-6000<br>harveystrickon@paulhastings.com |
| For Garment Center<br>Congregation: | SCOTT S. MARKOWITZ, ESQ.<br>DEBRA B. BERNSTEIN, ESQ.<br>ADAM JONES (Summer Intern)<br>Tarter Krinsky Drogin LLP<br>1350 Broadway, 11th Floor<br>New York, New York 10018<br>(212) 216-8000 |
| For United States Trustee: | BRIAN S. MASUMOTO, ESQ.<br>One Bowling Green<br>New York, New York 10004-1408<br>(212) 510-0500<br>nysbnotice@gmail.com |

2

1                    - A P P E A R A N C E S -

2    For OWS BCA Funding, LLC:        GREGORY PETRICK, ESQ.
                                      INGRID BAGBY, ESQ.
3                                     MICHELE MAMAN, ESQ.
                                      Cadwalader, Wickersham Taft LLP
4                                     200 Liberty Street
                                      New York, New York 10281
5                                     (212) 504-6000

6    Party in Interest:              DENNIS C O'DONNELL, ESQ.
                                      DLA Piper
7                                     1251 Avenue of Americas
                                      New York, New York 10021
8                                     (212) 335-4665
                                      dennis.odonnell@dlapiper.com
9

                                   **LISTEN ONLY**
10
     For Global One Professional     LAURA E. APPLEBY, ESQ.
11   Investment Type:                MARIA CHO, ESQ. (LA Ofc.)
                                      Faegre Drinker Biddle Reath LLP
12                                    1177 Avenue of Americas, 41st Fl.
                                      New York, NY 10036
13                                    (212) 248-3140

14   For AREPIII MVTS, LLC:          GREG DENTON
                                      The Arden Group
15                                    5324 Highland Way
                                      Mentor, Ohio 44060
16                                    (786) 218-1275
                                      gd@ardengroup.com
17

18   For AREPIII MVTS, LLC and CREP  GABRIELLE M. FLAUM, ESQ.
     Times Square Hotel LLC:         JODI KLEINICK, ESQ.
19                                    VICTORIA J SIESTA, ESQ.
                                      ZACHARY ZWILLINGER, ESQ.
20                                    Paul Hastings LLP
                                      200 Park Avenue
21                                    New York, New York 10166
                                      (212) 318-6000
22

23   For CREP Times Square Hotel:    BRANDON FLURY
                                      Corten Real Estate Management LLC
24                                    5425 Wisconsin Avenue, Suite 700
                                      Chevy Chase, Maryland 20815
25                                    (202) 255-1588
                                      bflury@cortenrealestate.com

3

```
- A P P E A R A N C E S -
```

**LISTEN ONLY**

For OWS BCA Funding, LLC:            RAYMOND NAVARO, ESQ.
                                      ANTHONY GREENE, ESQ.
                                      Cadwalader, Wickersham Taft LLP
                                      200 Liberty Street
                                      New York, New York 10281
                                      (212) 504-6000

For Contract-Counterparty of         SARA HOFFMAN, ESQ.
Subsidiary:                          Greenberg Traurig, LLP
                                      One Vanderbilt Avenue
                                      New York, New York 10017
                                      (212) 801-6834
                                      hoffmans@gtlaw.com

For Global One Professional          ALAN TANTLEFF
Investment Type:                     FTI Consulting
                                      1168 Avenue of Americas, 15th Fl.
                                      New York, New York 10036
                                      (212) 499-3613
                                      alan.tantleff@fticonsulting.com

For CREP Times Square Hotel:         STEVEN SCHROEDER, ESQ.
                                      Corten Real Estate
                                      4700 6th Street S
                                      Arlington, VA 22204
                                      (703) 408-2663
                                      sschroeder@cortenrealestate.com

For Margaritaville Enterprises:      DAVID B KURZWEIL, ESQ.
                                      Greenberg Traurig, LLP
                                      3333 Piedmont Road NE, Suite 2500
                                      Atlanta, Georgia 30305
                                      (678) 553-2680
                                      kurzweild@gtlaw.com

For Independent Managers:            JASON S. LEVIN, ESQ.
                                      Morris James LLP
                                      500 Delaware Avenue, Suite 1500
                                      Wilmington, Delaware 19801
                                      (302) 888-6888
                                      jlevin@morrisjames.com

4

1                          - A P P E A R A N C E S -

2                                **LISTEN ONLY**

3   For The Wallstreet Journal:    BECKY YERAK
                                    401 Justison Street, Suite 34
                                    Wilmington, Delaware 19801
4                                   (312) 543-1306
                                    becky.yerak@wsj.com
5

6   interested Party:              PENNOCK J. YEATMAN
                                    Corten Real Estate
7                                   8007 Navajo Street
                                    Philadelphia, Pennsylvania 19118
8                                   (215) 500-4950
                                    pjy@cortenrealestate.com
9

10  For Debtwire                   TAYLOR HARRISON
                                    1501 Broadway
                                    New York, New York 10036
11                                  (859) 559-5694
                                    taylor.harrison@iongroup.com
12

13  For The ABI Project:           UDAY GORREPATI
                                    2725 Turtle Ridge Drive
                                    Bloomfield Township, MI 48302
14                                  (313) 284-7244
                                    uday.gorrepati@gmail.com
15

16  Transcriber:                   AA EXPRESS TRANSCRIPTS
                                    195 Willoughby Avenue, Suite 1514
17                                  Brooklyn, New York 11205
                                    (888) 456-9716
18                                  contact@aaexpresstranscripts.com

19          (Proceedings recorded by electronic sound recording)

20

21

22

23

24

25

560 Seventh Avenue Owner Secondary - 8/3/23                    5

1    COURTROOM DEPUTY:  Good morning.  This is Greg White,

2    the courtroom deputy.  We're here this morning on case number

3    23-11071, 560 Seventh Avenue Owner Secondary LLC, on an initial

4    case conference and a motion for relief from stay.  At this time

5    for those who wish to speak, please go ahead and state your name

6    for the record, and who you represent, please.

7         MR. NASH:  Good morning, Kevin Nash for the debtor.

8         MR. STRICKON:  Harvey Strickon, Paul Hastings,

9    attorney for the secured parties, AREPIII MVTS, LLC, and CREP

10   Times Square Hotel LLC.

11        MR. MARKOWITZ:  Good morning, Scott Markowitz, Tarter

12   Krinsky Drogin, for Garment Center Synagogue.  We may or may not

13   need to speak, but we also have Deborah Bernstein from my office

14   here.  And we also have a law student, who'll be listening in, a

15   summer intern in our firm, Adam Jones is listening in.

16        MS. BERNSTEIN:  Good morning.

17        MR. LEVIN:  Good morning.  Can you hear me?

18        THE COURT:  Yes.  Sorry about that, Your Honor.  Jason

19   Levin, on behalf of the Independent Managers.  Likewise, you may

20   or may not have to chime in, but I'm here nonetheless.  Thank

21   you.

22        MR. MASUMOTO:  Good morning.  Brian Masumoto for the

23   Office of the United States Trustee.

24        COURTROOM DEPUTY:  Okay, thank you.  And the judge

25   will be out in just a moment.

560 Seventh Avenue Owner Secondary - 8/3/23                6

1      THE COURT:  Good morning, everybody.  My apologies for

2  keeping you waiting.  We're here on two matters this morning, a

3  status conference and a lift-stay motion.  Unless parties want

4  to weigh in and ask me to reconsider, I think it probably makes

5  sense to start with the status conference before turning to the

6  lift stay motion.

7      MR. NASH:  Good morning, Your Honor, Kevin Nash for

8  the debtor.  In terms of the status, the case was filed on July

9  9, 2023.  It was filed, as the motion papers indicate, in

10 response to a mezzanine foreclosure sale.  The debtor owns the

11 membership interest of the Margarita Resort Hotel.  We are

12 working on filing the hotel itself in very short order.  And I

13 understand that the 341 meetings and other administrative

14 matters are scheduled, I think, for early next week.  And we

15 have uploaded to the docket a bar date order, I believe.  The

16 schedules and statements have been filed.  And I submitted my

17 retention papers to the United States Trustee's Office.  And we

18 responded over the weekend to the lift-stay motion.

19     THE COURT:  Okay.  And Mr. Nash, can you give me any

20 more clarity on the likely timing of the filing of the hotel?

21     MR. NASH:  Yes, I think I can.  Since the better part

22 of the weekend, I have been in direct negotiations with the

23 senior lender.  We've been going back and forth since Sunday

24 afternoon on the terms of a cash collateral stipulation.  I

25 think we're in the last legs of that.  Updated budgets have been

560 Seventh Avenue Owner Secondary - 8/3/23          7

1   provided to the senior lender.  We exchanged emails as of last

2   night.  One of the issues that we wanted to clear was an issue

3   on cash collateral.  We wanted that to be consensual.  There's a

4   current lockbox arrangement in place where the collections of

5   the hotel go into a lockbox that will be maintained on the cash

6   collateral stipulation.  There's a payroll that has been funded

7   into ADP on Tuesday for prepetition payroll, and that's usually

8   made by early afternoon, around noon on Friday.  We wanted to

9   clear that.  Over the last several days, we have finalized

10  negotiations with the hotel union on an MOU, which was finalized

11  yesterday, and we wanted to clear that and have that executed

12  before the filing.  And so, I'm targeting either late tomorrow

13  afternoon or Saturday morning for the filing.

14          THE COURT:  And apologies if you've said this; I might

15  have missed it.  You're expected DIP lender, is this a new party

16  to the case, or is it one of your incumbent existing lenders?

17          MR. NASH:  No, it's a new party.  It's Cirrus.  I

18  think, C-I-R-R-U-S, phonetically.  We're working through a term

19  sheet.  They're finalizing due diligence.  We do have a term

20  sheet of $170 million, which would be sufficient to refinance

21  the existing senior lender, which is owed about $154 million,

22  $156 million.  In that neighborhood.  And provide additional

23  liquidity for the hotel.  We also received that term sheet, I

24  guess, late last week.  My memory is Thursday or Friday on that.

25  We did circulate that to the senior lender on the hotel side.

560 Seventh Avenue Owner Secondary - 8/3/23                    8

1  Those are some of the issues that they discuss with us in terms

2  of benchmarks and so forth under cash collateral issues as well.

3         Over the last ten days, I think there's been

4  tremendous progress in terms of moving towards a DIP financing.

5  And I do say that without a commitment, it's not definitive, but

6  I think it looks positive, finalizing with the union on an MOU,

7  and hopefully, finalizing our agreements with the senior lender

8  on consensual use of cash collateral with lockbox arrangements

9  to remain in place.

10         THE COURT:  And so, is it fair to say you do not

11  anticipate a priming fight in connection with the DIP?

12         MR. NASH:  No, I don't.  The whole goal of the DIP is

13  to refinance the senior lender.

14         THE COURT:  Okay.  All right.  And I don't want to get

15  into the weeds too much, but the takeout of the senior lender

16  would not occur immediately; that's why you're asking for cash

17  collateral?

18         MR. NASH:  Yes.  Yes.  It's targeted to happen,

19  assuming due diligence is completed, in September.

20         THE COURT:  In September.  Okay.  And we're actually

21  in August now, aren't we?

22         MR. NASH:  Yes.

23         THE COURT:  Okay.  All right.  Thank you, Mr. Nash.

24  If there's nothing more that you want to add, let me open up the

25  floor to other parties, starting with Mr. Strickon, if he wants

560 Seventh Avenue Owner Secondary - 8/3/23                    9

1    to speak.

2              MR. STRICKON:  Do you want me to speak on the status

3    conference or get right to my motion?

4              THE COURT:  No, no, no.  We're still on the status

5    conference.

6              MR. STRICKON:  Oh, I have nothing to add on the status

7    conference.  I'll cover all the points I wish to raise when we

8    have our discussion on the motion.

9              THE COURT:  I appreciate that.  Is there anybody else

10   who would like to be heard as part of the status conference?

11             MR. PETRICK:  Good morning, Your Honor.  It's Gregory

12   Petrick of Cadwalader, Wickersham Taft on behalf of OWS BCA

13   Funding, LLC.  OWS is the senior secured lender to the hotel.

14   We are not directly involved in today's dispute and don't want

15   to take much of Your Honor's time.  We did want to introduce

16   ourselves.  We have just recently, last weekend, saw the term

17   sheet.  We are analyzing it.  We're also analyzing the potential

18   filing of the hotel and considering all of our options.  I think

19   most significantly, Your Honor, as Mr. Nash has indicated, we

20   are in active negotiations for use of cash collateral, if there

21   is a filing.  You know, paramount to us and all parties is to

22   maintain the condition of the hotel, allow it to continue to

23   operate, and we are hopeful that we will be able to reach a

24   consensual agreement with the debtors on that point.  And we

25   hope to do that in short order.

560 Seventh Avenue Owner Secondary - 8/3/23          10

1       We are the largest creditor in the case by some

2  distance, so we have an interest in today's hearing, but you'll

3  hear more from us when and if the hotel files.  Thank you, Your

4  Honor.

5       THE COURT:  Okay.  Thank you, Mr. Petrick.  Don't go

6  away because it's conceivable that I might want to get your

7  input in connection with the lift-stay motion.

8       MR. PETRICK:  Very well.  Of course, Your Honor.

9       THE COURT:  Okay.  Would anybody else like to be

10  heard, again, on the status conference, not the motion.

11      MR. MARKOWITZ:  Yes, Your Honor.  Scott Markowitz,

12  Tarter Krinsky Drogin.  Good morning.  We also have Deborah

13  Bernstein from my office.  And we also have a summer law clerk

14  listening in too.  Similar to the prior counsel, the senior

15  lender on the fee property, we represent the Garment Center

16  Synagogue, which was granted a 99 year lease, $1 a year lease,

17  on the property owned by the fee debtor.  We're just observing

18  today.  We have a great interest there because of that.  You may

19  have seen a reference to it in the papers, but I just want to

20  let you know that we're observing and that we have a great

21  interest ultimately if the fee owner does file chapter 11.

22      THE COURT:  Understood.  Okay.  Thank you Mr.

23  Markowitz.  Anybody else?  Mr. Masumoto, no comments?

24      MR. MASUMOTO:  Good morning, Your Honor, Brian

25  Masumoto, with the Office of the United States Trustee.  Your

560 Seventh Avenue Owner Secondary - 8/3/23          11

1  Honor, I'm monitoring this case.  I was advised of a potential

2  filing, so some of the normal things expected of a debtor have

3  not occurred.  Obviously, there were no first day orders, and in

4  fact, Your Honor, we did not solicit for a committee in

5  anticipation of a subsequent filing with a significant number of

6  creditors.  So, this has been somewhat of an unusual

7  circumstance, and so, we're attempting to monitor the

8  circumstance of this case, as well as the potential filing.

9       THE COURT:  Okay.  And I just want to make sure I

10  understood what you said.  When you said multiple creditors,

11  you're referring to the hotel, not to the current debtor?

12       MR. MASUMOTO:  That's correct.  As far as I know, the

13  debtor only indicated a secured creditor in its filings.  And

14  although the claims register shows two claims that were filed,

15  they appear to have been claims that may be asserted against the

16  hotel.  It's not clear that somehow the debtor may have

17  guaranteed those claims.  And Con Edison was one of the

18  creditors, and then a small supplier of goods, which, again, did

19  not seem typical of the debtor.  So, again, those creditors that

20  filed on the claims register may be creditors of the hotel as

21  opposed to the debtor itself, unless there's some sort of

22  guarantee by the debtor.

23       THE COURT:  Right.  Okay.  Thank you, Mr. Masumoto.

24  So, I'm guessing that we've now completed the list of people who

25  want to be heard on the status conference.  But let me pause for

560 Seventh Avenue Owner Secondary - 8/3/23                    12

1  a second in case anybody else wants to weigh in.  Okay.  Hearing

2  nobody, let's turn to the left stay motion.  And let me make a

3  couple of preliminary comments at the outset.

4          As one of the parties, I think the debtor, pointed out

5  in its papers, under the local rules, particularly 9014-2,

6  today's hearing is not an evidentiary hearing.  But it may or

7  may not be a preliminary hearing.  It could conceivably be a

8  final hearing.  That will turn on whether I conclude at the end

9  of today's argument that evidence is needed to rule on the

10 motion.  If it is, then today's hearing will become a

11 preliminary hearing, and we'll schedule a final hearing,

12 consistent with Code § 362(e).  And that's something that we're

13 potentially going to need to talk about the timing for, because

14 the 30-day clock under (e) runs out a week from tomorrow.  It

15 runs out Friday the 11th.  And so, if we do need evidence, then

16 we may have to hold the hearing as soon as next Friday, unless

17 either I make a finding that's needed to extend it or the lender

18 consents to extend it.  But we can get into that later.

19         Let me make one other preliminary comment.  Mr.

20 Strickon, this is directed at you.

21         MR. STRICKON:  Yes, Your Honor?

22         THE COURT:  You did a fine job in your motion of

23 addressing the facts.  I found your factual presentation very

24 careful and helpful.  Obviously, I'm not making any factual

25 findings just yet, but I was surprised, frankly, that you

560 Seventh Avenue Owner Secondary - 8/3/23          13

1   essentially didn't address the law.  You quoted 362(d)(1) and

2   (2), and in a paragraph each, you marshalled the facts

3   supporting your position that each of those subsections warrants

4   a lift-stay order, but you didn't cite a single case.  And this

5   is not a case where there's no relevant case law.  So, I'm

6   feeling a little bit frustrated by that.

7            MR. STRICKON:  Well, Your Honor, each case is unique.

8   The facts in each case are unique, so citing other cases for

9   factual matter as to the operation of the hotel really are not

10  going to give the court very much guidance.  The question here

11  is, this is a single asset case, a single creditor case, and as

12  Your Honor noted, the law is quite clear on how these cases are

13  generally handled in the Second Circuit.  Plus there was urgency

14  in getting the motion filed.

15           THE COURT:  But let me ask you, I assume you saw the

16  order that I yesterday.

17           MR. STRICKON:  Yes.

18           THE COURT:  And I guess my threshold question to you

19  is, are you arguing, because I think you could, that under the

20  Pleasant Point factors that the Second Circuit has adopted, that

21  I should apply those factors and that that would warrant a

22  lifting of the stay?

23           MR. STRICKON:  Yes, Your Honor.  One thing I wanted to

24  clarify is, the Pleasant Point case ended up in a dismissal of

25  the chapter 11 case, and --

560 Seventh Avenue Owner Secondary - 8/3/23                14

1      THE COURT:  I realize, but if I can dismiss, I can

2    also lift the stay.

3      MR. STRICKON:  Well, we don't want the case dismissed.

4    And after practicing in this area for 50 years, I've discovered

5    that there are reasons that you don't want the case dismissed.

6    And that is because the court could dismiss the case, the

7    secured lender could go through the burden of re-advertising and

8    remarketing the property, and then a day before the sale takes

9    place, the debtor could file again.

10      THE COURT:  No, no, but hang on.  I could dismiss with

11   prejudice, right?

12      MR. STRICKON:  I'm not sure, Your Honor.  I think in a

13   subsequent filing yes, but I think in an initial filing, the

14   best course to follow is to terminate the stay, keep the case

15   active, and then once the UCC disposition is completed, the

16   debtor is free to do with the case what it wants to.  At that

17   point, the case could easily be dismissed as being moot.

18      THE COURT:  I see.  So, in other words, you want me to

19   lift the stay and essentially hold in abeyance any potential

20   dismissal until you've affected your foreclosure?

21      MR. STRICKON:  Yes, Your Honor.  That's exactly the

22   point.

23      THE COURT:  But let me ask you.  I appreciate your

24   candor in sharing with me what sounds like a little bit of a

25   dilemma you were wrestling with.  And it sounds to me like

560 Seventh Avenue Owner Secondary - 8/3/23          15

1  you're sort of saying, I didn't argue Pleasant Point because if

2  I did, the judge might dismiss the case.  Now, that I have

3  identified Pleasant Point, and I'm looking at it, and frankly,

4  it looks like it's potentially applicable here, what do you want

5  me to do about that?

6      MR. STRICKON:  Well, I want you to apply the criteria

7  of the Pleasant Point case as cause for granting relief from the

8  stay.

9      THE COURT:  Okay.  So, you could have argued that in

10 your paper.

11     MR. STRICKON:  Absolutely, Your Honor.

12     THE COURT:  And part of the problem that I now have

13 because you didn't -- you know, Mr. Nash may say to me, judge, I

14 want to be able to put in a brief responding to the Pleasant

15 Point factors.  And frankly, if he says that, I think he's

16 entitled to do that.  What are your thoughts on that?

17     MR. STRICKON:  Your Honor, the Pleasant Point factors,

18 as will be demonstrated, the Pleasant Point case pointed out

19 eight factors as being grounds for, in that case, a dismissal of

20 the case, which we argue is grounds for granting relief from the

21 stay.  In this case, this debtor has violated every one of those

22 eight factors, and there's no dispute that the debtor has

23 breached eight of those itemized factors in the Pleasant Point

24 case.  So, I'm not sure anything is going to be served by

25 putting in any reply papers or sur-reply papers when these are

560 Seventh Avenue Owner Secondary - 8/3/23          16

1   objective tests that the debtor is not disputing.

2           THE COURT:  Well, you may be right, but just as a

3   matter of due process, your adversary has not really been given

4   -- take out the word really, has not been given adequate notice.

5   He's been given less than 24-hours notice that I might be ruling

6   on that ground.

7           MR. STRICKON:  And you indicated that the parties

8   should be prepared to address those issues at the hearing.

9           THE COURT:  Okay.  Look, I didn't get to the end --

10          MR. STRICKON:  I'm ready to address those issues, and

11  I assume that Mr. Nash is likewise ready to address those issues

12  also.

13          THE COURT:  Well, I do, too.  On the other hand, I

14  don't think it's the end of the world, from your standpoint, if

15  I were to allow Mr. Nash to put in a supplemental brief.  It's

16  not going to derail the proceedings.  I like to move swiftly, as

17  a general matter, and I plan to do that here, you'll be glad to

18  hear.

19          MR. STRICKON:  Okay.

20          THE COURT:  Okay.  Let's turn to the substance of the

21  Pleasant Point factors.  So, I don't think I need you to walk me

22  through each one and explain why it applies.  That seems

23  straightforward.  I obviously want to hear from Mr. Nash if he

24  disagrees that they apply.  But the issue I'd like your help

25  with is, there's one factor, in particular, that strikes me as

560 Seventh Avenue Owner Secondary - 8/3/23                17

1  possibly problematic from your standpoint, and that is, single

2  asset debtor.  I mean, strictly speaking, this is a single asset

3  debtor.  Its only asset is the equity interest it holds in the

4  hotel.  At least that seems to be the case.  My question is,

5  assume hypothetically that the hotel had filed yesterday.  I

6  mean, it may file tomorrow.  The timing may complicate things a

7  little bit.  But let's just try to cut to the heart of this.

8  Assume that we now have a multi-debtor case, a two debtor case,

9  the hotel and this debtor.  Is it still appropriate in that

10  circumstance for me to dismiss on Pleasant Point grounds?

11          MR. STRICKON:  Yes, Your Honor.

12          THE COURT:  Tell me why.

13          MR. STRICKON:  Because we believe the cases are

14  unrelated.  While the debtor in this case owns the equity

15  interest in the hotel, change in ownership of the equity

16  interest is not going to have an impact on the bankruptcy filing

17  of the hotel owner other than putting a new indirect owner in

18  place that could possibly resolve all of the operational issues

19  of the hotel a lot better than this debtor has over the past

20  year.  And that's really the objective here, is to oust the

21  present owners of the hotel and to put in a new owner that can

22  deal with the plethora of problems that the current owners have

23  created at the hotel level.

24          THE COURT:  I get that point.  You made that point

25  quite effectively in your papers.  I guess my question is, and

1  obviously this is a question for Mr. Nash as well, I'm looking

2  in from the outside, and I don't know, until I learn from you

3  and Mr. Nash, is it possible that lifting the stay and allowing

4  you to foreclose on the equity interest, changing the ownership

5  interest of, is it possible that that might trigger defaults

6  under important contracts at the hotel?

7          MR. STRICKON:  Is that question directed to me, Your

8  Honor, or to Mr. Nash?

9          THE COURT:  It is.  Mr. Nash gets to think about it,

10  but he'll get to speak later.

11          MR. STRICKON:  Okay.  I can answer that question, and

12  the answer is no.

13          THE COURT:  Okay.  And I guess if the answer is no,

14  then maybe there's not much more for you to say about it.  Okay.

15          MR. STRICKON:  Just for your honest edification, the

16  senior mortgage loan at the hotel level is the subject of an

17  intercreditor agreement between our clients and the lender, One

18  Williams Street, and it governs a possibility that there would

19  be a change in ownership.  But as far as we understand, any of

20  the other contractual relationships with the food and beverage

21  operator, the hotel manager, are not triggered, defaulted, or

22  impacted as a result of a change in ownership.

23          THE COURT:  So, this agreement between your client and

24  the senior lender, would a change in ownership trigger a default

25  from the standpoint of the senior lender?

560 Seventh Avenue Owner Secondary - 8/3/23                19

1        MR. STRICKON:  Not in and of itself.

2        THE COURT:  Can you explain?

3        MR. STRICKON:  Well, it doesn't trigger it, but there

4   are certain obligations that the lenders to this debtor have to

5   the senior lender, certain cure rights, certain buyout rights.

6   There are numerous intercreditor issues that are dealt with, but

7   the mere change in ownership will not -- I mean, the senior loan

8   is already in default.  The mortgage loan is already in default.

9   So, if you're saying, will a change in ownership create a

10  default under the mortgage, the answer is it's already in

11  default.  So, it's really academic.

12       THE COURT:  Let me just push back on that a little bit

13  or follow up on that a little bit.  So, I appreciate it'll have

14  consequences as between you and the senior lender, intercreditor

15  consequences.  Will it have consequences for the hotel?

16       MR. STRICKON:  No.

17       THE COURT:  Okay.

18       MR. STRICKON:  Nothing more than has already been

19  created.

20       THE COURT:  Okay.

21       MR. STRICKON:  So, the point is that the senior

22  mortgage loan is in default and hypothetically, the senior

23  lender could commence a mortgage foreclosure action if it chose

24  to do so.

25       THE COURT:  Right.  Understood.  All right.  So, let

560 Seventh Avenue Owner Secondary - 8/3/23          20

1   me let you continue with your argument.

2          MR. STRICKON:  Okay.  I'll commence, Your Honor.  As I

3   said, we represent the secured lender to the debtor.  The debtor

4   is a mezzanine borrowing entity, whose only creditor is the

5   secured party, and whose only asset is its membership interest

6   in an entity called 560 Seventh Avenue Owner Primary, LLC.  So,

7   for ease of reference, we'll refer to Primary as the owner and

8   operator of the hotel and Secondary as the debtor in this case.

9          The debtor in this case is in turn owned by another

10  entity, which is a junior mezzanine borrowing entity.  And that

11  entity in turn is owned directly or indirectly by three

12  individuals.  One, Sharif al Gamal, Andrew Weiss and Chip Weiss.

13  As you now fully understand, Primary is the owner of the hotel.

14  Primary, as an operating entity, is managed by Soho Properties,

15  which is an affiliate of this debtor.  Margaritaville

16  Enterprises is the franchisor to the hotel.  The hotel is

17  currently managed by an entity called DHG TSQ, LLC, which we

18  refer to as Dream.

19          THE COURT:  Mr. Strickon, sorry.  You're having a

20  little bit of an audio problem.

21          MR. STRICKON:  Is that better, Your Honor?

22          THE COURT:  Might be.

23          MR. STRICKON:  Okay.

24          THE COURT:  It wasn't a terrible problem.  It's just

25  that you're a little bit fuzzy.

560 Seventh Avenue Owner Secondary - 8/3/23                    21

1          MR. STRICKON:  Oh, okay.  I'll try to get closer to

2     the microphone.

3          THE COURT:  Okay.  Yeah, that's better.

4          MR. STRICKON:  Okay.  As I said, Primary, the hotel

5     operating entity, is managed by Soho Properties, which is an

6     affiliate of this debtor.  The franchisor is a company called

7     Margaritaville Enterprises.  The hotel itself is managed by a

8     hotel management company called DHG TSQ, LLC, which we will

9     refer to as Dream.  The Margaritaville --

10         THE COURT:  Can I just jump in, and ask a question?

11         MR. STRICKON:  Right.

12         THE COURT:  I was following you fully until you

13    mentioned -- where I lost you is, there's a management company?

14    But before that, you said the hotel is managed by an affiliate

15    of the owner?

16         MR. STRICKON:  Yes.  The hotel consists of a hotel

17    operation and a restaurant and bar.  The debtor, we'll call

18    Primary, is managed by Soho Properties.  That's an affiliate of

19    this debtor.  But the hotel only entity enters into a hotel

20    management agreement with a professional management company.

21         THE COURT:  Okay.

22         MR. STRICKON:  So, during the course of my

23    presentation, when we refer to mismanagement, we're not talking

24    about the hotel manager per se.  The hotel manager only does

25    what it's allowed to do by the owner of the hotel.  When we talk

560 Seventh Avenue Owner Secondary - 8/3/23          22

1   about mismanagement, and judgments, and problems that are

2   created, these are not created by the Dream Hotels, as the hotel

3   manager, but by the debtor itself.  Margaritaville, the

4   restaurant and bar are separately owned and operated by a food

5   and beverage lessee.  The loan from our secured party, as you

6   know, is secured by the pledge of the membership interest, which

7   is the aim -- I'm sorry to keep interrupting, but the fuzziness

8   is getting worse.  It now sounds like you're almost underwater.

9           MR. STRICKON:  All right.  Is that better, Your Honor?

10  Yeah, I'm sorry.

11          THE COURT:  I don't think getting closer is

12  necessarily the problem.  Why don't you try moving back?

13          MR. STRICKON:  Okay.  Is that a little bit -- maybe

14  that's the problem.  I'm not that technically savvy.  I'm sorry.

15          THE COURT:  Yeah, it's not perfect.  So, I would

16  suggest when the hearing is over, you see if you can do

17  something, but I guess you should keep going .

18          MR. STRICKON:  Yeah, okay.  Behind the loan of the

19  secured party is a junior mezzanine loan to the entity which

20  owns the debtor.  And that's a loan which currently is claimed

21  to be owed $11,667,000.  So, behind our clients $85 million

22  senior mezzanine loan, there's an eleven plus million dollars

23  junior mezzanine loan.  The history is that the loan to our

24  clients first went into payment default on March 9th.  The day

25  after it went into payment default, a notice of default was

560 Seventh Avenue Owner Secondary - 8/3/23          23

1   issued to the borrower on March 10th.  The payment defaults

2   continued and other defaults started to occur which resulted in

3   the notification of disposition of collateral being issued on

4   April 10th, setting a sale date for July 10th, which was three

5   months later.  Payment defaults continued, additional defaults

6   occurred, and there was heavy advertising and marketing by

7   Newmark of the UCC disposition.

8        On June 28th, the debtor filed an action in the Supreme

9   Court seeking a temporary restraining order and a preliminary

10  injunction to prevent the UCC disposition from proceeding.  The

11  court held an initial hearing on June 29th, at which time the

12  motion for the temporary restraining order was denied.  A full

13  hearing was set for July 7th, and at that full hearing the motion

14  for the TRO and the preliminary injunction were also denied.

15  That was on July 7th.  On July 9th, at 7:05 p.m., the day before

16  the UCC disposition was to take place, the debtor filed its

17  chapter 11 petition.

18       Now, a lot of what I'm going to discuss does affect or

19  relate to the operation of the hotel itself.  And the only

20  purpose of focusing on the operation of the hotel is that it

21  affects the value of the collateral and supports the point that

22  our collateral is in jeopardy and is at risk of losing value.

23  The total debt stack of primary, secondary, and the junior

24  mezzanine entity is some $400 million, which is far in excess of

25  any current or future value that the debtor has presented.  The

560 Seventh Avenue Owner Secondary - 8/3/23                    24

1  proposed DIP financing for the hotel, which the debtor referred

2  to, calls for $170,000,000 of proceeds and that will require $27

3  million of payments over the next twelve month period, including

4  debt service to the loan and the junior mezzanine loan.

5  Interest accruals on the loans would put the hotel under another

6  $19 million worth of debt since the hotel is projected only to

7  generate $13 million of net income, according to the debtor's

8  appraiser.

9         Combined debt service of $4 million per month during

10  any restructuring period when the hotel is expected to generate

11  less than $2 million per month will require significant capital

12  infusions.  And absent any capital infusions which are projected

13  to be needed between $30 million and $50 million to keep the

14  property afloat, the unpaid indebtedness will escalate to a

15  point where our secured party lender's equity position could

16  potentially be wiped out completely.  The hotel has serious

17  issues in and of itself.

18         The mismanagement has resulted in numerous defaults

19  and judgments against the hotel which puts the franchise and

20  food and beverage leases in jeopardy.  It is believed, and

21  again, we just are suggesting, that several millions of dollars

22  have actually been diverted from the project.  Contracts have

23  been amended to the detriment of the property without obtaining

24  approval of the lenders and the debtor made affirmative efforts

25  to conceal or obfuscate these amendments so that the lenders

560 Seventh Avenue Owner Secondary - 8/3/23                25

1   would not disclose them.  Debt service under the debtor's

2   proposed restructuring plan far outweigh the property's cash

3   flows, sinking the hotel deeper and deeper in debt.  Our client,

4   the secured party has already been compelled to make millions of

5   dollars of protective advances in order to keep critical

6   stakeholders paid and the senior loan in compliance.  Over a

7   monthly basis with the term of the loan, the debtor was

8   reporting to all of its lenders that payments to vendors had

9   been made, but the debtor at the same time was diverting funds.

10  We believe that this fraudulent activity siphoned off millions

11  of dollars from the hotel to the detriment of the lenders.

12          Now, we're not suggesting that the debtor's appraiser

13  did not proceed in good faith, but the appraisal that was

14  presented to the court was grossly exaggerated, and it doesn't

15  constitute a full qualified appraiser based on information that

16  the debtor deliberately withheld from its appraiser.  Firstly,

17  our position is that the appraisal of what the hotel is worth is

18  what it's worth today and not what it potentially could be worth

19  two years from now.  Significant facts were withheld from the

20  appraiser.  The first was that the inevitable unionization of

21  the hotel would impact the appraised values by at least 15 to 20

22  percent.  The appraiser also assumed that the space that was

23  intended for the Garment Center Congregation could actually be

24  rented out as commercial space.  The financials that were

25  provided to the appraiser differ significantly from the

560 Seventh Avenue Owner Secondary - 8/3/23                    26

1   financials that were provided to our client.

2          THE COURT:  I'm sorry to interrupt, but let me ask you

3   a few questions about the unionization and its relation to the

4   appraisal.

5          MR. STRICKON:  Yes.

6          THE COURT:  So, I get the point that the -- I'm going

7   to call it an appraisal, but I realize it's something shorter

8   than an appraisal.

9          MR. STRICKON:  Yeah, we keep calling it appraisal, but

10  it's really an evaluation more than a full --

11         THE COURT:  Evaluation, yeah.  I get the point that

12  the valuation that the debtors annexed to their papers did not

13  take into account the unionization.  And I saw that the LW

14  Hospitality subsequently circulated a letter saying that, in its

15  view, the unionization would reduce its evaluation by 15 or 20

16  percent.  My question is, what's your basis for saying this was

17  deliberately withheld by the debtor from LW Hospitality?

18         MR. STRICKON:  Because at the time that the appraiser,

19  the digits evaluation, the employees had already taken a vote

20  and approved the unionization of the hotel.

21         THE COURT:  And what can I look at to confirm that LW

22  didn't know about this?

23         MR. STRICKON:  Because it's not mentioned in their

24  appraisal, and they subsequently confirmed that it was not

25  mentioned or considered in their appraisal.

560 Seventh Avenue Owner Secondary - 8/3/23          27

1          THE COURT:  Okay.  I have looked at the valuation.  I

2     haven't scrubbed it.  I'm sure I haven't read it nearly as

3     carefully as you have.  Are you telling me that it does not say

4     a word anywhere about unionization or potential unionization?

5          MR. STRICKON:  That's correct, Your Honor.

6          THE COURT:  Okay.  And one other question.  I have

7     some familiarity with appraisals of hotels, actually, but what

8     you could help with is, can you tell me, what are the main ways

9     in which this valuation falls short of a full-fledged appraisal?

10          MR. STRICKON:  Well, the answer is, it doesn't purport

11     to be a full-fledged appraisal.

12          THE COURT:  I know.  I'm trying to flush that out a

13     little bit.

14          MR. STRICKON:  Yeah, I think that full-fledged

15     appraisals go into much more detail as to comparable sales, room

16     revenues, things of that sort, which this did not do on a full-

17     fledged basis.  I'll call this something that we commonly call

18     desk appraisal, you know, based upon information that's provided

19     to the appraiser, and then the appraiser does an evaluation.

20     Whereas, the appraiser actually goes out itself and gathers its

21     information independently, and then comes to a conclusion as to

22     value.

23          THE COURT:  Okay.  I mean, the funny thing is, the

24     appraisal, once it's been adjusted to account for the

25     unionization, seems like it might actually help your position.

560 Seventh Avenue Owner Secondary - 8/3/23          28

1          MR. STRICKON:  No, no.  If the value of the hotel is

2     15 to 20 percent less than the appraiser says in its

3     conclusions, it clearly shows that there is no equity in this

4     property.

5          THE COURT:  That's my point.  That I'm not sure it

6     helps you to bash the valuation, the valuation actually seems to

7     come out your way.

8          MR. STRICKON:  Yeah, as I say, we're not criticizing

9     the appraiser or its conclusions.  We also need to point out

10    that the appraiser reported as one of the considerations of

11    value the revenue from resort fees that it charged to customers

12    that stay at the hotel, but failed to take into account that 40

13    percent of these resort fees get paid over to the food and

14    beverage operator, so that the income is grossly exaggerated

15    also.  The point is, that the appraisal, even taken at face

16    value, without all of these other considerations, show that the

17    property is underwater.

18         THE COURT:  Yeah, I get it.  And I have one or two

19    more questions, because I think the appraisal potentially helps

20    you in several ways.  One is the value point.  Another point

21    might be supporting your position that there's a pattern of

22    misbehavior by the debtor.

23         MR. STRICKON:  Yes, Your Honor.

24         THE COURT:  A pattern of deception.

25         MR. STRICKON:  It also would go to show the likelihood

560 Seventh Avenue Owner Secondary - 8/3/23                29

1    that even if the hotel did file a bankruptcy case, the

2    assumptions that were made on a going forward basis would not

3    support the debtor's proposed plan of reorganization.

4          THE COURT:  Okay.  Well, the debtor's proposed plan is

5    not before me, and I don't want to hear you tell me about what's

6    been shown to you as a matter of negotiations.

7          MR. STRICKON:  Okay.  That's fine.  But --

8          THE COURT:  Hang on, I have more questions.

9          MR. STRICKON:  Sorry, Your Honor.

10         THE COURT:  I'd like to understand better one of the

11   points you made in your papers, and you reiterated a moment ago,

12   and that is, that if you look at the numbers that went into the

13   appraisal and compare them to the numbers that were given to

14   your client, they're different in a number of significant ways.

15   Now, you're asking me to conclude that there was deliberate

16   obfuscation going on by the debtor.  Help me connect the dots

17   there.

18         MR. STRICKON:  What we're saying, and as I'll

19   elaborate, when I go over the major obligations that the hotel

20   has incurred as a result of the mismanagement, the point is, we

21   don't expect you to make a final ruling on whether or not this

22   debtor did or did not make any misrepresentations or did

23   deliberately inflate the revenue numbers in order to achieve a

24   goal, we're just saying that these are just factors that should

25   be taken into account by the court in determining whether

560 Seventh Avenue Owner Secondary - 8/3/23          30

1  there's any reason not to terminate the stay here because the

2  hotel itself, under the continued management of this debtor, is

3  viable.  We're saying that, you know, it's --

4          THE COURT:  Hang on, I'm not sure I follow you there.

5  It seems to me you're saying or maybe should be saying that

6  there's a whole bunch of things that I should consider that

7  would support a bad-faith dismissal.

8          MR. STRICKON:  Yes.

9          THE COURT:  One of them is a pattern of deception.

10 And obviously, Mr. Nash, I want to hear your rebuttal to that

11 because I'm not assuming that it's true, but it's certainly one

12 of your arguments, Mr. Strickon.  And it seems to me, if I agree

13 with you on that, you want me to make a factual finding to that

14 effect and conclude that those facts are part of the basis for a

15 bad faith lift-stay ruling.

16         MR. STRICKON:  No.  The only point in making those

17 statements is to show that -- the debtor has come forth saying

18 that the hotel owning entity is viable, we're working on a

19 restructuring, we're taking care of all of our problems.  You

20 know, we've heard this now for a year already.  And the only

21 point we are making here is that all of this is just smoke and

22 mirrors.  That we don't expect, with the information that Your

23 Honor has before him, that you can make a factual determination

24 that these are true or not true.

25         THE COURT:  Well, I could if we have an evidentiary

560 Seventh Avenue Owner Secondary - 8/3/23          31

1    hearing.

2          MR. STRICKON:  Well, that's true, yes, we could have

3    an evidentiary hearing, but we don't believe that an evidentiary

4    hearing is necessary.

5          THE COURT:  All right.

6          MR. STRICKON:  Because we're dealing with a mezzanine

7    entity.  As I said earlier on, it's a one debtor, one creditor

8    case.  It was the debtor itself that's making all these

9    arguments that, basically, we've got a hotel entity, we're going

10   to file it, we're going to restructure it, we're going to

11   reorganize it.  But they haven't addressed the fact as to how

12   they're going to deal with the debt at the mezzanine borrowing

13   entity level.  None of what they --

14         THE COURT:  Those are all things on which I might find

15   they're entitled to their day in court, that is, an evidentiary

16   hearing.

17         MR. STRICKON:  Yes.  Yes.  And we're entitled to say,

18   it's all a bunch of wishes and hopes.

19         THE COURT:  So, help me understand.  I'm well aware

20   that there's a number of different paths I could go down.  One

21   is, I could say, there are facts here, and I want to have a

22   trial, and we could schedule a trial.  But you're saying to me,

23   I shouldn't do that.  You're saying to me I should rule in your

24   favor today.  I just want to make sure I'm not confused.

25   Because the way I think of it.  If I were to do that, the

560 Seventh Avenue Owner Secondary - 8/3/23          32

1    simplest basis for me to do that would be the Pleasant Point

2    factors.  Do you agree with that, or do you have an alternative

3    ground you'd like me to lift stay on today?

4          MR. STRICKON:  We believe that all eight of the

5    Pleasant Point factors have been met, clearly met.

6          THE COURT:  Okay.  So, you're now all in on Pleasant

7    Point?

8          MR. STRICKON:  Yeah.  As I said, the only reason that

9    we've raised all these factual issues is because that's the

10   position the debtor has taken, that we have a debtor entity here

11   that owns another entity that owns a hotel, and they're arguing

12   about the future reorganization of the hotel, which, quite

13   frankly, we think is totally irrelevant to the issues before the

14   court on the mezzanine borrowing level.

15         THE COURT:  Okay.  Okay.  Understood.  So, I've been

16   cutting you off in a big way.

17         MR. STRICKON:  That's okay. That's your prerogative.

18         THE COURT:  Why don't you continue?

19         MR. STRICKON:  Yeah.  Just to add fuel to the fire,

20   the hotel has substantial arrears to its franchisor.  It has

21   substantial arrears to its food and beverage lessee.  It is the

22   subject of a judgment that was entered by the hotel management

23   company, the Dream Company, for over $3 million.  And that's a

24   judgment that was based on an arbitration award.  And the

25   likelihood of taking an appeal and being successful on appeal is

560 Seventh Avenue Owner Secondary - 8/3/23          33

1  practically nil.  There's a mechanic's lien that was filed

2  against the hotel for $2.8 million.  The Garment Center

3  Congregation is involved in litigation that has now been going

4  on for a number of years based upon the hotel owning entity's

5  breach of its agreement to provide substitute space and to

6  reconstruct a synagogue in the hotel space.  The union has

7  assessed substantial penalties against Primary for failing to

8  report certain mandatory inventory information that they were

9  required to provide.  And there apparently are past due

10  aggregate payables of some 5 million to $7 million in total.

11  So, the debtor coming in and saying that our subsidiary company

12  is ready to file, and we've got a DIP loan in place and

13  everything is going to be rosy, is far from the truth.

14          As we submitted in our papers, it's clear that the

15  debtor has only one asset.  The debtor filed its schedules, and

16  it shows one asset being its membership interest in the hotel

17  entity.  The debtor apparently has no other unsecured creditors.

18  While Mr. Masumoto indicated that two creditors filed claims, we

19  reviewed the claims, and it appears they filed against their own

20  company.  The debtor only has one asset, which is the subject of

21  the UCC disposition.  The disposition was instituted as a result

22  of defaults that have occurred, and none of those defaults have

23  ever been cured.  It's just a two party dispute that could be

24  resolved between the debtor, and its secured creditor.  If there

25  are any disputes regarding the UCC disposition, they could

560 Seventh Avenue Owner Secondary - 8/3/23                    34

1   easily be resolved in a state court.  The timing of the filing

2   is also critical.  This debtor filed, I think, eight hours

3   before the UCC disposition was to take place.  There is

4   absolutely no cash flow, and the debtor has no so employees.

5        THE COURT:  Wait.  Let me jump in on no cash flow.

6   What I interpret that to mean is, no cash flow, other than any

7   money that gets up streamed from the hotel to pay off, for

8   example, the lender.

9        MR. STRICKON:  Yeah, that's correct.  There is no cash

10  flow because the revenues of the hotel are not sufficient to

11  meet all of the hotel operating entities' creditors.  So,

12  there's no cash flow that's ever been upstream to our borrower.

13       MR. STRICKON:  Oh.  Okay, now, I'm confused, because

14  until a certain point in time, a few months ago, I think.  This

15  spring maybe?  This lender was being paid, wasn't it?

16       MR. STRICKON:  No.

17       THE COURT:  I thought you said the first payment

18  default occurred sometime earlier this year.

19       MR. STRICKON:  Yes.  The way the loan was structured

20  is accrued interest was being picked, you know, paid in kind.

21       THE COURT:  Okay.  So, the mezz lender has never

22  received any payments.

23       MR. STRICKON:  That's correct, Your Honor.

24       THE COURT:  So, everything was pick until?

25       MR. STRICKON:  Until April.  Okay.  Just hang on, I

560 Seventh Avenue Owner Secondary - 8/3/23                35

1   want to write this down.  Let me ask you to pause.  Okay.  So,

2   everything was pick until April.

3        MR. STRICKON:  Yeah, that's my understanding, Your

4   Honor.  Okay?  I will certainly doublecheck with the client, but

5   my understanding is that the interest was being picked and that

6   the April payment was the first actual cash required payment.

7        THE COURT:  Okay.  I'm going to ask you, while Mr.

8   Nash is arguing, to see if one of your colleagues can --

9        MR. STRICKON:  Yeah, I will do that, Your Honor.

10       THE COURT:  -- confirm that.  And just to follow up on

11  that point.  Did you also say no cash has ever actually been up

12  streamed from the hotel to --

13       MR. STRICKON:  I am in error.  There were some

14  payments that were made.

15       THE COURT:  Okay.

16       MR. STRICKON:  Yes.  I apologize for that.  Okay?

17  There were payments that were made, but the payments stopped in

18  April.

19       THE COURT:  So, just give me a little flesh on the

20  bones there.  What payments were made?

21       MR. STRICKON:  The April payment was the first

22  interest payment and nothing was paid going forward.

23       THE COURT:  Sorry, but you just said four payments

24  were made.

25       MR. STRICKON:  There were some payments made.  I'll

560 Seventh Avenue Owner Secondary - 8/3/23                36

1   try to get you the exact date payments were made.

2            THE COURT:  Okay.  I want to be precise on this.  So,

3   I want your help in laying out the facts precisely, because one

4   of the factors, if I wind up ruling on Pleasant Point is, has

5   there been any cash flow, and I want to make sure I have that

6   right.

7            MR. STRICKON:  Okay.  I'm waiting for a response, Your

8   Honor.

9            THE COURT:  Well, you can hold it until, you know,

10  rebuttal.

11           MR. STRICKON:  Okay.  That's fine.

12           THE COURT:  Okay.

13           MR. STRICKON:  I just --

14           THE COURT:  Because I didn't want to get a partial

15  response.  I want to wait till you have a complete response.

16           MR. STRICKON:  Yes.

17           THE COURT:  Okay.

18           MR. STRICKON:  The answer I got, Your Honor, is they

19  started making the payments in October of '22 and made payments

20  through March of '23.  That was when the payments stopped.

21           THE COURT:  Okay.  All right.  And so, there was cash

22  that was upstream during that period?

23           MR. STRICKON:  Yeah, for approximately six months.

24           THE COURT:  Okay.  But I guess to square that with

25  Pleasant Point, you would say, there's no cash flow, other than

560 Seventh Avenue Owner Secondary - 8/3/23                37

1   this limited cash flow you just described.

2          MR. STRICKON:  Yeah, there's no cash flow from that

3   point on.  And based upon the debtor's own projections, it

4   doesn't appear that there would be any cash flow in the near

5   future.

6          THE COURT:  Yeah, let's just pause on that because

7   that last point is heavily factual, right?  You say, it doesn't

8   appear; the debtors are going to tell me, oh, no, it will

9   happen.  I guess I'm wondering whether, as a legal matter, and

10  here's why I wish you had briefed Pleasant Point.  One example

11  of why.  As a legal matter, does it really matter?  That is, the

12  Second Circuit has not said every single Pleasant Point factor

13  has to be satisfied.  It seems to me like a totality of the

14  circumstances standard.  And it seems to me like, potentially,

15  it's good enough from your standpoint, that the other factors

16  are met.  And here, this is partially met, in the sense that,

17  there's no cash flow from sources other than the subsidiary, the

18  hotel.  And even there, the amount of cash has been partial, has

19  been limited.

20         MR. STRICKON:  Yeah, well, there are two reasons why

21  there's no cash flow.  Number one, the projected cash flow is

22  insufficient to meet all of the hotel operator's existing and

23  ongoing expenses.  And the second thing is because the cash is

24  all being trapped by the mortgagee.

25         THE COURT:  Okay.  But I mean, for whatever reason,

560 Seventh Avenue Owner Secondary - 8/3/23          38

1  there was cash during the six months you mentioned, and then the

2  spigot was turned off for some reason.

3       MR. STRICKON:  Well, because of a variety of debts

4  that were remaining unpaid.

5       THE COURT:  No, I realized, but basically, my point is

6  just the financial circumstances down at the hotel seemed to

7  have fluctuated somewhat over time.

8       MR. STRICKON:  And our client had to pay money out of

9  pocket as protective advances because the hotel had insufficient

10  cash to meet critical obligations.  Plus, the fact that right

11  now, the senior mortgage lender is requesting that approximately

12  $10 million of reserves be restored.  The senior mortgage lender

13  took $10 million of reserves and applied in a reduction of its

14  mortgage because of default.  But besides that, the senior

15  mortgage lender says, okay, we've applied the reserves, now you

16  have to restore the reserves.

17       THE COURT:  Okay.  Okay.  All right.  So, thank you.

18  I appreciate your answers to my questions.

19       MR. STRICKON:  Thank you, Your Honor.

20       THE COURT:  Did you have more?

21       MR. STRICKON:  No, I think we've described the whole

22  situation here.

23       THE COURT:  So, let me follow up on putting this into

24  a legal framework.  You said to me, if I understood you

25  correctly, judge, you don't have to consider all the messy

560 Seventh Avenue Owner Secondary - 8/3/23          39

1  facts, the facts that might require a trial, because all you

2  have to look at is what's happening upstairs at the mezz level,

3  at the debtor level.

4          MR. STRICKON:  Right.

5          THE COURT:  And I get that.  But then you say, but I'm

6  giving you all these messy facts sort of to preemptively rebut

7  what the debtor is going to say about how you've got to keep the

8  stay in place, or you'll tank the potential reorg at the hotel.

9          MR. STRICKON:  Correct, Your Honor.  Because we've

10 already fought this battle in a state court, so we know

11 exactly --

12         THE COURT:  You don't have to repeat the argument, I

13 understand it.

14         MR. STRICKON:  Sorry.

15         THE COURT:  Here's my question.  Don't you have a

16 simpler way of dealing with the messy facts?  Because the messy

17 facts, frankly, if I have to decide them, they probably need a

18 trial.  And I'm trying to think through whether I could rule

19 today.  Don't you have a simpler answer to the messy facts?  And

20 that is, maybe they'll reorganize at the hotel level, maybe they

21 won't.  I don't care, and judge, you shouldn't care either,

22 because all you need to care about all, all I need to care about

23 is that letting you foreclose, lifting the stay and letting you

24 foreclose won't impair the hotel's ability to do that.

25         MR. STRICKON:  And we said so much in our papers, that

560 Seventh Avenue Owner Secondary - 8/3/23          40

1  while we do address all these messy facts, we still believe that

2  our position is correct, that you only have to deal with this

3  debtor, and it's all totally irrelevant.  But we can't sit back

4  and remain mute while all these allegations are being made about

5  the rosy future of the Margaritaville Hotel.

6        THE COURT:  Understood.  I do have a few more

7  questions for you.

8        MR. STRICKON:  Surely.

9        THE COURT:  One is, as a legal matter, do you bear the

10 burden on this motion of proving your liens?  You know, I know

11 that at the end of the day, the debtor bears the ultimate burden

12 on everything other than the equity element of the (d)(2)

13 determination.  But what I want to ask you now is prima facia

14 case, do you have to make out a prima facia case today that your

15 liens are valid?

16       MR. STRICKON:  The answer is no, because the debtor

17 has never taken issue with the validity of the lien.  If that

18 was an issue, it would have been raised in the state court

19 proceedings, and it has not been raised in this case.  The

20 validity of the lien is acknowledged to be valid and

21 enforceable.

22       THE COURT:  So, what could I point to support that, if

23 I agree with that.

24       MR. STRICKON:  We can give you a copy of the several

25 hundred page pledge agreement.  It's not several hundred pages,

560 Seventh Avenue Owner Secondary - 8/3/23          41

1   but --

2          THE COURT:  No, no, that wouldn't answer it.  The fact

3   that you have a pledge agreement doesn't prove that you've

4   perfected your lien.

5          MR. STRICKON:  It's not an issue before the court.

6   The debtor has affirmatively acknowledged the validity of the

7   lender's lien.

8          THE COURT:  But I'm asking you to point something that

9   I could look at to confirm that.

10         MR. STRICKON:  As I say, we could file today documents

11  showing it.  The document is merely a loan agreement and a

12  pledge agreement.

13         THE COURT:  But I'm pushing back on that.

14         MR. STRICKON:  I'm not sure what more the court would

15  need to prove that we have a valid lien and a valid claim.

16         THE COURT:  There's lots of cases where a lender has a

17  loan agreement and a pledge agreement, but it turns out in the

18  bankruptcy that there are problems with its lien.

19         MR. STRICKON:  Yeah.  Where a debtor is challenging

20  it.

21         THE COURT:  So, that's what I'm trying to get to the

22  bottom of.  I think there may be a simple answer.

23         MR. STRICKON:  The debtor has never challenged the

24  validity of the lien.

25         THE COURT:  Okay.  So, I mean, I'm trying to make this

560 Seventh Avenue Owner Secondary - 8/3/23          42

1  simple, Mr. Strickon, and I'm asking you to help me make it

2  simple.  I'm thinking out loud now.  I mean, maybe I could look

3  at the debtor's schedules.

4          MR. STRICKON:  The debtor's schedules also acknowledge

5  that there's a lien.  You're absolutely correct.  The debtor

6  filed the schedules.  The debtor shows a single asset, and it

7  shows the single liability secured by a pledge of the membership

8  interest.  That's why we don't believe that the court needs to

9  go any further than that by the debtor's own acknowledgement and

10 its own schedules.

11         THE COURT:  Okay.  So, I'm going to give you a little

12 homework assignment, if you don't mind.  While Mr. Nash is

13 arguing, confer with your colleagues, see if when you speak on

14 rebuttal, you can point me to anything else.  Because, look, it

15 may be the schedules do it for you, and it may they don't.  I'm

16 not looking at them this second.  So, on rebuttal, if you come

17 up with anything more that I could look to, that would be simple

18 confirmation of your point, that would be helpful.

19         MR. STRICKON:  Sure, Your Honor .

20         THE COURT:  Okay.  All right.  Give me one second to

21 see if I have anything further.  Am I right that for today's

22 purposes at least, you're not pressing your argument under

23 (d)(2)?

24         MR. STRICKON:  Well, we did set forth in our papers

25 that the property is not necessary for an effective

560 Seventh Avenue Owner Secondary - 8/3/23          43

1  reorganization because there's nothing to reorganize here.

2          THE COURT:  I don't buy that.  The question is, is

3  there a way the debtor could confirm a plan in this case, and

4  it's not obvious to me that the answer is no.

5          MR. STRICKON:  The only way the debtor could confirm a

6  plan would be with the consent of our client, which our client

7  is not prepared to do.  And the debtor, in its refinancing

8  proposal, says the only way that they could effectuate a

9  reorganization here is if our client agreed to take less than

10 it's owed.

11         THE COURT:  Okay.  So, you know what, I'll see what

12 Mr. Nash has to say on that.  There may be issues you'll want to

13 address on rebuttal, but it seems to me this is an issue that I

14 don't need to get to today.  It's probably impossible for me to

15 rule on the issue today.  Among other things, I'd have to make a

16 ruling on whether the debtor has equity in the property, and

17 that may require a trial to make a finding on the value of the

18 property.  But am I right from your perspective, I don't need to

19 rule on (d)(2)?

20         MR. STRICKON:  That's correct.

21         THE COURT:  Okay.

22         MR. STRICKON:  Because you have sufficient grounds to

23 rule otherwise.

24         THE COURT:  Yup.  Okay.  All right.  Thank you, Mr.

25 Strickon.

560 Seventh Avenue Owner Secondary - 8/3/23          44

1          MR. STRICKON:  Thank you.

2          THE COURT:  Mr. Nash, your turn.

3          MR. NASH:  Thank you.  If I could, I want to take the

4    points in reverse order because I think we have a fundamental

5    dispute as to various items.  In fact, most items, and the

6    notion that we haven't disputed the amount of the claim, the

7    perfection of the claim based upon the schedules, I think is

8    just incorrect.  The schedules that were filed list the

9    mezzanine lender as an unliquidated and disputed creditor, both

10   blanks are checked off.

11         On page 33 of my response, I make the following

12   statement.  I say the mezzanine lender has failed to meet its

13   burden.  And the burden I'm talking about is the burdens that

14   the mezzanine lender has under 362.  It provides no, I

15   underscore the word "no", actual proof of either the correct

16   amount of its claim, the validity of its pledge and security

17   interest, and most importantly, ignores entirely the need to

18   establish that the value of the membership interest is actually

19   declining in value.  And I think there are three or four cases

20   that set the framework for this type of matter.  I think it's

21   intensive factual matter in terms of both value of the hotel,

22   the interplay of the MOU on the value of the hotel, the amount

23   of the actual legitimate claim of the lender.  The issues of

24   mismanagement are disputed.  I think there's a conflating of the

25   fact that the hotel opened up in 2021 in a COVID related

560 Seventh Avenue Owner Secondary - 8/3/23                45

1   environment, had some growing pains into 2022 and early 2023,

2   which explains for certain debts and obligations that have

3   accrued.  But if you look at the swing of the hotel, I think

4   it's very important.

5          If you look at the swing of the hotel, the hotel is on

6   an upward trend, and some objective data supports that.  The

7   occupancy rates are now above 95 percent.  The hotel is

8   generating between closely $2.7 million in revenues.  The senior

9   lender is holding outside of the reserves, which they paid down

10  on, I believe, July 13, another $3.2 million.  And if you look

11  at it in its entirety, the hotel, I think, is on an upward

12  swing.  It has drawn the attraction of a potential DIP lender.

13  And a big part of their motion was, well, there's labor unrest

14  and there's fines and there's penalties, and we can't trust

15  management to rectify that situation.  Well, management has

16  rectified that situation.  There is an MOU that has been signed

17  which eliminates the labor unrest, eliminates any fines and

18  penalties, and I think the MOU is fair to the hotel.  And I

19  think in the economic sense of it, I think it's a positive for

20  the hotel.  It's not the deflation of value that the appraiser

21  may think it is or the valuation may think it is.  There's no

22  basis for the assumption that it's an automatic 15 to 20 percent

23  reduction in value.  In fact, I think I could put on evidence

24  that that's a general rule, if you become a union hotel, you

25  lose value, with the exception of Manhattan.  And particularly,

560 Seventh Avenue Owner Secondary - 8/3/23          46

1   the exception of Times Square.  Because every hotel in Times

2   Square is unionized.

3        THE COURT:  But hang on, Mr. Nash, you really lost me

4   on that point, because isn't it true that LW Hospitality, your

5   valuation firm, put in a letter which is in the record, saying,

6   now that we're taking unionization into account, it knocks 15 to

7   20 percent off the value of the hotel?

8        MR. NASH:  That letter does say that.  I'm not

9   suggesting it doesn't.

10       THE COURT:  And they're your experts, aren't they?

11       MR. NASH:  Well, I think that they provided valuations

12  for both the lender and the debtor, because the letter is

13  addressed, my letter is addressed July 28th to the hotel.  Their

14  letter is addressed August 1st to the mezzanine lender.  And if

15  I'm looking at --

16       THE COURT:  So, I get that.  But you chose to rely on

17  them in a big way.

18       MR. NASH:  I did, and I'm not saying I didn't.  But if

19  you look at it, it's not a definitive statement.  And I don't

20  know what the assumptions they used, but they said likely

21  result.  It didn't say definitive result.  They didn't show any

22  basis for why it would be an automatic 15 to 20 percent

23  reduction in value.  And yes, I use this appraisal, but this

24  notion that it's a likely result, I don't think is supported by

25  any evidence in the midtown market.  And I would like to test

560 Seventh Avenue Owner Secondary - 8/3/23                    47

1   that, and I think I should have the opportunity to test that,

2   because that came in on reply.

3          There are a lot of things I would like to test.  I

4   would like to test, and I would like to have the opportunity to

5   present evidence on this notion of general mismanagement.  And

6   I'd like to put into context where we actually stand with the

7   franchise owner, Margaritaville.  And you asked a very poignant

8   question, and I think you can't answer that question off the

9   cuff.  Would a change in management affect any of the existing

10  contracts in terms of default?  Well, Mr. Strickon didn't answer

11  whether or not, and I would have to look at it, whether or not

12  that would cause a default under the franchise agreement.  And

13  there are payment arrears owed to Margaritaville, but there's no

14  notice of default and no notice of termination.  Just like there

15  are disputes going back and forth between the hotel and the food

16  and beverage operator, but there's no notice of termination on

17  that.  So, all of these issues are curable.  All of these issues

18  can be fixed with negotiation.  And I think when you look at it,

19  you can't take away from the fact that the papers here were

20  filed without any scintilla of any evidence, and they were filed

21  to throw dirt at the wall in terms of mismanagement, without

22  understanding each and every element of the growing pains of the

23  hotel, the issues that were really with the management company

24  Dream, where we really stand with the franchise holder,

25  Margaritaville.  Where we really stand with the food and

1    beverage operator.  Where we really stand with the ability to

2    track new DIP financing.  So, all of those issues, I think, are

3    fact intensive, and I would ask for an evidentiary hearing on

4    those issues because you cannot make an evaluation as to the

5    legitimacy of the filing, the long term and short term prospects

6    at a hotel without hearing actual positive evidence one way or

7    the other that gives you a clear record forward.  Quite frankly,

8    I haven't seen a motion to lift a stay where they didn't even

9    put in their loan documents.  They didn't put in an accounting

10   of how they go from 57 million principal to 87 million total.

11   There were payments made either through reserves or payments

12   from investors through March.

13           THE COURT:  So, Mr. Nash, let me try to cut to the

14   chase here, because I agree with a lot of what you've said, but

15   let me try to sharpen the focus.  Here's what I agree with you

16   on.  I agree that a lot of the issues you mentioned are factual.

17   And if I need to decide them in order to decide this motion,

18   then we need a trial.  No question.  Valuation?  You've got to

19   have a trial, right?  Arguments about mismanagement, deception

20   by management, you've got to have a trial.  I'm not deciding

21   those without a trial.  Okay?  But now let me try to hone in on,

22   are the issues in fact simpler?  Do I really need to rule on

23   those issues?  Could I grant the motion without getting to those

24   issues?  And what I'd like to ask you to do is walk through with

25   me the seven or eight factors, eight factors that the Second

560 Seventh Avenue Owner Secondary - 8/3/23                49

1   Circuit recites in the -- do you have the CTC case handy?

2          MR. NASH:  I don't, but I kind of know the factors,

3   and I'd be more than happy to walk through with those factors.

4          THE COURT:  Okay.

5          MR. NASH:  And I also like the opportunity to brief

6   them in detail.

7          THE COURT:  Okay.

8          MR. NASH:  Because most CT type motions, and I'm just

9   going to note, and I saw what Your Honor entered yesterday

10  afternoon, so I'm not caught by surprise, but I'd certainly like

11  to brief each of those factors.  Most motions that rely on CT

12  state, we're relying on --

13         THE COURT:  No, you don't have to persuade me.  I'm

14  going to give you the opportunity to brief it.

15         MR. NASH:  And if I could just make one further point.

16         THE COURT:  Yeah, go ahead.

17         MR. NASH:  I'm going to use the word gloss.  Maybe I

18  shouldn't, I think it's more than gloss.  I think in the Second

19  Circuit, CT starts with two things, an objective and a

20  subjective prong that to get relief under CT, you have to

21  establish with evidence that it's objectively futile and

22  subjectively futile.  That there is no legitimate objective

23  basis to reorganize.  And the debtor doesn't want to reorganize,

24  has no intention to reorganize, just wants to delay.  I don't

25  think you can get to that on the hearing of the evidence.  I

560 Seventh Avenue Owner Secondary - 8/3/23                50

1   would also --

2           THE COURT:  Yeah, let me respond to that because I

3   know what you're referring to, and I'm not sure I agree with

4   you.

5           THE COURT:  So, there are other cases, not CTC, that

6   talk about there being two tests, an objective and a subjective.

7   There's several cases by Judge Brosman going back more than 20

8   years that adopt that dual standard.  She was relying on an

9   earlier Second Circuit case called Cohoes, I think.  CTC, I

10  believe, doesn't get into that standard.  And there are later

11  decisions.  For example, one by Judge Glenn and another by Judge

12  Gerber, both highly regarded colleagues of mine, that choose not

13  to follow the Judge Brosman dual standard but instead do a more

14  straightforward, largely apply the CTC, Pleasant Point factors.

15  Anyway, I'm just mentioning that because it may help focus you

16  as you brief the issue.  But for today's purposes, let's walk

17  through the Pleasant Point CTC factors together.  I have them in

18  front of me.  So, I'm happy to tick down the list, one by one.

19  And what I'm going to ask you for each of these factors is,

20  let's assume that after briefing I conclude that this is it.

21  Right?  This is the legal standard I'm required to follow.  What

22  I want to get to right now, in that scenario where I'm adopting

23  this as the standard, which I haven't done yet.  But if I were

24  to adopt it, do you agree that each of these facts is undisputed

25  in this case?  Or if you have disputes, tell me what they are.

560 Seventh Avenue Owner Secondary - 8/3/23          51

1   If you think a trial is needed to address a dispute.  Okay?

2          MR. NASH:  Yes.

3          THE COURT:  All right.  So, eight factors.  Factor

4   number one the debtor has only one asset.

5          MR. NASH:  This debtor has one asset in the sense it

6   owns the membership interest in a hotel, which is an asset unto

7   itself.  So, it has one direct asset and one very large indirect

8   asset which holds multiple property rights.  It owns the hotel.

9   It operates the hotel.  It has reserve funds.  And it has the

10  ability to generate income.  So, on a direct basis, yes.

11  Through the membership interest, no.

12         THE COURT:  Okay.  No, I appreciate that.  And look, I

13  don't want to hide my thinking from either you or Mr. Strickon.

14  Here's my view on that issue.  I agree with what you said that

15  whether the debtor has one asset or many is a matter of how you

16  interpret those words, one asset.  But here's what I think

17  really matters.  I think it's a question of, would keeping the

18  stay in place for this debtor further the purposes of the

19  Bankruptcy Code?  And what I mean by that is, if I lifted the

20  stay and Mr. Strickon's client were to foreclose, would that

21  impair the hotel's ability to reorganize?  I think that's what

22  it comes down to.  I mean, that's my preliminary view based on

23  what I've seen so far.  And so, you've already, I think, given

24  me your answer sitting here today to the question, what impact

25  would foreclosure have.  I think your answer is, it might have

560 Seventh Avenue Owner Secondary - 8/3/23                52

1   bad impacts.  You need to look into it further.

2          MR. NASH:  And there's one obvious impact that I think

3   is important.

4          THE COURT:  What's that?

5          MR. NASH:  Present management is committed to getting

6   refinancing, exit financing as well as DIP financing.  And so,

7   to me, that's another factual issue that we have to really

8   seriously look at.  Because I think if you canvassed everybody

9   on this screen, the answer to the long term viability of the

10  hotel, and I did say in my papers, I think it is a solid asset.

11  It is a new series of lenders that can stabilize immediate

12  operations and ultimately take out the mezzanine loans.  So, we

13  cannot say sitting here now, certainly without evidence, that

14  the change in management would not affect financing.  And I

15  think it's a very important aspect of this case, and quite

16  frankly, in my mind, could be the most important aspect of this

17  case.  Certainly to leave chapter 11 is the ability to bring in

18  new financing that deals with these situations.

19          And I don't think there's anything in the papers that

20  I saw that dealt with two things, one, eliminating any

21  possibility that there can't be new financing.  There was

22  frustration from the mezzanine lender for sure that it didn't

23  happen yet.  But let's look at the timing that we're talking

24  about.  The default happen in April.  They sent out an immediate

25  notice, and now we filed in July.  So, I don't think you can

560 Seventh Avenue Owner Secondary - 8/3/23                53

1   make an indictment on the debtor's ability to bring new

2   financing to the table because it couldn't do it between April

3   and July.  Now, obviously the filing of the chapter 11 turns up

4   the heat on, put up or shut up time in terms of financing.

5   We're aware of it, and we think we can make the case for it.

6   But we have to be, I think, and I think the court is imminently

7   fair, but I think the mezzanine lender is not fair to paint us

8   with such a broad brush and ignore a lot of these issues, which

9   they call mismanagement because certain monies are owed.  New

10  money cures a lot of ills, and I think it can cure ills here.

11          And I go back to Timbers, because I did cite Timbers.

12  Quite frankly, judge, the case I most rely upon is your Holiday

13  Inn case, Golden Seashore case.  I read that very closely,

14  judge, and I took some heart into that case.  Why, there was a

15  seven hour trial on that case, I think you looked at it

16  correctly.  Who has the burden of proof, and what do you have to

17  prove.  And what the proof was, diminution in the value of the

18  collateral.  And you held the lender, and I think you ruled

19  against the lender, because they didn't offer any sufficient

20  proof.  They offered some proof, I don't think they offered

21  sufficient proof.  And here we just have accusations,

22  allegations, and I agree, there are judgments against the hotel.

23  There was an adverse arbitration.  Now, the irony of that

24  arbitration is, the hotel sent out a notice of termination

25  against Dream, and went through a three year arbitration or a

560 Seventh Avenue Owner Secondary - 8/3/23          54

1  two year arbitration, and the amount in issue was a million

2  dollars, but with the fees and expenses, it became $3 million.

3  And I asked them why wasn't that settled, and both sides believe

4  they were right in their positions.  Whether or not that is true

5  or untrue, that's not an indicia of mismanagement.

6          THE COURT:  But I got to say, Mr. Nash, the pattern

7  here from a big picture perspective, looks like your client

8  can't get along with anybody.  They're at loggerheads with their

9  franchisor and also with their food and beverage company  And

10  also with their management company and also with this synagogue

11  that is out on the street because of --

12          MR. NASH:  Well, if I can address each of those?

13  Those are fair points, and I'd like to address it.  Okay?

14  They're in arrears with Margaritaville.  But if you heard the

15  testimony, there's no notice of termination, and I don't think

16  the relationship is as fractured as the mezzanine lender

17  portrays.  I do agree the relationship with Dream, who is the

18  management company, is fractured, but that management company

19  can and should be replaced.

20          The synagogue is a long standing issue.  Mr. Markowitz

21  is on the Zoom.  From our view, there's been no adverse

22  determination in the state court.  We recognize that it has to

23  be resolved.  I put in my papers, I don't think the synagogue is

24  coming back to the location.  I think a lot of the relationship,

25  they didn't get final approval or there was an issue as to how

560 Seventh Avenue Owner Secondary - 8/3/23                55

1   it would be redeveloped physically in the basement.  And I do

2   think there's a monetary issue to resolve with the synagogue.

3   And I would note, as I understand there's already $1.7 million

4   in escrow with a title company, which can be used towards

5   resolving that.  There were approximately $5 million set aside

6   in escrow with the senior lender that was now reallocated to pay

7   down the debt.  But yes, there is an issue with the synagogue.

8   I don't think it's irreparable, I think it's a long standing

9   issue on relocation, and I do think it can be resolved with a

10  fair payment to both sides.

11          THE COURT:  Food and beverage, is that --

12          MR. NASH:  Food and beverage, they still pay rent as

13  we speak today.  So, it's back and forth.  They pay us rent, we

14  owe them monies on customers.  People charge it to the rooms,

15  just like you would expect.  There were certain expenses that

16  we're being charged under their monetary demand that we don't

17  think belong to the hotel, we think belong to the food and

18  beverage company.  But that's a reconciliation and a final

19  payment.  And I think the numbers that we're talking about are

20  closer to 500,000 than over a million dollars.  So, the food and

21  beverage company is still in place.  They're not walking out.

22  And I'm not going to use the word "excited," but I think the

23  published reports from Margaritaville, and again, the food and

24  beverage company is not Margaritaville, but it's a preferred

25  vendor.  I think Margaritaville wants to remain in Times Square,

560 Seventh Avenue Owner Secondary - 8/3/23          56

1   and I think we can work out our issues with them.  But again, I

2   have to prove that up to Your Honor, and if I prove that up, I

3   think it's important.

4        But I also think they jumped down my throat on the

5   labor issue, and they came to all sorts of conclusions that were

6   adverse when in fact, we now have labor piece on a decent MOU,

7   which will be a part of the chapter 11 filing of the hotel.  The

8   senior lender has it, and I think that's a positive step.  So,

9   yes, historically there's been disputes, and I don't mean to cut

10  you off, judge.  I've been involved in this since, I would say,

11  late June.  And since I've been involved, I think, we've made

12  headway on a potential DIP loan.  We certainly made headway on

13  an MOU with the union.  And I think if you look at the operating

14  data, I think the hotel is operating very strongly.  You know,

15  as Timbers says, a reasonable time to achieve a reasonable

16  reorganization, if I can keep up this pace, I think we can meet

17  that standard, and that's an important standard here.

18       So, I know the CT factors, if you look at it very

19  narrowly, and I want to brief it because I don't think you

20  should look at it that narrowly.  And we go consistent on the

21  factors.  One of them is no employees.  True, no direct

22  employees, but certainly --

23            THE COURT:  Hang on, let's do this in orderly fashion.

24            MR. NASH:  Sure.

25            THE COURT:  Before we continue marching down the CTC

1  list.  Because I do want to return to that.  First, let me give

2  you a couple.  First let me give you two reactions to what

3  you've said.  First off, I fully agree with you that if we wind

4  up having to litigate the issues you just discussed, it's going

5  to be a very long trial.  And if we have to litigate valuation,

6  I think, everybody on this call appreciates how expensive and

7  complicated that can be.  If we have to litigate battles over

8  management dishonesty, or incompetence, or orneriness, that's

9  also messy.  I am hoping that we can resolve this motion without

10 having to have a trial on either of those types of issues.  I am

11 looking to see whether we can have a much more targeted trial if

12 we have a trial at all.  And in my mind, the potential way to do

13 this is by focusing on the CTC factors.  Because frankly, if the

14 CTC factors apply, and if you lose on them, then I don't need to

15 get into whether your clients are bad guys, or what the value of

16 the hotel is, or even whether the hotel has great prospects

17 because I'm only going to rule against you on the CTC factors if

18 I conclude that what's happening at the mezzanine level is

19 completely separate from what's happening below.  And I can let

20 your lender foreclose at the mezzanine without harming the

21 hotel.  If I think it harms the hotel, I'm not going to allow

22 that.  Or I won't allow it with it out getting into the more

23 difficult issues.  But that's the threshold question.  So, let's

24 turn back to that.  And you said something interesting that I

25 want to follow up on.  I asked you would there be any adverse

560 Seventh Avenue Owner Secondary - 8/3/23                58

1  consequences from foreclosure at the mezz level, and one thing

2  you said is yup, one potential bad consequence is, my clients

3  are in great shape for getting financing.  And if this lender

4  forecloses, who knows what will happen, right?  That's basically

5  what you said.

6          MR. NASH:  That's correct.

7          THE COURT:  So, let me follow up on that.  Are you

8  saying the lender would be less effective than your clients at

9  getting the financing that's needed?  Or are you making an even

10  stronger argument, namely, that the lender would not be

11  interested in getting refinancing, it would just liquidate?

12          MR. NASH:  I believe that if there is a change in

13  control, the likely path forward is the sale of the hotel.

14  That's what I believe.  I Think --

15          THE COURT:  But, I mean, is that necessarily the end

16  of the world?  A new operator, a  new owner comes in.  They put

17  in place a new operator.  Maybe the new operator gets along

18  better with Margaritaville and the other key parties than your

19  clients.  Why is that a disaster?

20          MR. NASH:  I think that's somewhat up in the air, who

21  would get along better.

22          THE COURT:  I know.  But who knows what the answer is?

23          MR. NASH:  But I want to answer your question.

24          THE COURT:  All right.  So, why is it so terrible --

25          MR. NASH:  I want to answer your question.

560 Seventh Avenue Owner Secondary - 8/3/23                59

1      THE COURT:  Okay.

2      MR. NASH:  And I think it's important that we focus on

3  this.  There's a concept that's floating about in these

4  expressions, appraisals of value and so forth.  It's called full

5  stabilization.  Now, I think it's important because a lot of the

6  reserves that were created in 2021 went through a concept of

7  full stabilization, meaning that the hotel was up and running,

8  food and beverage was going great guns, and all the retail space

9  had been leased.  I think it's very important that we underscore

10  that.  We have not reached full stabilization.  You know, you

11  can blame market conditions to a large extent.  We can't divorce

12  ourselves of what market forces that came into play in 2023,

13  late 2022, that were not necessarily in play in 2021.  And so we

14  have to work through those market forces, because I'm a believer

15  that Times Square is still a unique place in the world and that

16  retail chunk of space that we have can be rented and we can

17  achieve full stabilization.  So, the value here, I think, for

18  creditors is in achieving full stabilization.  And I do think

19  you need bridge financing, DIP financing, and likely two

20  tranches of DIP and exit financing to get you to that point.

21  And I do think the current management is in the best position to

22  do that.  Why?  They've done it twice already.  The original

23  loans here were refinanced.  So, back in the day, they got

24  initial financing, large amounts of money.  They got those

25  refinanced in 2021.  And so, these lenders came in about two

560 Seventh Avenue Owner Secondary - 8/3/23          60

1   years ago.  And I think if you give this management team a

2   chance, I think they can refinance this type of debt as well.

3   And I don't think if you look at it, you can say that's

4   impossible.  And the change in management, I think, would set

5   the hotel in another direction.  So, I think that's an important

6   point to be developed at a trial as well.

7          THE COURT:  Okay.  I hear you.  Let's go back to the

8   CTC factors.  I think hopefully we can actually march through

9   the rest of them or most of the rest of them quite quickly.

10  Number two, debtor has few unsecured creditors.  Would you agree

11  that the debtor has either no unsecured creditors or at most

12  two?

13         MR. NASH:  I don't think I even have two.  I think the

14  Con Ed is obviously at the hotel level, and I would assume the

15  vendor is at the hotel level.  Directly, they have no unsecured

16  creditors.  The hotel operation has quite a bunch.

17         THE COURT:  Of course, you don't have to persuade me

18  of that.  All right.  Give me a second.  Number three, the

19  debtors one asset is the subject of a foreclosure action.  That

20  seems clear.  Number four, the debtor's financial condition is,

21  in essence, a two party dispute, which can be resolved in the

22  foreclosure action.  I assume that's a yes.

23         MR. NASH:  Well, it is directly a two party dispute.

24         THE COURT:  And I understand your point about

25  indirectly.

560 Seventh Avenue Owner Secondary - 8/3/23                61

1          MR. NASH:  Right.  Right.

2          THE COURT:  All right.

3          MR. NASH:  And I would just say, judge, so we

4    understand because I don't think we should gloss over this.

5    This was an Article 9 UCC non-judicial foreclosure.  They sent

6    out a notice, notice of disposition of collateral.  The

7    litigation that we're talking about is a litigation over the

8    commercial reasonableness of the notice.  So, it's not a

9    conventional mortgage foreclosure where you have a judgment of

10   foreclosure, a referee's report computing outstanding amounts

11   and so forth.  We didn't have that here.  We had --

12         THE COURT:  I know, but that doesn't necessarily mean

13   you get a bad outcome from a value standpoint.  Does it?

14         MR. NASH:  But I just wanted to make that distinction.

15   I understood, particularly CT, and I think even Cohoes, I think

16   they all emanated, if I'm not mistaken, all out of lender

17   foreclosures, judgments of foreclosure actions.

18         THE COURT:  Okay.

19         MR. NASH:  I agree they apply, regardless of a

20   judicial foreclosure or nonjudicial, but I think there is a

21   variance there.

22         THE COURT:  Okay.  All right, I hear you.  The next

23   point, I'm not asking you to accept the characterization here,

24   but the underlying facts.  The next point is the timing of the

25   debtors filing evidences an intent to delay or frustrate the

560 Seventh Avenue Owner Secondary - 8/3/23          62

1   legitimate efforts of the debtors secured creditors.  I'm not

2   going to ask you to respond to that.  But let me ask you, do you

3   agree the timing of the filing was driven by the upcoming

4   foreclosure sale?

5          MR. NASH:  Most assuredly.

6          THE COURT:  Yes.  Okay.  Next factor.  The debtor has

7   little or no cash flow.

8          MR. NASH:  I won't agree on that.

9          THE COURT:  Okay.  And are you basically pointing to

10  the six months that Mr. Strickon was talking about?

11         MR. NASH:  Yes, we had cash flow.  Yes, we made

12  payments.  Yes, there's cash flow.  I think that can come

13  through the hotel.  I think if the thing is stabilized there's a

14  big group of financial investors here, judge.  One of the know,

15  Mr. Strickon points to Flintlock Construction, which filed the

16  lien, but they're know part of the investor group.  There's a

17  lot of people here.  And the fact they've been sued on their

18  guarantees.

19         THE COURT:  But I really want to focus on this as a

20  historical factor.

21         MR. NASH:  Right.

22         THE COURT:  Okay.

23         MR. NASH:  Yes, there was cash flow until -- there

24  were reserves and cash flow up until April of this year.

25         THE COURT:  Well, let me just sort of sharpen the

1   question a little bit.  Has the debtor ever had cash flow other

2   than monies that were up streamed from the hotel?

3        MR. NASH:  Or were up streamed from investors.  The

4   answer is, the debtor gets its money either from the hotel or of

5   its own investors, hotel investors, yes.

6        THE COURT:  Okay.  And the upstreaming, did it occur

7   solely during the six-month period that Mr. Strickon mentioned?

8        MR. NASH:  I would have to check that.  Mr. Pomerance,

9   the president, he indicated to me there was several months of

10  payments.  I would have to check that.  But I know we were

11  current with the mezzanine lender through April.

12       THE COURT:  Okay.  So, the only question is when it

13  stopped picking and started being cash.

14       Speaker A: Right.

15       THE COURT:  Okay.  The next point, the debtor cannot

16  meet current expenses.  Is that fair?

17       MR. NASH:  I don't know, and I don't mean to punt, but

18  I'm going to say this.  At the mezzanine level, and this is why

19  I do think valuation is important.  Whether or not there's post

20  obligations to pay post petition interest, in my mind, is a

21  function of secured or over secured nature of the debt.  And I

22  did cite three possible scenarios.  Under secured, partially

23  secured, over secured, equity cushion.  And a lot of that can

24  flow out of evaluation.  And I know valuation does take time,

25  but I think it lies at the core of this debate.  Is the

1  valuation now?  And I do agree with Mr. Strickon, that it's now.

2  But you can't discount tomorrow either in terms of where we are

3  in the market and where we came from.

4        THE COURT:  But let me just ask you a more focused

5  question.  The debtor is currently in arrears with its secured

6  lender.

7        MR. NASH:  Yes.

8        THE COURT:  And it has not made payments to its

9  secured lender since March.

10        MR. NASH:  April.

11        THE COURT:  Okay.  The last payment, I think, was in

12  March.

13        MR. NASH:  March, yes.

14        THE COURT:  All right.  Okay.  Final factor, number

15  eight, the debtor has no employees?

16        MR. NASH:  Again, we have no direct.  We have 75

17  indirect.  And I'm very cognizant of when that payroll is due.

18        THE COURT:  Okay.  All right.  Thank you.  So, I

19  probably interrupted your argument.  Were there other points you

20  wanted to make?

21        MR. NASH:  But I think the court's questions may help

22  frame where I'm coming from.  I'm coming from, and I think the.

23        record is not here to lift the stay either on the CT

24  under 362(d).  I do take heart in your honor's decision.  It's

25  got to be a diminution of value.  I do take heart in the Timbers

560 Seventh Avenue Owner Secondary - 8/3/23                65

1  framework of effective reorganization within a reasonable period

2  of time.  Reasonable reorganization within a reasonable period

3  of time.

4        THE COURT:  But I'm not getting to the Timbers issue

5  if I rule on the Pleasant Point.

6        MR. NASH:  Yes, I hear you.  When I saw your order

7  yesterday, I knew that that would be a focus and I do appreciate

8  the heads up, so to speak, on that, but I would really like to

9  brief that because there is, in my mind,  I called it in my

10  paper a symbiotic relationship.  I don't know, but I think it's

11  important that I have that opportunity.  And I don't want an

12  indefinite time for it, but I would certainly like to brief CT

13  in this context.

14        THE COURT:  How much time do you want?

15        MR. NASH:  I would ask the court until Tuesday to

16  brief that.  And the reason I'd ask you, I'm on trial on Monday,

17  and I would ask the court basically the weekend and to finish it

18  up on Tuesday.  I'm also working on other things related to the

19  hotel.  So, I would ask till Tuesday.

20        THE COURT:  Okay.  All right.  I think that's legit.

21        MR. STRICKON:  Your Honor, may I chime in?

22        THE COURT:  Yes, go ahead.

23        MR. STRICKON:  I'm due to leave the country Tuesday

24  night.  Could you shorten the time?  Make it Saturday or Sunday?

25  How much time does counsel need to brief one case?

560 Seventh Avenue Owner Secondary - 8/3/23                66

1          THE COURT:  So, this gets into a broader question.

2    Let me give you a couple of preliminary thoughts.  Here's what I

3    want to do.  Let's just talk about what we're going to do next.

4    I want to see if anybody else wants to be heard.  And I would

5    like to hear, at least briefly from Mr. Petrick.  I want to hear

6    his reaction, in particular, to the question that in my mind may

7    be the single most critical factual question.  And that is,

8    would lifting the stay, and letting your client, Mr. Strickon,

9    foreclose, have any adverse effects on the hotel either by

10   triggering defaults under contracts that are important or by

11   potentially bolloxing up financing that's needed, or in some

12   other way?  In my mind, if we're asking, do the Pleasant Point

13   factors warrant a lift-stay order, that's probably the single

14   most important issue.  So, before we sort of reach decisions

15   about briefing and other next steps kind of matters, I want to

16   hear from Mr. Petrick and anyone else who wants to be heard.

17          But let me briefly say a couple of preliminary things

18   that you can all think about.  Because what I'm going to suggest

19   is, we hear from anyone else who wants to be heard.  We then

20   take a break.  We can do a ten minute break or we could do an

21   hour break.  I'll defer to counsel on what they'd prefer and

22   then we come back and talk about next steps.  And when we do,

23   Mr. Strickon, the ball is sort of in your court for starters

24   because we have this 30-day deadline, right?  So, if you say to

25   me, you're prepared to extend that deadline, it makes it a whole

560 Seventh Avenue Owner Secondary - 8/3/23          67

1  lot easier to set a schedule.  If you don't agree, I realize you

2  have a client, if you don't agree, then I need to consider

3  whether I can make the finding that's required to kick out the

4  30 day deadline.  I need to think about that.  But what I can

5  say is, if you don't agree and if I don't feel I can make the

6  finding, then you all are going to need to act really fast,

7  because in that circumstance, Mr. Strickon, you and/or your

8  client are forcing me to have a trial next Friday, and there are

9  consequences to that.  The consequences would be in terms of the

10 briefing schedule, it would have to be really fast, and also

11 your prep for trial.  So, let me just plant that seed, and let

12 you think about it.  And meanwhile, let's see if anybody else is

13 going to weigh in.  And then I'll circle back to you before we

14 take our break.

15         MR. NASH:  I raised my hand, judge.  Is it possible we

16 could take a short break now?

17         THE COURT:  Okay.  Like as in a restroom break?

18         MR. NASH:  Yes.

19         THE COURT:  Okay.  That's fine.  And by the way, just

20 on briefing, Mr. Nash, I am going to give you until Tuesday.  I

21 think that's only fair and whatever other deadlines, we'll work

22 them around that.

23         MR. STRICKON:  I apologize, Your Honor, I got my

24 schedule all mixed up.  Yeah, I'm available all of next week.

25         THE COURT:  Oh, okay.  All right.  Thank you.

1          MR. STRICKON:  I'm looking at the calendar and I'm

2    getting confused on the dates.

3          THE COURT:  Okay.  All right, thank you for clarifying

4    that.  So, it's now 1:10.  We've been going for basically two

5    hours.  Do people want to take a five or ten minute break and

6    resume, or do you want to break for an hour?

7          MR. STRICKON:  My preference would be to take a ten

8    minute break, and see if anyone else wants to chime in.

9          THE COURT:  Oh, right.  Yeah, let's do that.  And then

10   we'll take our lunch break.

11         MR. STRICKON:  Right.

12         THE COURT:  All right, we're taking a ten minute

13   break.  I will see you -- it's now 1:10, I'll see you at 120.

14         MR. STRICKON:  Okay.  Bye.

15         (Off the record.)

16         THE COURT:  Okay.  Sorry to keep you waiting.  I was

17   actually giving some thought to the best way to stage this going

18   forward, but let's --

19         MR. STRICKON:  Your Honor, may I have two minutes to

20   respond to a couple of things that counsel for the debtor stated

21   on the record just so we're --

22         THE COURT:  Well, first, let's hear from anyone else.

23         MR. STRICKON:  Okay.

24         THE COURT:  Then you'll do rebuttal.

25         MR. STRICKON:  Thank you very much.

560 Seventh Avenue Owner Secondary - 8/3/23                69

1      THE COURT:  So, Mr. Petrick, are you there?

2      MR. PETRICK:  I am, Your Honor.  And thank you for the

3  opportunity to respond to some of the questions.  I do have a

4  number of points of information which I can provide to the

5  court, and hopefully, would be helpful to the court in reaching

6  a determination today.  I do want to say that my client is party

7  to an intercreditor agreement with the mezzanine lender, which

8  is fairly complicated, and I want to be sure that I don't

9  trip --

10      THE COURT:  They always are, aren't they?

11      MR. PETRICK:  Yeah.  This one is at the higher end of

12  complication, if that's possible.  So, I want to make sure I

13  don't trip against any footfalls and mindful of that.  But I do

14  think I can respond to some of your questions.  I think

15  paramount inquiry you had, Your Honor, was whether lifting the

16  stay would be harmful to the hotel.  And I can tell you that our

17  client did not oppose the foreclosure action in state court.

18  So, I think you can infer from that that we did not think it

19  would be harmful to the hotel.  We know, for example, that the

20  hotel has an ability, through terms of agreements, to maintain

21  the Margarita flag if there were a change in control.  So, that

22  is sort of big picture item.  We do not think that a change of

23  control would be harmful to the operations of the hotel.

24      THE COURT:  Just flush that out for me.  What

25  agreement binds the hotel to do that?

560 Seventh Avenue Owner Secondary - 8/3/23          70

1          MR. PETRICK:  I'm so sorry, Your Honor, I don't know

2    if I'm following your question.

3          THE COURT:  You said the hotel is required to maintain

4    the Margaritaville flag.

5          MR. PETRICK:  No, I think that we would have the

6    ability to negotiate with Margarita to maintain the flag if

7    there were a change in control of the hotel.

8          THE COURT:  Oh, okay.  You're saying you would not

9    necessarily lose the Margaritaville --

10         MR. PETRICK:  That's correct.  We have the ability to

11   maintain it.  That's an example of not being harmed by a

12   foreclosure.

13         THE COURT:  Although, frankly, the inverse of what you

14   said to me suggests -- are you saying there's a possibility that

15   the opposite is true?  That the agreement would tank?

16         MR. PETRICK:  No, I don't think that's the case, Your

17   Honor.  There's some procedural things that would have to

18   happen, but we are confident that that flag should be

19   maintained.

20         THE COURT:  Let me just push you on that a little bit.

21   So, hypothetically, we have a foreclosure sale.  We have no idea

22   who the buyer will be.

23         MR. PETRICK:  Right.

24         THE COURT:  How do we have any way of knowing whether

25   they'll be acceptable to Margaritaville?

560 Seventh Avenue Owner Secondary - 8/3/23                71

1          MR. PETRICK:  This is the instance where the change of

2    control becomes the mezzanine lender, not a change of control to

3    a new buyer.  That may be a different issue.  But in terms of

4    the mezzanine lender coming in and foreclosing on the equity,

5    that would not change the ability to the Margarita flagging of

6    the hotel.

7          THE COURT:  So, let me just make sure I understand.

8    You're saying if you look at the contract between the hotel and

9    Margaritaville, there would not be a default by virtue of the

10   change of ownership?

11         MR. PETRICK:  Correct.

12         THE COURT:  What if new ownership puts in new

13   management?

14         MR. PETRICK:  I should say that it's probably more

15   complicated than I am qualified to answer.  But the change of

16   control from the current equity owner to the mezzanine lender,

17   just a simple foreclosure of that action, would not affect the

18   Margaritaville flag.  And whether that would change if a new

19   management company were brought in or some other circumstances

20   when the new owner of the equity wanted to make a change or sell

21   the hotel, that's a second inquiry.  But the simple act of

22   foreclosure would not affect that --

23         THE COURT:  So, I understand that.  But I don't see

24   how we can ignore the second question.  Because isn't it

25   guaranteed that a new owner will not leave Mr. Gamal and the two

560 Seventh Avenue Owner Secondary - 8/3/23                72

1  Weiss brothers in place?

2          MR. PETRICK:  Yes.  Yes.

3          THE COURT:  So, it will bring in new management.

4          MR. PETRICK:  Correct.

5          THE COURT:  So, the question is, and I don't want to

6  put you on the spot if you don't have the answer, but the

7  question I'm curious about is, whether that change of management

8  would trigger any problems or potential problems under the

9  Margaritaville agreement.

10          MR. PETRICK:  Yeah, and we don't believe that it

11  would, Your Honor.  I mean, we support the foreclosure, we

12  support that effort, and we believe all that can be managed.

13          THE COURT:  And let me ask you another question, and I

14  don't mean to put you on the spot, and if you want to dodge this

15  question, you're welcome to, and I won't hold it against you,

16  but do you think the prospects of the hotel might actually be

17  better under new management?

18          MR. PETRICK:  Well, I should say this to Your Honor

19  that our client has serious concerns about the management of the

20  hotel.  You know, our main interest here, as the senior secure

21  lender, is protecting our collateral, the hotels collateral, and

22  the operations of the hotel.  Now, that value, supporting our

23  loan, ultimately comes from the cash flow of the hotel, and how

24  it's managed in terms of the restaurants, and lawsuits, and

25  unions.  And we have very serious concerns about current

560 Seventh Avenue Owner Secondary - 8/3/23          73

1   management and believe a change in management is in the best

2   interest of protecting our collateral.

3        THE COURT:  Okay, thank you.  Now I was interrupting

4   you.  Was there more you wanted to say?

5        MR. PETRICK:  Yes, Your Honor.  You had some questions

6   about whether or not there was cash flow to the mezzanine

7   lender.  And we do have some information that there was

8   insufficient cash flow coming from the hotel from the period of

9   October to March to service the debt.  There was cash flow

10  provided to the mezzanine lender from other sources, not from

11  hotel revenue, or excess cash flow, or net cash flow from a

12  hotel that was used to pay the mezzanine lender.  But the source

13  of that cash flow was not operating income or net cash flow from

14  the hotel.  So, I know it's a little bit of a hybrid, but that,

15  factually, is how it happened.

16       THE COURT:  Can you tell me in broad strokes what the

17  source was?

18       MR. PETRICK:  I am not entirely -- I don't know, Your

19  Honor, other than my client knows that it was not from a hotel.

20  I think Mr. Nash indicated it might have been from investors in

21  the hotel, but other than that, I don't know.

22       THE COURT:  Okay.  All right.

23       MR. PETRICK:  I guess the important point from our

24  perspective, Your Honor, is that there is imminently going to be

25  a filing of the hotel, and we have urged Mr. Nash, orally and

560 Seventh Avenue Owner Secondary - 8/3/23          74

1   through letters, to avoid that result.  And frankly, that result

2   is being triggered by this filing of the mezzanine lender.  But

3   from our point of view, everything that would have to be

4   achieved at the hotel level in terms of refinancing, the

5   synagogue, the union, all those events could happen outside of

6   chapter 11 at a much lower cost.  This is an asset that is

7   struggling, maybe recovering, but chapter 11 is not good for its

8   value.  And we have urged Mr. Nash not to file the hotel in our

9   view that the results of that chapter 11 can be achieved

10  outside.  So, that sort of supports our view that, but for this

11  proceeding, that wouldn't happen, and we're trying to avoid that

12  result.  Mr. Nash, obviously, and the members will do what

13  they're going to do, but that has been our consistent position

14  with him.

15          THE COURT:  So, I don't want to ask you to speculate,

16  and I am going to ask Mr. Nash when you're done, to give his

17  input on this, but why is the hotel about to file, despite the

18  position you're taking?

19          MR. PETRICK:  Well, I'll let Mr. Nash speak for

20  himself, but what he has said to us is, he thinks it's needed to

21  have a comprehensive restructuring in that it can't -- I don't

22  know if it's more difficult or if it's impossible to achieve,

23  but that's the rationale that's been articulated to us, and we

24  have had some substantial discussion about.

25          THE COURT:  Okay.  I appreciate that.  I don't want to

560 Seventh Avenue Owner Secondary - 8/3/23                    75

1  press you further.  I'll let Mr. Nash speak for himself on that.

2        MR. PETRICK:  Thank you, Your Honor, I think that's

3  all the information I have to share with the court.

4        THE COURT:  Okay.  All right, thank you.  Mr. Petrick.

5  I'm going to turn back to Mr. Nash, and then as the last

6  speaker, Mr. Strickon.  But before I do, is there anybody else

7  who wants to be heard?

8        MS. BERNSTEIN:  Yes, Your Honor.  Hi.  Deborah

9  Bernstein.  I've been representing the Garment Center in the

10  state court litigation, and I know this is not the most germane

11  issue to the motion before the court, but Your Honor did mention

12  about the debtor not seeming to get along with anyone and that

13  could not be more true with respect to my client.  I just wanted

14  to clear the record because there are some misstatements in the

15  papers and today with respect to what's been going on there.

16  The only reason that it's been dragging on is because the

17  developer, the debtor, has not been moving forward with its

18  obligations to the synagogue.  The synagogue certainly does want

19  to be back in that space.  At the request of developer, they

20  were entertaining some discussion of a payment, but they

21  primarily want to be back in that space.  And I know in the

22  papers it said something about the GCC matter will be resolved

23  once GCC makes up its mind as to how it wants to proceed.  And

24  that's entirely inaccurate.  It's the developer, the principles

25  of the debtor here, that have just been really stringing along

560 Seventh Avenue Owner Secondary - 8/3/23          76

1  the congregation and not moving forward at all with building out

2  the synagogue for them.

3         THE COURT:  Can you help me understand?  I actually

4  read a portion of your complaint.  Just the first few pages.

5  But just give me the context.  Your rights, your clients rights,

6  arise under what?  Is it a ground lease or something else?

7         MS. BERNSTEIN:  Yes, it's a lease.  Our client sold

8  the building to one of its members.  They cofounded the New

9  School, back in the in return got a 99 year lease for one

10  dollars a year payment.  And in that lease there are subsequent

11  amendments, and there's a right pursuant to amendments to the

12  lease for the congregation to have a new space built in the

13  building if there's any redevelopment of the property, which

14  there was by the debtor here, the debtor's other entity.

15         THE COURT:  So, the lease that you have, the dollar a

16  year lease, is that a ground lease?

17         MS. BERNSTEIN:  Yes, I guess it would be a ground

18  lease, as opposed to?

19         THE COURT:  As opposed to a lease on the building

20  constructed on top of the ground.

21         MS. BERNSTEIN:  There's a right in there for the

22  synagogue to be built in whatever the new building is.

23         THE COURT:  So, basically the synagogue had its own

24  building, a synagogue, on the space, which was demolished to

25  build a space for the New School.

560 Seventh Avenue Owner Secondary - 8/3/23          77

1      MS. BERNSTEIN:  Right.  The synagogue was on the

2 ground and/or basement of that building.  It was the School of

3 Visual Arts or one of those.  I'm maybe getting the name wrong,

4 but it was a part of the New School that then relocated.  So,

5 there were other things in the building. And the building was

6 eventually sold, I think it was of around 2016 or so to the

7 developer.

8      THE COURT:  So, the developer's purchase is subject to

9 this lease, whether it's a ground lease or something else.

10      MS. BERNSTEIN:  Right.

11      THE COURT:  And so, your rights continue as against

12 the current owner, the developer.

13      MS. BERNSTEIN:  Correct.  And the memo or lease is

14 actually recorded in Acris and those rights continue.  I don't

15 think there's any question about that.

16      THE COURT:  Have they asserted any defense?

17      MS. BERNSTEIN:  No real viable defense.  No.

18      THE COURT:  Well, I can't take your word for that.

19 Give me the 32nd version for what their defenses are.

20      MS. BERNSTEIN:  I'm not recalling what it says in

21 their answer, but there really is no --

22      MR. CZERNIAWSKI:  Your Honor, could I speak?  Could I

23 speak?  I am counsel for the defendants in this case, and I just

24 heard this going on.

25      THE COURT:  Mr. Markovitz, identify yourself, please.

560 Seventh Avenue Owner Secondary - 8/3/23                78

1          MR. CZERNIAWSKI:  I'm Joseph E. Czerniawski --

2          THE COURT:  Oh.

3          MR. CZERNIAWSKI:  -- from Condon & Forsyth.  I

4   represent 560 Seventh Avenue in the Garment Center Congregation,

5   and I'm very upset about what's going on here.  I was not told

6   they would be making an appearance and making any presentation.

7   We just had a conference in the U.S. Supreme Court, it was not

8   told to me that this would be happening.  They are fully aware

9   of the bankruptcy filings.  And I'd like to speak because what

10  I've heard is outrageous.

11         THE COURT:  Okay.  So, pause for a second, please.

12  I'm going to let Ms. Bernstein finish.  Maybe she's finished

13  already, and then I will let you respond.

14         MS. BERNSTEIN:  Thank you.  Yeah, I'm not sure -- I

15  can also respond to what was just said.

16         THE COURT:  No.  I want to limit the amount of back

17  and forth.  So, it sounds like you made the basic points you

18  want to make, Ms. Bernstein?

19         MS. BERNSTEIN:  And I was just as I was interrupted by

20  Mr. Czerniawski, I just was about to say that I think there

21  were, like, the kind of blanket defenses in the boilerplate,

22  defenses in the answer, but there is a counterclaim regarding

23  the purported holdover from the temporary space that was leased.

24  But that's kind of a separate issue.  But in terms of a

25  substantive defense, the developer has been talking about moving

560 Seventh Avenue Owner Secondary - 8/3/23          79

1  forward.  And we were recently told that he has the team

2  assembled, and he is moving forward with the build out.  And we

3  had a meeting in the middle of June where his architect was

4  there and was meeting at Mr. Czerniawski's office --

5           THE COURT:  Okay.  You know what, at this point, I'm

6  going to cut you off.  I recognize I did invite this, but I'm

7  trying to strike a balance between having a general sense of the

8  overall context, but not going too far beyond that.  So, thank

9  you, Ms. Bernstein.  Mr. Czerniawski, let me just assure you

10 before you proceed, I am certainly not making any findings of

11 fact.  I'm a litigator my entire career, so I understand the

12 difference between argument and evidence.  This is not evidence.

13 But that said, it's only fair since the congregation has shared

14 its perspective, so, I'm happy to hear your perspective in

15 response.

16          MR. CZERNIAWSKI:  Thank you, Your Honor.  First of

17 all, I'd like to point out that we had a conference only a week

18 ago in front of the New York Supreme Judge's law clerk in the

19 lawsuit.  The bankruptcy, this bankruptcy and the upcoming

20 bankruptcy were openly discussed.  No mention was made.  There

21 would be an appearance or anything like that in front of Your

22 Honor.  Obviously, I would have appeared.

23          THE COURT:  Well, you're here.

24          MR. CZERNIAWSKI:  And here I am.  Here I am.  Number

25 one, the congregation.  We have counterclaims against

560 Seventh Avenue Owner Secondary - 8/3/23          80

1   congregation; they're significant.  Because what happened is

2   during COVID there were temporary quarters.  They abandoned the

3   space, and then after abandoning the space, the lease expired.

4   After the lease expired, they refused to remove their

5   belongings, and then wouldn't allow us to get their belongings.

6   It took, I think, a period of eight to nine months because of

7   COVID restrictions, because of congregation's refusal for us to

8   get the belongings, get their permission to remove them from

9   temporary space.  And it cost us a judgment, which we suffered,

10  I believe, over a million dollars.  And that is part of the

11  counterclaim.  It's certainly significant.  As for the issues

12  with regard to building the synagogue or an alternative

13  settlement arrangement, the bottom line is --

14          THE COURT:  I don't want to hear about settlement.

15          MR. CZERNIAWSKI:  Okay.  I get it.  The bottom line is

16  resolutions were discussed, one of which is building out the

17  synagogue in the current space.  Plans were made to be moving

18  forward, but events overtook us.  Events, primarily being, the

19  filing of the mezz bankruptcy, which is currently in front of

20  you, and the knowledge, full knowledge, that there is a coming

21  bankruptcy of the primary entity.  I let counsel know that.

22  They're fully aware that really the hang up here is simply that

23  it's kind of hard to deal with the micro issues until the macro

24  issues are sorted out.  And we have full intention of being able

25  to work with counsel ultimately, whether it probably will be in

560 Seventh Avenue Owner Secondary - 8/3/23          81

1  this court on resolving it and sorting through the issues.  I'm

2  just upset because I would have been here --

3       THE COURT:  That's all right.  I don't need to hear

4  more about why you're upset.  I think I've now gotten your

5  perspective on the substance, correct?

6       MR. CZERNIAWSKI:  Yes, Your Honor.  But obviously if

7  we need to talk more about it, I'm happy to do.

8       THE COURT:  No.  Let me make a few things clear.  And

9  this is my fault for not making this clear earlier.  First off,

10 as you may or may not know, Mr. Czerniawski, today's hearing

11 began with a status conference, and we then turned to the lift-

12 stay motion.  This is really something that probably I should

13 have invited Ms. Bernstein to address at the status conference

14 because I do not view this as related -- this is not something

15 I'm going to consider in connection with the left stay motion,

16 the whole dynamic back and forth with GCC.  I do think it's

17 something that generally at status conferences, in cases like

18 this, I like to understand the big context.  I like all the

19 affected parties to be able to have their say and tell me their

20 story, and I treat it as context and as raising issues that I

21 may or may not at some point need to take evidence on.  But to

22 be crystal clear, nothing any of you say today on any subject is

23 evidence, and I will not treat it as such.  So, anyway, I hope

24 that context is a little bit helpful in allaying your concerns,

25 Mr. Czerniawski.  But I appreciate your giving me your

560 Seventh Avenue Owner Secondary - 8/3/23          82

1    perspective.

2         MR. CZERNIAWSKI:  Thank you, Your Honor.

3         THE COURT:  Okay.  Is there anybody else who wishes to

4    be heard before we turn back, first to Mr. Nash and then to Mr.

5    Strickon?

6         MS. APPLEBY:  Your Honor, I apologize, I had not filed

7    an appearance at the beginning.  This is Laura Appleby of Faegre

8    Drinker Biddle Reath.  We represent the junior mezzanine lender.

9    We're Global One Professional Investment Type -- it's a long

10   Private U.S. Real Estate Investment Trust No. 1-H and Global One

11   Professional Investment Type Private U.S. Real Estate Investment

12   Trust No. 2-H.  Similar to the senior lenders, we're also

13   subject to a very complicated intercreditor agreement.  So, we

14   were just monitoring the hearing today.  But I just wanted to

15   make sure that the record was correct.  I think Mr. Strickon had

16   misspoken when he had mentioned the amount due to the junior

17   mezz lender.  The amount due to the junior men's lender, we

18   assert, is 113,000,000.  A little over 113,000,000 as of July

19   28th of 2023.  So, I just wanted to make sure the record was

20   corrected right.

21        THE COURT:  Right.  And I think he might have said it

22   was 13 million.

23        MS. APPLEBY: 11 million.

24        THE COURT:  Okay.  Right.  That did catch my notice

25   that it was a smaller amount than I expected.  Okay.  Was there

1  anything else you wanted to add?

2          MS. APPLEBY:  No, Your Honor.

3          THE COURT:  Okay.  All right, thank you.  All right.

4  Mr. Nash?

5          MR. NASH:  Yes?  I think the question to me is, why

6  does my client and I see the necessity of a chapter 11 for the

7  hotel?  And there's two points to that.  We do believe that we

8  do need new financing to come in here.  We think a chapter 11

9  gives the clearest path to get new financing to deal with any

10  objections that could be raised to that, gives order and

11  structure to new financing, and gives comfort to prospective

12  lenders where they would stack on new financing given the

13  various different types of liens that are out there, judgments

14  and so forth.  So, we believe that the DIP financing is a key

15  component, and chapter 11 gives us the best opportunity to

16  obtain financing.

17          We also don't want to get into a situation where we're

18  subject to notices of termination on any critical contracts, and

19  the automatic stay would prevent that.  The third reason I think

20  is --

21          THE COURT:  I'm sorry, repeat the last point for me,

22  please.

23          MR. NASH:  My point is, a chapter 11 would preserve

24  the status quo on all important contracts without getting into a

25  notice of termination situation or a notice of default

1   situation, where we would have to go into state court and get

2   interim relief.  I think it's a status quo type of situation.

3   And the third --

4           THE COURT:  If I don't follow that.  What sorts of

5   defaults are you facing that chapter 11 would cure?

6           MR. NASH:  I think it gives us the opportunity to cure

7   any defaults under the existing food and beverage lease.  I

8   think it would give us the opportunity to cure any defaults

9   under the franchise agreement.  So, those are two very big

10  points that chapter 11 does.  It also gives us the opportunity

11  to change management companies in a more streamlined fashion.

12  And so, that's another bonus that I see to chapter 11.  And the

13  third bonus, I'm a big believer that chapter 11 is the best

14  place to negotiate with creditors, to get the best results with

15  creditors.  The apparatus is here, obviously, to do that.  And

16  when you have a myriad of outstanding liabilities and a myriad

17  of financial issues, not that chapter 11 is a safe harbor,

18  there's a lot of work involved, but chapter 11 gives you the

19  best opportunity to deal with a myriad of issues at the same

20  time.

21          Now, from a senior lender perspective, I understand,

22  we have had conversations about this, and I've explained to him

23  that when I say I need a global restructuring, more than the

24  senior debt is involved.  And despite their feelings and my

25  feelings, I think the cash collateral order and stipulation

560 Seventh Avenue Owner Secondary - 8/3/23                    85

1   we're negotiating, I think is a fair way of accommodating the

2   party's respective concerns.

3          THE COURT:  Okay.  Thank you.  Mr. Nash.  Mr.

4   Strickon, rebuttal?

5          MR. STRICKON:  Just a few brief closing points, Your

6   Honor.  Number one, we reiterate that we believe that change in

7   ownership of the primary hotel owning entity is not going to

8   impact operations.  In fact, we believe that it will improve

9   operations because it gives a new owner an opportunity to deal

10  on a more sound basis with the creditors.  We've also confirmed

11  with our clients that to the best of their knowledge, the

12  payments that were made during that six-month period did not

13  come from cash flow from the operation of the hotel, but from a

14  third party source as an equity infusion.  And I think that was

15  the same knowledge that One Williams Street, the mortgagee, has

16  as to the source of those funds.

17         It's strange to hear Mr. Nash argue that the best

18  route for the hotel is filing a chapter 11 petition because they

19  could use it to cure the franchise agreement with Margaritaville

20  and the food and beverage lease, but at the same time, he argued

21  earlier, that while there are arrears under these contracts,

22  nobody has ever sought to terminate them or to enforce any

23  alleged defaults.

24         Your Honor also indicated that the record might be

25  deficient in whether or not the claim and the security for our

560 Seventh Avenue Owner Secondary - 8/3/23                86

1   client's claim is adequately established in the record.  I will

2   point out that at no time in the state court litigation and at

3   no time in connection with the UCC disposition was there ever a

4   claim that the debt or the lien were not enforceable.  And in

5   fact, if we're required to put in documentation to support that

6   fact, which would be the loan agreement and the pledge

7   agreement, we would also be submitting an opinion of Mr. Nash's

8   counsel who represented the borrower in connection with the

9   financing.  It was an enforceability opinion that the debt and

10  the lien were fully valid and enforceable.

11          Other than that, I think that the record is pretty

12  clear that the operation of the hotel is seriously lacking and

13  the best course of action here would be to permit the UCC

14  disposition to proceed and to change management.

15          THE COURT:  Okay.  Thank you, Mr. Strickon.

16          MR. STRICKON:  I'd also like to mention that under

17  this complicated intercreditor agreement, which I can't say that

18  I'm fully familiar with all of the intricate terms and

19  conditions, the junior mezzanine lender would have to pay off or

20  refinance the mortgage on the property, unless it reached

21  another accommodation with the senior lender.  And because

22  that's its business, it would have no problem in raising the

23  necessary funds that would be necessary to satisfy the

24  mortgagee.

25          THE COURT:  I apologize, but can you say that point

560 Seventh Avenue Owner Secondary - 8/3/23          87

1  one more time?

2          MR. STRICKON:  Yeah.  There was an issue raised that a

3  change in ownership might trigger a default under the senior

4  mortgage on the property.  What I'm saying is, under the terms

5  of the intercreditor agreement, our client would be obligated,

6  if he wants to save its collateral, obviously, to either pay off

7  or refinance the senior mortgage.  And since that is its

8  business, financing, it certainly has the capability of doing so

9  a lot better than the debtor has in trying to get refinancing

10 with a third party.

11         THE COURT:  Okay.  Got it.

12         MR. STRICKON:  Thank you.

13         THE COURT:  Thank you.  All right, let me tell you

14 what I'm thinking about, next steps.  We need to have briefing.

15 I want to give Mr. Nash the opportunity to brief the Pleasant

16 Point issues.  I think we've come to rest on next Tuesday being

17 the date.  Although let's just put a pin in that.  I'm not going

18 to shorten that, but possibly return to that after we discuss

19 other matters.  So, I'm persuaded that we need to have an

20 evidentiary hearing, but I would like to stage the proceedings.

21 That is, Mr. Strickon, as I see it, you advance essentially

22 three different grounds for lifting the stay, in broad strokes.

23 One, Pleasant Point.  Two, adequate protection, including the

24 risks you perceive to the collateral from what you view as

25 mismanagement.  And three, 362(d)(2), the two part analysis that

560 Seventh Avenue Owner Secondary - 8/3/23                88

1   that entails.

2         My view is that your simplest and strongest case is

3   the first of the three I mentioned, the Pleasant Point, and I

4   think you agree with me on that.  So, I'm inclined to schedule

5   an evidentiary hearing on that topic alone.  That is, namely,

6   should I list the stay on the ground that it's warranted under

7   the Pleasant Point factors as incorporated by the -- well, by

8   the Pleasant Point factors, with one footnote.  And that is, Mr.

9   Nash is going to brief how the legal standard before me may be

10  some variation on a simple application of the Pleasant Point

11  factors.  And I'm not going to rule before I see his briefing on

12  that issue.  That is precisely what the legal standard is for

13  lifting the stay on the ground, essentially, that this is a

14  single asset debtor and a two party dispute, that the legal

15  standard may be Pleasant Point, it may be some variation on

16  that.  But that's the issue I want to schedule an evidentiary

17  hearing on, and I don't want the parties to put on evidence

18  that's needed only for what I've called points two and three.

19  That is, the adequate protection ground or the 362(d)(2) ground.

20  Those bases for lifting the stay, Mr. Strickon, you're

21  reserving.  If you win on Pleasant Point, we don't need to get

22  to them.  If you lose on Pleasant Point, then we'll schedule

23  them.  But I just think it's much more efficient to not do it

24  all at once because I think a trial on two and three would be a

25  much more burdensome and complex matter than a trial on number

560 Seventh Avenue Owner Secondary - 8/3/23                89

1   one.  So, let me just pause and ask each of you in turn if you

2   have questions or comments about that approach.

3          MR. NASH:  I don't, Your Honor.

4          THE COURT:  Okay.  You're okay with that approach?

5          MR. STRICKON:  Yeah, I'm fine, Your Honor.

6          THE COURT:  Okay.  You're both okay with that.  Okay.

7   All right.  So, let's talk timing.  And as I mentioned earlier,

8   as a threshold matter, the ball is in Mr. Strickon's court to

9   tell me, do you want to waive the 30-day limitation of 362(e) to

10  allow this trial to occur sometime later than next Friday, or is

11  it your position that I'm required to hold the trial no later

12  than next Friday?

13         MR. STRICKON:  I haven't confirmed with our client

14  yet, but my question is, can we hold it any earlier than Friday

15  of next week?  Because I think that there isn't any factual

16  matter that has to be developed between now and then.

17         THE COURT:  You're saying you don't need discovery?

18         MR. STRICKON:  We don't need discovery.

19         THE COURT:  Okay.  Mr. Nash, I don't want to urge you

20  to take discovery, but are you going to take the position you

21  need discovery or not?

22         MR. NASH:  Yes.  But not a lot.

23         MR. STRICKON:  Of course.

24         MR. NASH:  Not of course, but not a lot.  But I'm

25  going to brief the issues on Tuesday.  I would have hoped Mr.

560 Seventh Avenue Owner Secondary - 8/3/23                90

1   Strickon would have agreed that we could have the trial the

2   following week, so we could have adequate time to prepare.  I

3   recognize it's streamlined, but we do need to prepare, and so,

4   I'm hoping that we can get a date the following week.

5          THE COURT:  Tell me what discovery you think you need,

6   Mr. Nash.

7          MR. NASH:  I would like to take some discovery,

8   depending on where the criteria lays out, as to the secured

9   creditors' amount of its claim, and it's --.

10         THE COURT:  I'm sorry, I didn't hear you.  The secured

11  creditors?

12         MR. NASH:  The amount of its, and how it's computed,

13  and how it went about perfecting its claim, when it received

14  monies, the allocation of those monies, and why the payment

15  stopped, which go to the element of -- I would use the word

16  generically -- cash flow.

17         THE COURT:  I am struggling --

18         MR. STRICKON:  I am too.

19         THE COURT:  -- with that.  Let me share a little bit

20  more of my thinking about the issues that we're going to be

21  trying in stage one, Pleasant Point.  It seems to me, the by far

22  central issue, possibly the only issue, but certainly the

23  central issue, is what I would think of it in shorthand, as the

24  intertwining issue.  To put it differently, would foreclosure by

25  the mezz lender pose a significant risk of harm to the hotel's

560 Seventh Avenue Owner Secondary - 8/3/23          91

1  ability to reorganize or to keep going as a going concern?  To

2  me, that's far and away the biggest issue, and I don't know the

3  answer to that.  I need a trial to decide the answer.  With that

4  context, Mr. Nash, do you really need discovery?  And if so,

5  why?

6          MR. NASH:  Well, no, I recognize that burden would be

7  on me to establish that for you.  I was just going over in my

8  mind the factors, because I don't think there's full agreement

9  on it in terms of the payment history and the source of the

10 payment history to the mezzanine lender.  And I do believe,

11 depending on what further documents I look at, that establishing

12 a valid claim for a valid amount would be involved in this

13 hearing.  Either we stipulated to it or we stipulate to what's

14 in dispute.  So, those are the only two points where I would

15 need to seek anything from the lender.  And I recognize the

16 burdens on me on that particular issue, that I have to present

17 evidence in favor of those points.

18          THE COURT:  Let's just parse through those a little

19 bit.  The amounts of the payments that were made, that's in your

20 possession, your client's possession.  It's also in the lender's

21 possession.  But I assume your clients know the amounts they

22 paid.  And I assume your clients know the sources of those

23 payments.

24          MR. NASH:  Correct.

25          THE COURT:  Okay.  So, I'm still struggling to see --

1    MR. NASH:  Judge, I'm not trying to delay it, and I'm

2    not trying to make more work for myself.  I would like discovery

3    or no discovery.  I'd like to take the following week so I can

4    prepare, and I will have my briefing on Tuesday.

5    THE COURT:  Before I circle back to timing, let me

6    touch on one substance issue that might affect timing.  Mr.

7    Strickon, as I mentioned earlier, you are going to need to prove

8    the validity of your liens.  I'm not sure it's critical that you

9    prove the amount of your liens.  whether it's 65 or 85 or some

10   other number, I'm not sure that matters at all.  It's certainly

11   not certainly not centrally important.  But the validity of your

12   lens, that's critical.  Now, as a first step, maybe the right

13   first step is, maybe Mr. Nash, after he thinks about it, I don't

14   want to put you on the spot, Mr. Nash will tell you he doesn't

15   dispute the validity of the liens.

16   MR. STRICKON:  I would hope Mr. Nash does not dispute

17   the validity of the lien, because if necessary, we would have to

18   subpoena his firm to show to any hearing to testify and back up

19   their opinion letter that was delivered to --

20   THE COURT:  You can put in his opinion letter.  You

21   don't need testimony for that.

22   MR. STRICKON:  Okay.  Well, we have an opinion letter

23   from Goldberg Weprin that the pledge and the lien are valid and

24   enforceable.

25   THE COURT:  So, Mr. Nash, I don't want to put you on

560 Seventh Avenue Owner Secondary - 8/3/23          93

1   the spot, and if you need time to consider this, that's your

2   prerogative, but can you respond sitting here now?

3          MR. NASH:  I would like to think about it, but I know

4   what the opinion letter would say.  It wouldn't say that it's

5   valid, enforceable, it would say that it's authorized and that

6   the perfection of it is up to the lender, because that's what

7   every one of our opinions say.  I'd be very surprised if it said

8   otherwise.  But having said that, I will get back to Mr.

9   Strickon tomorrow morning as to that, and we'll have a

10  conversation about perfection.  That is the only issue.  They

11  signed a note, they signed a pledge agreement, and the question

12  is perfection.  That's it.

13         THE COURT:  That sounds right to me, that the only

14  issue is perfection.  So, okay.  I urge the two of you to

15  resolve it unless there's a genuine issue there.

16         MR. STRICKON:  What I can offer, Your Honor, is, let's

17  say by Monday morning to give a full accounting of the loan and

18  the calculations of the amount due.  It was attached as one of

19  the exhibits to our reply papers, the breakdown of the claim,

20  but I'm certainly amenable to providing him with a full,

21  detailed accounting, which he's entitled to.

22         THE COURT:  I think that's constructive.  I don't want

23  to get in between the two of you and the nitty gritty.  Let me

24  just urge the two of you to try to work out the amount and

25  the --

560 Seventh Avenue Owner Secondary - 8/3/23          94

1          MR. STRICKON:  The perfection.

2          THE COURT:  -- validity of payments, the history, as

3    well as perfection.

4          MR. STRICKON:  Okay.

5          THE COURT:  I have confidence the two of you will work

6    it out and reach an agreement, unless there's a genuine dispute.

7    Okay.  Timing.  Yeah, Mr. Strickon, I'm going to lean on you to

8    agree to kick this into the week of August 14th.  Is that

9    something you can do?  Do you need to take a break and talk to

10   your client?

11         MR. STRICKON:  Yeah, I'm sure I can convince the

12   client if we can push it off, to say, the 14th of August at the

13   latest.

14         THE COURT:  I'm going to propose the 15th.  Oh, hang

15   on.  Hang on.  I'm looking at my calendar.  Just give me a

16   second.

17         MR. STRICKON:  Surely.

18         THE COURT:  I think I'm having a trial on a Monday is

19   just a very bad idea, especially for the lawyers, as you'll

20   spend the whole weekend doing nothing but preparing.

21         MR. STRICKON:  No, I look at the weekend as available

22   to prepare.

23         THE COURT:  Okay.

24         MR. NASH:  So, do I.

25         THE COURT:  All right.  Okay.  It also does impose a

560 Seventh Avenue Owner Secondary - 8/3/23          95

1   burden on my chambers in terms of prep.  I have something that

2   may or may not be big on Tuesday, so it will be big unless it

3   settles.  So, I'd really rather not do Monday or Tuesday.  I'm

4   going to propose Wednesday the 16th.  No, I'm sorry.  Yeah,

5   Wednesday, the 16th.

6          MR. STRICKON:  Okay.  I'm going to have to consult

7   with our clients on that, Your Honor.

8          THE COURT:  Okay.  Okay.  And Mr. Nash, if we get a

9   thumbs up from Mr. Strickon, does that work for you?

10          MR. NASH:  Yes, I will make it work.

11          THE COURT:  Okay.  And this tentative date, subject to

12   hearing back from Mr. Strickon, 10 a.m. on Wednesday, August

13   16th.  Okay.  Then to circle back to briefing, Mr. Nash, you'll

14   file your brief next Tuesday?

15          MR. NASH:  Yes.

16          THE COURT:  Okay.  All right.  And just to make sure

17   I'm not leaving any procedural requirements dangling, I'm going

18   to make a finding right now that -- give me one second, please.

19   Let me pause.  I'm just going to go off camera for one minute.

20   I'll be back in just a minute.  (Brief pause.)

21          Okay.  All right, I'm back.  So, I want to address a

22   couple of aspects of next steps.  First, as I already mentioned,

23   I'm ruling that the final hearing on the lift-stay motion is

24   going to be held in stages.  The first stage we are tentatively

25   scheduling for Wednesday, August 16th at 10:00 a.m., subject to

560 Seventh Avenue Owner Secondary - 8/3/23                96

1   Mr. Strickon, confirming to me by noon tomorrow.  Can you do

2   that, Mr. Strickon?

3          MR. STRICKON:  Yes, I can.

4          THE COURT:  Okay.  So, by noon tomorrow, Mr. Strickon

5   will let me know whether or not his client consents to holding

6   stage one of the lift-stay final hearing more than 30 days after

7   the filing of his motion, namely on August 16th.  If Mr. Strickon

8   says yes, then we're all set for the August 16th date.  If Mr.

9   Strickon says no, then I want to hold a status conference

10  tomorrow afternoon.  Unless you all tell me this time does not

11  work, I'm going to propose 2 p.m. tomorrow.  Does that work?

12         MR. STRICKON:  Yes, Your Honor.

13         THE COURT:  Mr. Nash?

14         MR. NASH:  Can we make it at 3:00, judge?

15         THE COURT:  We can make it at 3:00, yeah.

16         MR. STRICKON:  Yes, that's fine.

17         THE COURT:  Okay.  So, if Mr. Strickon says no, his

18  client does not consent to the August 16th setting, I will rule

19  at three o'clock tomorrow on when I'm going to set that hearing

20  date.  As part of that ruling, I will indicate whether or not I

21  find that there is a reasonable likelihood that the debtor will

22  win at stage one of the lift-stay trial.  And I'm quoting the

23  language from 362(e)(1).  If I find there is such a reasonable

24  likelihood, then I will confirm the August 16th hearing date.  If

25  I find there is not, then in that event, the stage one hearing

560 Seventh Avenue Owner Secondary - 8/3/23          97

1  will be held a week from tomorrow, namely August 11th at 10:00

2  a.m.  And let me just pause and ask Mr. Nash and Mr. Strickon,

3  is that okay, the August 11th  date?

4          MR. STRICKON:  I am supposed to be flying to

5  Indianapolis on Friday.  Could we push that earlier in the week?

6          THE COURT:  I think earlier in the week is problematic

7  because we're talking about a genuine evidentiary hearing.

8          MR. STRICKON:  Yeah.

9          THE COURT:  And Mr. Nash's brief is only coming in on

10  Tuesday.

11          MR. STRICKON:  Or put it down for Monday the 14th.

12          THE COURT:  Well, I'm happy to do that.  It requires

13  your client's consent.

14          MR. STRICKON:  Yeah, as I say, I think the best thing

15  to do is to give me an opportunity of conferring with our

16  clients as to all of these scheduling issues, and then we can

17  finalize dates and times when we confer tomorrow.

18          THE COURT:  Okay.  All right.

19          MR. STRICKON:  Maybe a status conference tomorrow may

20  be the best alternative rather than speculating.

21          THE COURT:  Well, but I want to hear from you.  I want

22  you to send a letter to the court by noon tomorrow saying yes or

23  no on the August 16th date.

24          MR. STRICKON:  Okay.

25          THE COURT:  Because I want to then consider if the

560 Seventh Avenue Owner Secondary - 8/3/23                    98

1    answer is no.

2              MR. STRICKON:  Okay.  All right.  So, we'll put it

3    down for August 11th at 10:00 a.m.

4              THE COURT:  Okay.  All right.  So, let me amend what I

5    said a few minutes ago.  Mr. Strickon, by noon tomorrow, we'll

6    send that letter to the court.  If the answer is yes, then I'm -

7    - you know what, let's hold the three o'clock status conference

8    anyway, because I think, if Mr. Strickon says no, we'll need it

9    for me to rule on the (e) issue and to set a new trial date.

10   And whether Mr. Strickon says yes or no, I think it's probably

11   useful to have the status conference to address trial

12   procedures.

13             MR. STRICKON:  Yeah, that's what I was doing.

14             THE COURT:  Exhibits, whether we do declarations for

15   witnesses' direct testimony, which is something I'm often

16   amenable to in the first instance.  I view it as an issue where

17   you each should tell me if you want to do that or not.  So,

18   please give some thought to those issues, and we will discuss

19   them tomorrow at 3:00.

20             MR. STRICKON:  Okay.

21             THE COURT:  Okay.  The final thing I want to address -

22   - no, actually, I'll address the 362(e) issue as to all aspects

23   of your motion at tomorrow's three o'clock.  Okay.  All right.

24   I think that was all I wanted to cover.  Do either of you have

25   any questions or comments?

560 Seventh Avenue Owner Secondary - 8/3/23                99

1          MR. NASH:  No, Your Honor.  I'm sure I speak for

2    everybody, we appreciate your time, and we appreciate the time

3    you've devoted today.

4          THE COURT:  Okay.  Mr. Strickon, no questions?

5          MR. STRICKON:  No.  Thank you again, Your Honor, for

6    spending the necessary time on this.

7          THE COURT:  Okay.  All right.  Thanks everybody.  And

8    we'll send out a notice for tomorrow's three o'clock hearing.

9    It will be a Zoom hearing like this one was.

10          ALL COUNSEL:  Thank you, Your Honor.

11                              - o0o -

12                          CERTIFICATION

13   I, Rochelle V. Grant, approved transcriber, certify that the

14   foregoing is a correct transcript from the official electronic

15   sound recording of the proceedings in this matter, 23-11071-pb,

16   held on 8/3/23.

17   _Rochelle V. Grant_

18   August 5, 2023

19

20

21

22

23

24

25